1
2
3
4
5

S.  YOUNG LIM (SBN 126679)
ylim@parkandlim.com
JESSIE Y. KIM (SBN 289173)
jessie@parkandlim.com
PARK & LIM
3530 Wilshire Blvd., Suite 1300
Los Angeles, CA 90010
Tel: (213) 386-5595
Fax: (213) 384-7110

6

Attorneys for Defendant EIN Cap, Inc.

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| IT'S MY SEAT, INC, a California corporation; VAHE SHAHINIAN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>HARTFORD CAPITAL LLC, a Limited Liability Company; KEVIN WOODLEY, an individual; EIN CAP, INC., a New York Corporation; RUSSELL NAFTALI, an individual; GENE SLAVIN, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | **CASE NO.:**<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION TO UNITED STATES DISTRICT COURT BY DEFENDANT EIN CAP, INC.**<br><br>**Los Angeles Superior Court Case No.: 22STCV07999** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE CLERK OF THE ABOVE-ENTITELD COURT:**

**PLEASE TAKE NOTICE** that defendant EIN Cap, Inc. ("EIN") hereby removes the above-entitled civil action from the Superior Court of the State of California for the County of Los Angeles to the United States District Court for Central District of California, pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446.  As to the grounds for removal, Defendant EIN states as follows:

1. The State Court action was commenced by Plaintiffs' filing of a complaint on or about March 4, 2022 and is currently pending in the Superior Court of California, County of Los Angeles. Attached to this Notice as Exhibit "1" is a true and correct copy Plaintiffs' Complaint for the case entitled *It's My Seat, Inc., et al. v. Hartford Capital LLC, et.al.,* Los Angeles County Superior Court Case No. 22STCV07999.

2. None of the Defendants, including removing Defendant EIN, have been served with the summons and complaint.

3. The time within which the Defendant EIN is required by the law of the United States, 28 U.S.C. § 1446 (b) to file this Notice of Removal has not yet expired.

4. The aforesaid action is one that may be removed to this Court pursuant to 28 U.S.C. § 1332 under diversity of citizenship.

5. Complete diversity of citizenship exists in that:

   a. Plaintiff IT'S MY SEAT, INC. is a corporation incorporated under the laws of California and having its principal place of business in California;

   b. Plaintiff VAHE SHAHINIAN is a citizen of the State of California;

   c. Defendant Hartford Capital LLC is a limited liability company organized under the laws of New York and having its principal place of business in the State of New York;

   d. Defendant KEVIN WOODLEY is a citizen of the State of New York;

e. Defendant EIN CAP, INC. is a corporation organized under the laws of New York and having its principal place of business in the State of New York;

f. Defendant Russell Naftali is a citizen of the State of New York; and

g. Defendant Gene Slavin is a citizen of the State of New York.

6. The "amount in controversy" as defined by 28 U.S.C. §1332 (a) is in excess of $75,000, exclusive of interest and costs for the reasons that Plaintiffs demands payment of $2,000,000 from Defendants for the damages they have allegedly incurred. See Exhibit "1," page 28.

7. In addition, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. § 1441(a) in that it alleges violations of 18 U.S.C. section 1962. See Exhibit "1," pages 15-17 (first and second cause of action for Civil RICO and Conspiracy to commit RICO against all Defendants.)

8. Venue is proper in the United States District Court for the Central District of California because it embraces the place in which the removed action was pending. See 28 U.S C. §1441 (a).

9. Defendant EIN will promptly file a notice of filing of this Notice of Removal with the clerk of Superior Court of California and will serve the same on Plaintiffs.

WHEREFORE, Defendant EIN prays that this action be removed from the Superior Court of the of the State of California for the County of Los Angeles to the United States District Court for the Central District of California.

//

//

1  Dated: March 31, 2022                          PARK & LIM

2

3                                          By:    /s/ Jessie Y. Kim

4                                                 S.  YOUNG LIM
                                                  JESSIE Y. KIM
5                                                 Attorney for Defendant EIN Cap, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 03/04/2022 02:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:22-cv-02192   Document 1   Filed 04/01/22   Page 6 of 35   Page ID #:6

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Barbara Meiers

Sareen Bezdikian (SBN 229165)
Email: sareen@bezdikkassab.com
Raffi Kassabian (SBN 260358)
Email: raffi@bezdikkassab.com
**BEZDIK KASSAB LAW GROUP**
790 E. Colorado Blvd., 9th Floor
Pasadena, CA 91101
Telephone: +1 626 499 6998
Facsimile:  +1 626 499 6993

Kris Demirjian (SBN 252767)
Email: kris@kdemlaw.com
**DEMIRJIAN LAW FIRM**
15915 Ventura Blvd., Suite 301
Encino, CA 91436
Telephone: (818) 275-0099
Facsimile:  (310) 946-0039

Attorneys for Plaintiffs
IT'S MY SEAT, INC. and VAHE SHAHINIAN

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IT'S MY SEAT, INC., a California Corporation; VAHE SHAHINIAN, an Individual,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD CAPITAL LLC, a Limited Liability Company; KEVIN WOODLEY, an Individual; EIN CAP, INC., a New York Corporation; RUSSELL NAFTALI, an Individual; GENE SLAVIN, an Individual; and DOES 1 through 100, Inclusive.<br><br>Defendants. | Case No.:  22STCV07999<br><br>**COMPLAINT FOR:**<br><br>**(1)  CIVIL-RICO;**<br>**(2)  CONIPRACTY TO COMMITT RICO;**<br>**(3)  PROMISSORY ESTOPPEL;**<br>**(4)  FRAUD;**<br>**(5)  INTENTIONAL MISREPRESENTATION;**<br>**(6)  NEGLIGENT MISREPRESENTATION; AND**<br>**(7)  UNFAIR COMPETITION VIOLATION OF BUSINESS & PROFESSIONS CODE 17200**<br><br>**DEMAND FOR JURY TRIAL** |

-1-

1

2  Plaintiffs IT'S MY SEAT, INC. and VAHE SHAHINIAN, (collectively, "Plaintiffs") who

3  complain and allege as follows:

4  **PARTIES**

5  1.   Plaintiff VAHE SHAHINIAN ("SHAHINIAN"), as owner of IT'S MY SEAT, INC., is, and

6  at all times relevant hereto was, an individual and resident of the County of Los Angeles,

7  California.

8

9  2.   Plaintiff IT'S MY SEAT, INC. ("IT'S MY SEAT"), is a California corporation, that does

10  business as a ticketing vendor for various organizers and events; is also a concert promoter for its

11  internal concert productions, with its principal place of business in the County of Los Angeles,

12  California.

13  3.   Plaintiffs are informed, believe, and thereupon allege that Defendant HARTFORD

14  CAPITAL LLC ("HARTFORD") is, and at all relevant times was, a Limited Liability Company

15  conducting business within this judicial district.

16

17  4.   Plaintiffs are informed, believe, and thereupon allege that Defendant KEVIN WOODLEY

18  ("WOODLEY") is, and at all relevant times was, an individual, conducting business within this

19  judicial district.

20  5.   Plaintiffs are informed, believe, and thereupon allege that Defendant EIN CAP, INC.

21  ("EIN") is, and at all relevant times was, a New York Corporation conducting business within this

22  judicial district.

23  6.   Plaintiffs are informed, believe, and thereupon allege that Defendant RUSSELL NAFTALI

24  ("NAFTALI") is, and at all relevant times was, an individual, conducting business within this

25  judicial district.

26

27

28

7.     Plaintiffs are informed, believe, and thereupon allege that Defendant GENE SLAVIN ("SLAVIN") is, and at all relevant times was, an individual, conducting business within this judicial district.

8.     Plaintiffs are informed, believe and thereupon allege that the true names and capacities of defendants named herein as DOES 1 through 100 are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave of Court to amend this Complaint to insert the true names and capacities of such fictitiously-named defendants when they have been ascertained.  Plaintiffs are informed and believe, and on that basis allege that such defendants are liable for the injuries to Plaintiffs hereinafter alleged.

9.     Plaintiffs are informed and believe and upon that basis allege that the defendants named as DOES 1 through 100 are individuals and/or unknown entities that reside and/or conduct business within this judicial district.

10.    Plaintiffs are informed and believe and upon that basis allege that the defendants named as DOES 1 through 100 are responsible in some manner for the occurrences hereinafter alleged, and that Plaintiffs' damages were proximately caused by these defendants.

11.    At all relevant times to this action, the Defendants, and each of them, acted in concert with, and/or was the agent, partner, affiliate, joint venturer, co-conspirator, aider and abettor, servant, associate, representative, predecessor-in-interest and/or successor-in-interest of the other, and in engaging in the acts, omissions and occurrences hereinafter alleged, the defendants, and each of them, were acting in concert with and within the course and scope of their authority as agent, partner, affiliate, joint venturer, co-conspirator, aider and abettor, servant, associate, representative, predecessor-in-interest and/or successor-in-interest of the other.

## JURISDICTION AND VENUE

12.    This is an action for damages against Defendants HARTFORD, WOODLEY, EIN,

- 3 -

NAFTALI and SLAVIN (collectively, "Defendants") for Racketeer Influenced and Corrupt Organizations Act ("RICO") authorized by 18 U.S.C. Sections 1964(a) and (c) ("Civil RICO"), Conspiracy to Commit RICO.  Promissory Estoppel; Fraud; Intentional Misrepresentation; Negligent Misrepresentation; and Violation of California Unfair Competition Law (*Business & Professions Code* § 17200).

13.    This Court has subject-matter jurisdiction over the causes of action alleged in this Complaint because this Court is a court of general subject-matter jurisdiction and is not otherwise excluded from exercising subject-matter jurisdiction over said causes of action.

14.    This Court has personal jurisdiction over each and every one of the Defendants because each has had sufficient contacts with California and purposefully availed themselves to California's resources including California clients, such as Plaintiffs SHAHINIAN and IT'S MY SEAT, so as not to offend traditional notions of fair play and substantial justice.  A substantial portion of the acts, omissions, events, and transactions constituting the causes of action alleged herein occurred within the State of California.  CAL. CODE CIV. PROC. § 410.10.

15.    This Court is the appropriate venue for this action under California *Code of Civil Procedure* sections 395 and 395.5, because the acts that give rise to the causes of action alleged herein occurred in the County of Los Angeles, State of California.  Plaintiffs hereby designate the County of Los Angeles, State of California, as the place of proper venue.

16.    Plaintiffs are informed and believe, and thereupon allege, that at all relevant times mentioned herein, Defendants, WOODLEY, NAFTALI, SLAVIN and Does 1 through 100 (also referred to as the "Non-Corporate Defendants") were the owners of all or a controlling proportion of the shares of stock of defendants HARTFORD and EIN and that there existed between Non-Corporate Defendants, including Defendants, WALTERS, WOODLEY, NAFTALI and SLAVIN a unity of interest and ownership, such that any individuality and separateness between,

- 4 -

WALTERS, WOODLEY, NAFTALI, SLAVIN, HARTFORD and EIN never existed or has ceased to exist, and that the Non-Corporate Defendants, including Defendant, WALTERS, WOODLEY, NAFTALI and SLAVIN, are the alter ego of Defendants HARTFORD and EIN in that:

    a.    Defendants HARTFORD and EIN were conceived, intended, and used by the Non-Corporate Defendants, including, WALTERS, WOODLEY, NAFTALI and SLAVIN as a device for the purpose of substituting a financially insolvent corporation in the place of the Non-Corporate Defendants, including Defendants STEIN, WOODLEY, NAFTALI and SLAVIN, to avoid individual liability for the breach of contract and other acts alleged herein;

    b.    The Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN, used the assets of HARTFORD and EIN for their own purposes as though it were their own, and caused assets of HARTFORD and EIN to be transferred to them, or to entitles they controlled, or to their family members, without adequate consideration and to avoid clients with loans, including Plaintiffs;

    c.    The Non-Corporate Defendants, including Defendant, WOODLEY, NAFTALI and SLAVIN, dominated and controlled the finances of HARTFORD and EIN, treated the corporate accounts as their personal bank accounts, and commingled corporate and personal funds for their personal use and to avoid clients with loans, including Plaintiffs;

    d.    The Non-Corporate Defendants, including Defendant, WOODLEY, NAFTALI and SLAVIN, completely disregarded the corporate formalities and separateness of Defendants HARTFORD and EIN in that the operations of HARTFORD and EIN were carried out without the holding of shareholders' or directors' meetings,

- 5 -

records or minutes of any corporate proceedings were not maintained, and

transactions between and among the Defendants, including Defendant,

WOODLEY, NAFTALI, SLAVIN, HARTFORD and EIN were neither approved

by directors nor shareholders, nor properly documented.

20.     Plaintiffs are informed and believe, and thereupon allege that Defendants, WOODLEY,

NAFTALI, SLAVIN, HARTFORD and EIN are one and the same in that defendants commingled

funds.

21.     Plaintiffs are informed and believe, and thereupon allege that adherence to the fiction of

the separate existence of HARTFORD and EIN as an entity distinct from the Non-Corporate

Defendants, including, WOODLEY, NAFTALI and SLAVIN, would permit an abuse of the

corporate privilege and would sanction fraud and promote injustice in that, among other things,

the Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN, set up the

business of HARTFORD and EIN to make an unfair profit from collecting daily payments on

loans at high interest rates and failing to pay funds under a line of credit to clients with loans,

including Plaintiffs.

## GENERAL ALLEGATIONS

22.     At all relevant times, IT'S MY SEAT does business as a ticket sales agency and also a

concert promoter for internal concert productions (which helps grow the ticketing usage and

reach).  As part of its business, IT'S MY SEAT provides A to Z box office services for all kinds

of event organizers (local school performing arts centers, non-profit fundraising events, sports

events, theaters, concerts, and any other events that need ticket sales).  Additionally, IT'S MY

SEAT produces high caliber concerts and concert tours that exclusively make use of the ticketing

services in order to help expand the reach of such services to a wider audience.  The goal of

producing such concerts is to generate profits, help financially grow the company and invest it all

- 6 -

back into IT'S MY SEAT.  As a consequence of IT'S MY SEAT's promotions and marketing, the company must pay for the services upfront.  SHAHINIAN is the owner and president of IT'S MY SEAT and manages the day to day operations of the company.

23.    At the time WALTERS and Boris Shteyngart aka Boris Stein ("STEIN") approached SHAHINIAN in January of 2019, SHAHINIAN and IT'S MY SEAT were finishing up three (3) big loans from 2018 (from other lenders), and were in a prime condition to be eligible for regular low rate loans.  When STEIN suggested a $750,000.00 regular term loan at 8.89% annual rate, SHAHINIAN thought he could make use of this great rate term loan to plan seven (7) more shows for 2019.  Plaintiffs already had six (6) shows planned in March 2019 so with such a new term loan, Plaintiffs saw the opportunity to grow the business by adding more dates in June and September.  Plaintiffs were excited to use the extra money to grow IT'S MY SEAT.  Plaintiffs planned to use most of the loan funds towards planning extra shows and the remainder would go into completing the programming upgrade project for IT'S MY SEAT.  The programming upgrade project was a new version of the company website (close to being launched) but needed more funding.  Launching the new website would have greatly improved the look and feel of the site and helped IT'S MY SEAT grow, but this never happened due to the term loan never coming through from Defendants.

24.    In August of 2018, WOODLEY, an EIN internal lender/broker, contacted Plaintiffs in an attempt to sell a $250,000.00 EIN loan (Merchant Cash Advance loan).  Plaintiffs refused because the rate being offered was too high.

25.    On January 7, 2019, Plaintiffs received a phone call followed by an email communication from WALTERS who identified himself as the managing partner of HARTFORD.  WALTERS sent Plaintiffs a Hartford Capital Application and requested bank statements and tax returns.

Plaintiffs explained to WALTERS that they need a low-term stable loan to help run, grow and expand the ticketing and concert promoting business.

26.     On January 8, 2019, STEIN contacted Plaintiffs, identified himself as another managing partner of HARTFORD and promised Plaintiffs a $750,000.00 line of credit ("Term Loan") but only if Plaintiffs took a "bridge loan" of $250,000.00 (to be funded by EIN) for 30 days ("Bridge Loan").  The Bridge Loan would be in the form of a Merchant Cash Advance, through EIN at a high interest rate of 15% monthly and with a daily payment of $3,600.00 (the 15% monthly rate would always be calculated from the main principle amount of $250,000.00, regardless of how much of the principle was paid down by the daily payments.  This would be an equivalent of 180% annual interest rate).  STEIN agreed that Defendants would transition this Bridge Loan to a Term Loan after the first 30 days at an annual rate of 8.89%.  Terms of this agreement also required Plaintiffs make uninterrupted daily payments on the Bridge Loan and not take any other loans for 30 days (the "Agreement").  STEIN stated that HARTFORD's money was invested in EIN, that it would be HARTFORD's money used to fund the Bridge Loan; they had to do this to show the bigger term-loan parent company that they risked their money with Plaintiffs for a good reason; and the result will be for the Bridge Loan to roll over to the Term Loan. Once it transitioned to the Term Loan, interest would go down to 8.89% annual rate and Plaintiffs would not have to pay the EIN bridge loan to term with the high interest.  The transition would be the $250,000.00 loan minus the 30day payments, promising Plaintiffs that they would never pay any of the interest on the Bridge Loan.

27.     Immediately thereafter, STEIN sent Plaintiffs the Bridge Loan documents.  Plaintiffs signed, notarized and sent the documents to EIN, care of NAFTALI as requested by STEIN.

28.     On January 9, 2019, Plaintiffs asked STEIN what would happen if Plaintiffs kept their two conditions and after the 30th day the Bridge Loan does not roll over into the Term Loan.  STEIN

- 8 -

reassured Plaintiffs that they should believe in the "sincerity in his voice" and there was nothing to worry about as long as Plaintiffs met the two conditions of making uninterrupted daily payments on the Bridge Loan and not take any other loans all for a period of 30 days.  When Plaintiffs asked STEIN why EIN would give up $130,000.00 in profits for Plaintiffs to roll over into a Term Loan, STEIN replied because he would make the real money with Plaintiffs on the Term Loan commissions over the long term, since this was the best long term decision Plaintiffs would make; and it would be a long term solution where the Term Loan (Line of Credit) would be available for use at any time.  STEIN assured Plaintiffs that he and Defendants would handle the back-end transition of the roll over.  STEIN further stated that EIN will be fine with the transition because it was HARTFORD's money being used and that he handles the back-end transition through the senior EIN individuals and the parent term loan company.

29.     Prior to transferring the Bridge Loan funds to Plaintiffs, EIN contacted Plaintiffs for a recorded teleconference call known as the "Funding Call".  STEIN called Plaintiffs prior to this teleconference alerting Plaintiffs that a call would come from EIN and asked Plaintiffs not to mention the Agreement (transition of Bridge Loan to Term Loan) because the person calling is simply a paper shuffler at EIN and had no idea about the back-end plans of EIN and HARTFORD and the roll over plans; that to minimize any delay, Plaintiffs should focus on letting the EIN funding go through smoothly.  In reliance to STEIN's statements, Plaintiffs did not mention the Agreement during the EIN Funding Call.

30.     On January 10, 2019, Plaintiffs received the Bridge Loan but in the amount of $228,000.00.  Although the initial Bridge Loan documents showed the amount of $250,000.00, $22,000.00 was taken out for funding fees.  STEIN promised Plaintiffs he would return that $22,000.00 as credit when the roll over happened.

31.     Defendants encouraged Plaintiffs to use the money to grow Plaintiffs' business. Defendants assured them that Plaintiffs made the best business decision and encouraged Plaintiffs to invest in future projects in confidence since the main Term Loan would be coming in 30days. Plaintiffs finalized six (6) June concerts and one (1) September concert in addition to the already planned six (6) shows in March, calculating how much daily payments could be made in preparation for these shows with enough to last until the 30days were complete (on February 10, 2019).

32.     Plaintiffs strictly adhered to the Agreement terms and made daily payments to EIN for the first 30 days.

33.     On or about mid-January 2019, WOODLEY contacted Plaintiffs again referencing the Bridge Loan.  Plaintiffs mentioned WOODLEY to STEIN who then told Plaintiffs he would make one call to a senior EIN employee and WOODLEY would never bother Plaintiffs again. Soon after, WOODLEY stopped contacting Plaintiffs, making Plaintiffs believe that STEIN had all the connections and control at EIN, that STEIN was a big player and would hold true to the Agreement.

34.     On February 8, 2019, Plaintiffs contacted STEIN to follow up on anything that needed to be done prior to the 30th day that was soon approaching.  STEIN requested current bank statements, which Plaintiffs provided reflecting Plaintiffs daily payments and no other loans being taken out.  Plaintiffs abided by the terms of the Agreement.

35.     The 30th day came around but there was no word from STEIN or any of the other Defendants.  On February 12, 2019, Plaintiffs reached out to STEIN requesting the status of the Agreement (transition of the Bridge Loan to a Term Loan).  STEIN replied that it was being worked on.  For days and weeks, Defendants gave Plaintiffs string-along statements to reassure Plaintiffs that the Term Loan would come through.  Such statements included STEIN responding

- 10 -

to SHAHINIAN on February 13, 2019 "[a]ll submitted I expect an update soon as I didn't receive one yesterday evening." Other string-along statements included but are not limited to the following:

On February 22, 2019:

STEIN:  "Got delayed did not forget will call ASAP."

SHAHINIAN:  "Ok.  Bryan can we finalize this today?  I have major milestones coming up early next week.  Let me know when it will be done please."  "Hi Bryan, day is about to end in NYC. You think we'll have an update before closing office hours?"

STEIN:  "Only update I got was 'wait for the link' which is positive."

SHAHINIAN:  "Ok, great.  I'll keep an eye out for it.  Have a good weekend Bryan.  Hope we can finalize this on Monday.  If there [is] an issue, I need to know ASAP please."

STEIN:  "No issue."

On March 4, 2019, Plaintiffs asked for status of the Term Loan transition and link to a login which was suppose to be provided to Plaintiffs.

STEIN:  "As I expressed to you, we use a different platform for the consolidation.  They are delayed.  The file is not declined.  This being said, I will be in touch with an update as soon as I have one."

On March 5, 2019:

STEIN:  "I understand the urgency based on the numerous emails and calls.  This is submitted and we are waiting for sign off approval.  The platform is not yet assigned thus there is no login. We use different platforms depending on the investors in these files.  I am doing everything I can to get this pushed through."

36.     Plaintiffs consistently inquired on status of the Agreement but Defendants kept providing excuses to stall and continued to assure Plaintiffs that the Agreement would be completed very

- 11 -

soon.  In the meantime, Plaintiffs continued to make the daily EIN payments of $3,600.00 in the hopes that the transition would occur soon and smoothly.  Plaintiffs patiently waited for over seventy (70) days but the Bridge Loan was never transitioned into a Term Loan.  In other words, Plaintiffs never received the line of credit under a Term Loan from any of the Defendants and were forced to pay over one (1) month of extra payments to EIN at high interest that Plaintiffs had not accounted for because the Agreement was for a 30day period.

37.     Plaintiffs were induced into the Agreement where Defendants had no intention of following through on their end of the terms.  Defendants conspired to force Plaintiffs into a corner at every opportunity.  Both HARTFORD and its representatives along with EIN and its representatives pushed a non-existent product to unknowing businesses and individuals.  On or about March 2019, WOODLEY, a representative of EIN & Fast Capital Partners, offered Plaintiffs another promise of a term loan.  WOODLEY explained that Plaintiffs could obtain a Wells Fargo loan of $1 million at low interest, but that it would take a long time to get this loan and Plaintiffs would have to take another Merchant Cash Advance.  WOODLEY sent Plaintiff application form with Wells Fargo logo on it, giving the impression that a legtimate loan process was taking place. WOODLEY connected Plaintiffs to a supposed Wells Fargo loan agent to discuss terms but when Plaintiffs asked the agent for his Wells Fargo email, he responded he could not share his email address because of his level of work at Wells Fargo.

38.     Plaintiffs were in serious financial jeopardy as a result of relying on Defendants' words and actions.  Defendants made numerous misrepresentations.  Despite time being of the essence and Plaintiffs waiting over two times the agreed upon period, Plaintiffs had no other option but to obtain two (2) emergency loans from third-parties.  When Defendants learned of the new loans, they automatically claimed that Plaintiffs were in direct violation of the Agreement and using the third-party loans as an excuse, refused to provide the line of credit (no transition of the Bridge

Loan to a Term Loan).   Plaintiffs were ping-ponged between Defendants' conspiracy.  EIN stated through its representatives that because Plaintiffs did not tell them during the Funding Call that Plaintiffs were taking the advance for any other reason, Plaintiffs are to blame.  HARTFORD, through its representatives, called Plaintiffs before the Funding Call stating that in order for the Agreement to be completed by Defendants and a smooth transition from Bridge Loan to Term Loan to occur, Plaintiffs must not mention the Term Loan during the call, and the funding call agent from EIN was a low-level secretary type, who is not aware of the high level workings of Hartford/EIN.  The trap was set.  In actuality, Defendants EIN, HARTFORD and all of their respective representatives and owners were acting in cahoots.  After Defendants strung Plaintiffs along for 70 days with statements of the transition happening as discussed, and Plaintiffs patiently abiding by the Agreement terms (daily payments and no third-party loans for 30days), Plaintiffs were in a bind.  Defendants targeted and defrauded Plaintiffs who were financially vulnerable from the beginning (small business); purposely delayed giving Plaintiffs the line of credit until Plaintiffs were in a financial corner and were forced to seek third-party funding.  Once Plaintiffs obtained third-party funding, Defendants used such conduct as an excuse to not transition the Bridge Loan to a Term Loan and somehow this made Defendants all free and clear of ANY responsibility.  In the meantime, Defendants collected daily payments at high interest rates from Plaintiffs for 70days.  Defendants further pretended to offer a 'life line' to Plaintiffs by advising that they obtain *another* Merchant Credit Advance (loan) from EIN.

39.     NAFTALI, SLAVIN and WOODLEY called and emailed Plaintiffs on numerous occasions in the guise of being a 'friend' to Plaintiffs.  By Spring of 2019 when it became clear to Plaintiffs that they were duped by all Defendants, NAFTALI, SLAVIN and WOODLEY on behalf of EIN insisted they did nothing wrong and denied any involvement in the conspiracy.

Their general statement was that EIN would no longer work with Defendants anymore but refused to discuss anything that STEIN and Defendants did in detail.

40      Further, EIN used corporate logos on their website to obtain authenticity and look like a legitimate business. Based upon inquiries, Plaintiffs have now discovered that EIN was not authorized to use any of the logos, including but not limited to claiming to be a 5000, Inc. company, ETA member, Business Consumer Alliance, and Better Business Bureau.









- 14 -

40.     As a result of the funding (under the Term Loan) not coming through on February 10, 2019, Plaintiffs had to face financial issues on a daily basis since then, finding other financial sources to keep the business afloat, taking unnecessary attention away from the concert promoting projects and even having to cancel several of those projects.  Plaintiffs took massive financial losses.  Plaintiffs have also suffered general and special damages in an amount to be proven at trial.

41.     After all the damage caused by Defendants' misconduct as stated above, red flags appeared so that Plaintiffs made attempts to better understand Defendants' true identities. Through assistance by an attorney and a retired law enforcement officer, Plaintiffs discovered that Defendants were part of the Colombo Family of Organized Crime.  STEIN aka SHTEYNGART was arrested for stock market fraud for defrauding over $200,000.00 from naïve elderly clients and was charged with grand larceny, criminal impersonation, forgery and scheme to defraud. LESZCAK, the registered agent for HARTFORD, was arrested and convicted in the early 2000s by the Federal Bureau of Investigation as part of the New York City Colombo Family Organized Criminal Operation.

### FIRST CAUSE OF ACTION

### (Civil RICO against all Defendants)

42.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 41 of this Complaint.

43.     At various times and places, all Defendants did associate with a RICO enterprise of individuals who were associated in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

44.     Likewise, all RICO DEFENDANTS did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering

activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

45.     During the four (4) calendar years prior to this Complaint, all RICO DEFENDANTS did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that is itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c).

46.     PLAINTIFF further alleges that all the RICO DEFENDANTS did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to damage the PLAINTIFF and their conduct continues to threaten PLAINTIFF, the title and lending industry i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c).

47.     As a direct and proximate result of the RICO DEFENDANTS' racketeering activities and violations of 18 U.S.C. section 1962(a), PLAINTIFF has been damaged in an amount to be proven at trial.

48.     As a direct and proximate result of the RICO DEFENDANTS' racketeering activities and violations of *18 U.S.C.* sections 1961 and 1962, PLAINTIFF has been damaged in an amount to be proven at trial, not less than $2,000,000

## SECOND CAUSE OF ACTION

**(Conspiracy to Engage in a Pattern of Racketeering Activity against all Defendants)**

49.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 48 of this Complaint.

50.     At various times and places partially enumerated in Plaintiff's documentary material, Defendants conspired to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

51.     At various times and places, Defendants did also conspire to conduct and participate in

said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).

52.     During the four (4) calendar years preceding the filing of this Complaint, the defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1) (A) and (B), in violation of 18 U.S.C. 1962(d).

53.     Plaintiff further alleges that all defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d).

54.     As a proximate result of the Defendants racketeering activities and violations of 18 U.S.C. sections 1961 and 1962, Plaintiff has been injured in its business and financially damaged in an amount of not less than $2,000,000.00

### THIRD CAUSE OF ACTION

**(Promissory Estoppel Against All Defendants)**

56.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 55 of this Complaint.

57.     As alleged above, Defendants, through STEIN and individuals, promised to provide a Line of Credit of $750,000.00 (the Term Loan) if Plaintiffs took a Bridge Loan of $250,000.00 (to be funded by EIN) for 30 days.  The Bridge Loan would be in the form of a Merchant Cash Advance, through EIN at a high monthly interest rate of 15%.  Defendants would transition this Bridge Loan to a Term Loan after the first 30 days at an annual rate of 8.89%.  Plaintiffs relied upon the statements made by Defendants, made their daily payments for over 70 days pursuant to their belief and understanding of the original Agreement terms, and forwent alternative loans and scheduled future concert promotions, in reliance upon the promises made by Defendants.

58.     Defendants breached the terms of its promise by failing to transition the Bridge Loan to a Term Loan.

59.     Plaintiffs actually relied upon the promises of Defendants by foregoing alternative financing for the concert promoting business.  Plaintiffs scheduled upcoming shows and worked on marketing such concerts.

60.     Plaintiffs' reliance upon Defendants' promises were reasonable and foreseeable, as Defendants were lenders in the industry and provided the underlying paperwork for the Bridge Loan, which appeared legitimate.  Defendants had also transferred some monies to Plaintiffs under the Bridge Loan.  Daily payments at a high $3,600.00 were being paid by Plaintiffs to Defendants.

61.     Plaintiffs have been injured to their detriment, by relying on the promises made by Defendants.  Plaintiffs now face the loss of a failing business and monies required to keep it afloat.

62.     As Plaintiffs face cancellation of future projects, monetary loss as a result and loss of reputation as a qualified concert promoter, an injustice can only be avoided by enforcing the Agreement with Defendants.

**FOURTH CAUSE OF ACTION**

**(Fraud Against All Defendants)**

63.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 62 of this Complaint.

64.     Defendants, either personally or through their agents and employees, knowingly and willfully made false representations to Plaintiffs, as described above. STEIN represented to Plaintiffs that Defendants would give Plaintiffs a $750,000.00 Line of Credit (the Term Loan) if Plaintiffs took a Bridge Loan of $250,000.00 (to be funded by EIN) for 30days.  The Bridge Loan

would be in the form of a Merchant Cash Advance, through EIN at a monthly high interest rate of 15% but Defendants would transition this Bridge Loan to a Term Loan after the first 30 days at an annual rate of 8.89%.  Defendants further represented that as long as Plaintiffs made their daily payments and did not take any third-party loan for the first 30 days, the Line of Credit would be approved.  STEIN stated that HARTFORD's money was invested in EIN, that it would be HARTFORD's money used to fund the Bridge Loan; they had to do this to show the bigger term-loan parent company that they risked their money with Plaintiffs for a good reason; and the result will be for the Bridge Loan to roll over to the Term Loan. Once it transitioned to the Term Loan, interest would go down to 8.89% annual rate and Plaintiffs would not have to pay the EIN bridge loan to term with the high interest.  The transition would be the $250,000.00 loan minus the 30 day payments, promising Plaintiffs that they would never pay any of the interest on the Bridge Loan.  STEIN reassured Plaintiffs that they should believe in the "sincerity in his voice" and there was nothing to worry about.  STEIN insisted that the real money would be made by Defendants on the Term Loan commissions because it would be a long term solution for Plaintiffs as a Line of Credit.  Prior to the EIN Funding Call, STEIN contacted Plaintiffs and advised Plaintiffs not to mention the Agreement (transition of Bridge Loan to Term Loan) because the person calling is simply a paper shuffler at EIN and had no idea about the back end plans of EIN and HARTFORD and the roll over plans; that to minimize any delay, Plaintiffs should focus on letting the EIN funding go through smoothly.  In reliance to STEIN's statements, Plaintiffs did not mention the Agreement during the EIN Funding Call.  Each time Plaintiffs inquired as to the status of the transition to Term Loan, Defendants all used the same string-along statements such as 'it is delayed but submitted', 'in the works', 'file is not declined', 'waiting for approval' and will get an 'update' soon.

65.     The representations set forth above were false, and at the time the above representations

were made, Plaintiffs were informed and believe, and on that basis allege, that Defendants and/or their agents and employees knew they were false. Defendants had knowledge of the falsity because Defendants were in sole control of whether to transition the Bridge Loan to a Term Loan. Rather than provide the transition (and thus the Line of Credit) to Plaintiffs at the end of the first 30 days, they continued to provide false representations that the approval for the transition was 'in the works' even after the 30 days had passed, kept Plaintiffs in the dark and resulted in Plaintiffs having to take third-party loans to save the business.  Defendants then used Plaintiffs' last resort action of taking third-party loans (after 70 days from the start of the Bridge Loan) as the reason to deny the Line of Credit.

66.     At the time of the representations, Plaintiffs were ignorant of the falsity of such representations, and believed them to be true.  Had Plaintiffs known of the falsity of the representations, Plaintiffs would have never entered into any agreement with Defendants.  When Defendants, through WOODLEY, reached out to Plaintiffs in August 2018 and offered a Merchant Credit Advance loan, Plaintiffs knew it was high interest and therefore refused the offer.  Because Plaintiffs refused the loan due to the high interest, Defendants realized through this joint fishing that they were dealing with a more advanced company and owner.  In round two of the conspiracy, in January 2019, Defendants contacted Plaintiffs through HARTFORD representatives to see what it would take to hook Plaintiffs and their monies into Defendants' scam.

67.     Plaintiffs actually and reasonably relied on the representations made by Defendants and/or their agents and employees, in particular, STEIN and WOODLEY.  Not only did Defendants string Plaintiffs along past the first 30 days, they did so for an additional 40 days under the guise that they would make sure the Term Loan would happen and Plaintiffs would get their Line of Credit to help support and grow their business.  Plaintiffs were forced to make daily payments to

- 20 -

EIN at high interest and way beyond the agreed-upon 30 days. With such an additional financial responsibility, Plaintiffs' business sales, marketing development and reputation in the industry were damaged because Plaintiffs were no longer able to fund any project upfront as a concert promoter. Plaintiffs were put in a corner by Defendants and had no other option but to find other funding from third-parties. Statements made by HARTFORD and EIN representatives were all made fraudulently with intent to make Plaintiffs think it was a legitimate business transaction of transitioning a Bridge Loan to a Term Loan within 30 days to obtain a Line of Credit. Defendants' statements encouraged them to use monies towards business development when in actuality all Defendants did was defraud Plaintiffs of their hard-earned monies. As described above, to the best of their knowledge, Plaintiffs had an Agreement with Defendants; and Plaintiffs submitted all of their daily payments to Defendants and did not take any third-party loans for the first 30 days in accordance with the Agreement. In bad faith, Defendants refused to honor the Agreement by refusing to abide by the terms and denied Plaintiffs their Line of Credit. Furthermore, in bad faith, Defendants conspired to pin Plaintiffs into a corner by making them pay the daily $3,600.00 to Defendants for 70 days at high interest. During this time, Defendants strung Plaintiffs along for days and weeks with assurances that the Line of Credit would happen and near the tail end of those 70 days when monies were depleted, even attempted to get Plaintiffs to take out another Merchant Cash Advance from Defendants (round three of the conspiracy when WOODLEY communicated with Plaintiffs). Plaintiffs were ping-ponged between Defendants. EIN and representatives said since Plaintiffs failed to tell them during the Funding Call that they were taking the advance for any other reason, Plaintiffs are to blame and Defendants are off the hook. HARTFORD and representatives called Plaintiffs before the Funding Call advising Plaintiffs not to mention the transition Agreement in order for the transition to go smoothly. When Plaintiffs were strung along for 70 days and had no other option

but to get third-party funding, HARTFORD and Defendants jumped on that excuse to claim they were off the hook from providing the Line of Credit.

68.     As a direct result of the above-mentioned misrepresentations, Plaintiffs have been and continue to be damaged in an amount to be proven at trial, but in no event less than the jurisdictional amount.

69.     Further, Defendants, in engaging in the acts, omissions and/or occurrences alleged herein, acted with malice and oppression towards Plaintiffs, and in conscious disregard for their rights. As such, Plaintiffs hereby request that they be awarded punitive and exemplary damages pursuant to California *Code of Civil Procedure* section 3294, in an amount sufficient to punish and make an example of Defendants.

70.     HARTFORD, EIN and their respective representatives represented to Plaintiffs that Defendants intended to provide Plaintiffs with a Line of Credit of $750,000.00 at an annual rate of 8.89%.  HARTFORD and its representatives along with EIN and its representatives knew that Defendants never had any intention of actually providing Plaintiffs with the $750,000.00 Line of Credit because HARTFORD and its representatives along with EIN and its representatives knew that Defendants targeted vulnerable borrowers and misrepresented the terms of loan agreements for the purpose of collecting monies from such borrowers at high interest rates and never transitioning the Bridge Loans to Term Loans. Furthermore, STEIN and WALTERS both represented themselves as managing partners of HARTFORD, knew the senior EIN individuals who could approve the Line of Credit, had knowledge of underhanded dealings at HARTFORD and EIN where they targeted vulnerable borrowers.  WOODLEY on behalf of EIN came back for round three of the conspiracy by offering (and actually fabricating a Wells Fargo application and interview) Plaintiffs a Wells Fargo loan that would take time to come through so that in the meantime Plaintiffs would need another Merchant Cash Advance from Defendants.

71.     Had Plaintiffs known of the falsity of STEIN, WOODLEY and Defendants'

representations, Plaintiffs would not have entered into an agreement with Defendants.

**FIFTH CAUSE OF ACTION**

**(Intentional Misrepresentation Claims Against All Defendants)**

72.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 71 of

this Complaint.

73.     Between 2018 and the present, Defendants made intentional misrepresentations of

material fact to Plaintiffs by representing that they would transition the Bridge Loan to a Term

Loan after the first 30days (give Plaintiffs a $750,000.00 Line of Credit).  Defendants further

made intentional misrepresentations during the 70 days that Plaintiffs paid the daily $3,600.00 to

Defendants by assuring Plaintiffs that even though things were delayed, the transition to a Term

Loan would happen.  Defendants intentionally encouraged Plaintiffs to use monies towards

supporting and growing the concert promoting business because the Line of Credit was coming.

Defendants kept repeating that the request was submitted and in the works.  Plaintiffs were forced

to make daily payments to EIN at high interest and way beyond the agreed-upon 30days.  With

such an additional financial responsibility, Plaintiffs' business sales, marketing development and

reputation in the industry were damaged because Plaintiffs were no longer able to fund any

project upfront as a concert promoter.  Plaintiffs were put in a corner by Defendants and had no

other option but to find other funding from third-parties.  Statements made by HARTFORD and

EIN representatives were all made fraudulently with intent to make Plaintiffs think it was a

legitimate business transaction of transitioning a Bridge Loan to a Term Loan within 30days to

obtain a Line of Credit.  Defendants' misrepresentation resulted in robbing Plaintiffs of their

hard-earned monies.  As described above, Plaintiffs submitted all of their daily payments to

Defendants and did not take any third-party loans for the first 30days.  Plaintiffs patiently waited

- 23 -

for the Line of Credit that never came through.  Furthermore, Defendants intentionally misrepresented and conspired to pin Plaintiffs into a corner by making them pay the daily $3,600.00 to Defendants for 70 days at high interest.  During this time, Defendants strung Plaintiffs along for days and weeks with assurances that the Line of Credit would happen and near the tail end of those 70 days when monies were depleted, even attempted to get Plaintiffs to take out another Merchant Cash Advance from Defendants.

74.     These representations were in fact false.  When Defendants made these representations, they knew them to be false and intentionally made these representations to deceive and defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.  Defendants knew the above representations were false because they had no intention of giving Plaintiff a Line of Credit; they only intended to keep collecting from Plaintiffs for over the 30day period at high interest and conspired to find other ways to extract more monies from Plaintiffs.

75.     At the time Plaintiffs acted, Plaintiffs did not know Defendants' representations were false and believed them to be true.  Plaintiffs acted in justifiable reliance upon the truth of the material representations.

76.     Because of Plaintiff's reliance upon Defendants' misrepresentations and conduct, Plaintiffs sustained damages as set forth herein and according to proof.

77.     The aforementioned conduct of Defendants was not only fraudulent, but also malicious and oppressive within the meaning of Cal. Civ Code Section 3294 in that the conduct was egregious, reckless and carried out with a willful and conscious disregard of plaintiff's rights and made with the intent to injure Plaintiffs by depriving Plaintiffs of property and other legal rights.

78.     Defendants intended to cause injury to Plaintiffs because Defendants intentionally instituted its intellectually dishonest, deceptive and misleading lending policy to disguise its real

- 24 -

intention of scamming honest businesses and individuals of their hard-earned monies.

79.     Defendants' acts and omissions were in conscious disregard of Plaintiff's rights so as to justify an award of exemplary and punitive damages.

### SIXTH CAUSE OF ACTION

**(Negligent Misrepresentation Claims Against All Defendants)**

80.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 79 of this Complaint.

81.     Plaintiffs are informed and believe and upon that basis allege that Defendants, through their agents and employees, made representations to Plaintiffs that they knew or should have known were false, or had no reasonable grounds to believe were true, as described above.  The representations were, in fact, false.

82.     Such false representations were made in an effort to induce Plaintiffs into forgoing alternative loans and making daily payments to Defendants at high interest rates.

83.     At the time of the representations, Plaintiffs were ignorant of the falsity of such representations, and believed them to be true.  Had Plaintiffs known of the falsity of the representations, Plaintiffs would not have foregone alternative loans from other entities and relied upon the representations of Defendants that they would provide a Line of Credit (Term Loan).

84.     Plaintiffs actually and reasonably relied on the representations made by Defendants and/or their agents and employees.

85.     HARTFORD and its representatives, EIN and its representatives negligently represented to Plaintiffs that Defendants would provide Plaintiffs with a Line of Credit of $750,000.00 on or around January 08, 2019.  Defendants and their representatives should have known that HARTFORD and EIN would not actually provide Plaintiffs with a $750,000.00 Line of Credit because Defendants, knew that Defendants targeted vulnerable borrowers and misrepresented the

terms of loan agreements for the purpose of collecting monies from such borrowers at high interest rates and never transitioning the Bridge Loans to Term Loans.  Furthermore, STEIN and WALTERS both represented themselves as managing partners of HARTFORD, knew the senior EIN individuals who could approve the transition into the Line of Credit, had knowledge of underhanded dealings at HARTFORD and EIN where they targeted vulnerable borrowers. Defendants made such negligent representations to induce Plaintiffs to act in reliance on these representations in the manner herein alleged or with the expectation that Plaintiff would so act.

86.     At the time Plaintiffs acted, Plaintiffs did not know Defendants' representations were false and believed them to be true. Defendants also did not provide their real names, such as Boris Shteyngart, which would have resulted in immediate google search red-flag evidence of prior financial criminal activity, and evidence of barred brokerage status.  Plaintiffs acted in justifiable reliance upon the truth of the material representations.

87.     As a direct result of the above-mentioned misrepresentations, Plaintiffs have been and continue to be damaged in an amount to be proven at trial, but in no event less than the jurisdictional amount.  Plaintiffs will seek leave of Court to amend this Complaint once the full amount of Plaintiffs' damages have been ascertained.

<u>**SEVENTH CAUSE OF ACTION**</u>

**(Violation of Business and Professions Code §17200 Against All Defendants)**

88.     Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 87 of this Complaint.

89.     *Business and Professions Code* section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

90.      Beginning in 2018, Defendants violated and continue to violate by engaging in the practices described above that are prohibited under the UCL.

91.      By engaging in the false, deceptive, and misleading conduct alleged above, Defendants have engaged in unlawful business acts and practices in violation of the UCL by violating state and federal laws including but not limited to Business and Professions code§ 17500 et seq., which makes false and deceptive advertising unlawful.

92.      Section 17200 also prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business & Professions Code §17200.  Defendants deceived Plaintiffs and the public by providing false representations to the public that the approval for a transition was 'in the works' even after the 30 days had passed, and keeping Plaintiffs and members of the public in the dark, which resulted in Plaintiffs having to take third-party loans to save their business.  Defendants would then use Plaintiffs' last resort action of taking third-party loans (after 70 days from the start of the Bridge Loan) as the reason to deny the Line of Credit. On information and belief, this unfair business practice has deceived the public.

93. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs.  Plaintiffs have suffered injury in fact and lost money as a result of Defendants' unfair conduct.

94. Additionally, pursuant to California Business & Professions Code §17203, Plaintiffs seek an order requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring Defendants to return the full amount of money improperly collected to all those who have paid them.

## **PRAYER**

WHEREFORE, Plaintiff prays for relief as follows:

1.    General and consequential damages in an amount to be proven at trial but no less than $2,000,000;

2.    Special damages in an amount to be proven at trial;

3.    For disgorgement of profits;

4.    For pre and post judgment interest;

5.    For attorney's fees;

6.    For punitive damages;

7.    For costs of suit; and,

8.    For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this action.


Dated:  March 4, 2022

**BEZDIK KASSAB LAW GROUP**


By:_____

     Sareen Bezdikian
     Raffi Kassabian
     Attorneys for Plaintiffs

- 28 -

COMPLAINT

## PROOF OF SERVICE

STATE OF CALIFORNIA       )
                           ) ss.
COUNTY OF LOS ANGELES )

       I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen (18) years and am not a party to the within action; my business address is: 3530 Wilshire Boulevard, Suite 1300, Los Angeles, California  90010.

       On **April 1, 2022,** I served the following document described as **NOTICE OF REMOVAL OF CIVIL ACTION TO UNITED STATES DISTRICT COURT BY DEFENDANT EIN CAP, INC.** on the interested parties as follows:

Attorneys for It's My Seat, Inc. and Vahe Shahinian
Sareen Bezdikian, Esq.
Raffi Kassabian, Esq.
BEZDIK KASSAB LAW GROUP
790 E. Colorado Boulevard, 9th Floor
Pasadena, CA 91101
Tel: 626-499-6998
Fax: 626-499-6993
Email: sareen@bezdikkassab.com
       Raffi@bezdikkassab.com

Attorneys for It's My Seat, Inc. and Vahe Shahinian
Kris Demirjian, Esq.
DEMIRJIAN LAW FIRM
15915 Ventura Boulevard, Suite 301
Encino, CA 91436
Tel: 818-275-0099
Fax: 310-946-0039
Email: kris@kdemlaw.com

__X__    (BY REGULAR MAIL):   I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California.  I am "readily familiar" with firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___    (BY PERSONAL SERVICE):  I caused the above-referenced document(s) to be personally delivered by hand to the offices of the addressee(s).

___    (BY OVERNIGHT COURIER): I caused the above-referenced document(s) to be delivered to Federal Express for delivery to the above address(es).

___    (BY FACSIMILE MACHINE):   The foregoing document was transmitted to the above-named persons by facsimile transmission from (213) 384-7110 on said date and the transmission was reported as complete and without error.

___    (BY ELECTRONIC MAIL): In accord with the Local Rules and General Orders of this Court, service will be made upon the judge and by Notice of Electronic Filing ("NEF") on the parties to this proceeding by e-mail. I checked the CM/ECF docket for this proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmissions from the Court.  Service will be made on those parties by NEF transmission.

///

XX   (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

EXECUTED on **April 1, 2022** at Los Angeles, California.

_____/ S /___*Catherine Kim*_____
Catherine Kim

2