WHITE AND WILLIAMS LLP
BY:   Shane R. Heskin (admitted *pro hac vice*)
Identification No. 201925
1650 Market Street | One Liberty Place, Suite 1800 |
Philadelphia, PA 19103
215.864.6329
heskins@whiteandwilliams.com

Attorneys for Plaintiffs,
IT'S MY SEAT, INC., a California Corporation; VAHE SHAHINIAN, an individual

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IT'S MY SEAT, INC., a California Corporation; VAHE SHAHINIAN, an individual,<br><br>                    Plaintiffs,<br><br>          v.<br><br>HARTFORD CAPITAL LLC, a Limited Liability Company; KEVIN WOODLEY, an individual; EIN CAP, INC., a New York Corporation; RUSSELL NAFTALI, an individual; GENE SLAVIN, an individual; and DOES 1 through 100, inclusive,<br><br>                    Defendants. | **CASE NO.: 2:22-cv-02192-ODW-AFM**<br>**[Assigned to Hon. Otis D. Wright, II]**<br><br>**Related case:**<br>**Case No. 2:20-cv-06378-ODW-AFM**<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4)**<br><br>Pre-trial conference: May 21, 2025<br>Trial: June 10, 2025 |

Pursuant to the July 5, 2025 Scheduling Order in the above-referenced Action, the Court's Individual Rule IX, and Local Rule 16-4, Plaintiffs It's My Seat, Inc. ("IMS") and Vahe Shahinian ("Vahe," collectively "Plaintiffs") submit this

Memorandum of Contentions of Fact and Law in preparation for the trial scheduled in this matter beginning on June 10, 2025 at 9:00 a.m.

### a) A summary statement of the claims Plaintiffs have pled and plan to pursue:

<u>Claim 1</u>: Civil RICO under 18 U.S.C. § 1962(c) against culpable persons Russell Naftali and Gene Slavin. The purpose of the Enterprise is to fatten the pockets of its members through fraudulent schemes and ruses. To carry out their fraudulent schemes, Defendants use organized crime members from the Columbo crime family to fraudulently induce their victims to take out unlawful, high-interest loans exceeding 100%. Indeed, when these organized crime associations were ultimately uncovered by Plaintiffs, Defendants admitted in an internal email: "Now we have a problem." [P. Ex. 184]. Defendants did not produce this document during discovery. Instead, Defendants produced the email for the first time on May 15, 2025.

The fraudulent scheme at issue here began on or around August 29, 2018, when Defendant Kevin Woodley attempted to induce Plaintiffs into a criminally usurious loan with the Enterprise. At that time, Plaintiffs made clear that they were not interested in a criminally usurious loan but were only interested in a long-term line of credit. When Woodley failed, the Enterprise resorted to a fraudulent "carroting" scheme, wherein the Enterprise's agent and co-conspirator, Hartford Capital, LLC, promised the desired long-term line of credit upon entering into the criminally usurious loan at issue.[1]

---

[1] Notably, the United States Attorney for the District of New Jersey just recently arrested eight individuals on wire fraud for carrying out a similar "carroting" scheme. https://www.justice.gov/usao-nj/media/1397096/dl?inline

Based on these knowingly false promises, Plaintiffs entered into the criminally usurious loan with the Enterprise, through Defendant EIN, on January 8, 2019. The interest rate charged and obtained by the Enterprise exceeded 112%, which is four times New York's criminal interest rate of 25%, and over ten times California's maximum interest rate of 10%. Under both New York and California law, this unlawful interest is unenforceable. This fraudulent scheme constitutes the collection of unlawful debt under 18 U.S.C. § 1962(c). *See* Complaint ¶ 45 (citing 18 U.S.C. § 1961(1)(A)), ¶¶ 26-30 (describing EIN MCA as disguised high-interest loan), ¶ 36 (alleging RICO injury from EIN loan), ¶ 21 (alleging EIN is engaged in the business of making loans with usurious interest rates to borrowers), ¶ 26 (alleging that the EIN MCA has an interest rate of 15% monthly and/or 180% annually).

This fraudulent scheme did not end there. Even after Defendants were made aware of these fraudulent misrepresentations by their agent and co-conspirator, Defendants, through Woodley, continued the "carroting" scheme by promising Plaintiffs their desired long-term credit line through Wells Fargo. This was yet another fraudulent scheme with the same objective of collecting unlawful debt. Woodley promised the Wells Fargo loan with the objective of inducing Plaintiffs into making continued payments on the first criminally usurious loan. Woodley also made these knowingly false promises in an attempt to bait Plaintiffs into a second criminally usurious loan with the Enterprise. At all times, Defendants knew Plaintiffs had no hope

of a long-term credit line but used Plaintiffs' known desperation to further induce and defraud.

Claim 2:  Civil RICO claim for conspiracy under 18 U.S.C. § 1962(d) against all Defendants premised on the same facts as Claim 1.

Claim 3:  Promissory estoppel against all Defendants on the following facts:  In January 2019, a broker-agent of EIN, Boris Shteyngart a/k/a Bryan Stein ("Stein"), approached Plaintiffs and promised them a $750,000 line of credit (the "LOC") if Plaintiffs took out the EIN MCA loan referenced above and made payments for 30 days. Plaintiffs relied on Stein's representations made as an agent of EIN and entered into the EIN MCA agreement and made daily payments thereunder for 70 days, yet neither Stein nor Defendants honored the promise to provide Plaintiffs with the LOC. Plaintiffs' reliance on the promised LOC was detrimental because it induced Plaintiffs to enter into the usurious loan disguised as the EIN MCA agreement, which only exacerbated Plaintiffs financial problems, and when the LOC never materialized, Plaintiffs had to turn to riskier and ultimately harmful financial products to quickly secure financing to cover expenses Plaintiffs incurred relying on the LOC to come through.

Related to and in addition to the promissory estoppel concerning the LOC, Plaintiffs are also assert this claim as to Woodley's promises that he, as EIN's agent and/or employee, could secure Plaintiffs with a loan from Wells Fargo.  Before Woodley made this promise, Plaintiffs already informed Woodley about the promised LOC and came to Woodley in February 2019 to see if he could find another different solution to

Plaintiffs' long term credit needs. Woodley continued to promise Plaintiffs that the Wells Fargo loan would be coming soon on March 1, 2019.  On March 7, 2019, Woodley received confirmation from Wells Fargo that it would *not* be offering a loan to Plaintiffs, yet on March 14, 2019, Woodley misrepresented to Plaintiffs that Wells Fargo was still considering them for a loan. Consequently, Plaintiffs relied on this representation to their detriment by waiting for the Wells Fargo loan to materialize when Woodley already knew it was rejected. This caused Plaintiffs to have to resort to other predatory lenders to secure financing after the tours they planned for 2019 began to run into problems due to lack of money.

Claim 4:  Plaintiffs assert a common law fraud claim against all defendants for the aforementioned material false statement that Plaintiffs would receive a $750,000 LOC if they made 30 days of payment on the EIN MCA loan. Because this promise was made using interstate electronic communications and was materially false, in constitutes the first predicate act by Defendants' RICO Enterprise. Defendants' agents and co-conspirators Stein and Hartford repeated this false promise in several text messages sent interstate to Plaintiffs between February and March 2019, representing additional instances of wire fraud and predicate acts. Plaintiffs' reliance on Stein's promises were reasonable because Stein was acting in his official capacity as an agent of EIN, and Stein continued to assure Plaintiffs the LOC would ultimately be approved.  Plaintiffs were damaged by the fact that the EIN MCA agreement was a usurious loan that only exacerbated Plaintiffs' financial problems and because Plaintiffs began booking vendors

and expenses for tours IMS would be managing for the 2019 season in anticipation of receiving the LOC. When the LOC failed to materialize, Plaintiffs were forced to secure riskier financial products to cover for the loss of the anticipated LOC monies, which further caused damages.

Plaintiffs are also asserting fraud for Woodley's knowingly false statement made on March 14, 2019 that Wells Fargo was still considering Plaintiffs for a loan while Wells Fargo told Woodley in a March 7, 2019 email the opposite. Because Woodley made this materially false statement in writing using interstate e-mail communications, it constitutes the second predicate RICO act by the Defendants' RICO Enterprise. As a result, Plaintiffs relied on this knowingly false statement to their detriment by waiting for the Wells Fargo loan to materialized when Woodley already knew it would not be coming. This caused Plaintiffs to have to resort to predatory hard-money lenders to secure financing after the tours they planned for 2019 began to run into problems due to lack of money. These knowingly false representations also caused Plaintiffs to continue to make payments on an unenforceable, criminally usurious loan.

Claim 5: Plaintiffs assert a common law claim for intentional misrepresentation against all Defendants for the aforementioned false statement that Plaintiffs would receive a $750,000 LOC if they made 30 days of payment on the EIN MCA agreement.

Plaintiffs are also asserting intentional misrepresentation for Woodley's, on EIN's behalf, knowingly false statement made on March 14, 2019 that Wells Fargo was still considering Plaintiffs for a loan while Wells Fargo told Woodley in a March 7, 2019

email the opposite.  As a result, Plaintiffs relied on this knowingly false statement to their detriment by waiting for the Wells Fargo loan to materialized when Woodley already knew it would not be coming.  This caused Plaintiffs to have to resort to predatory hard-money lenders to secure financing after the tours they planned for 2019 began to run into problems due to lack of money.

Claim 6:  Plaintiffs assert a common law claim for negligent misrepresentation against all Defendants for the aforementioned false statement that Plaintiffs would receive a $750,000 LOC if they made 30 days of payment on the EIN MCA agreement. Plaintiffs also assert that Woodley, acting on EIN's behalf, made a negligent misrepresentation on March 14, 2019, to Plaintiffs when he told them Wells Fargo was still considering them for a loan when Wells Fargo's March 7, 2019 email to Woodley indicated the opposite.

Claim 7:  Plaintiffs assert claim against Defendants for violation of the California Business and Professions Code § 17200 et seq. for Defendants unethical behavior in engaging in usurious lending, which violates California's strong public policy coupled with the added unscrupulous behavior of Defendants and Defendants' agents fraudulently inducing Plaintiffs into entering into the usurious loan with a false promise that after 30 payments they would receive the $750,000 LOC. Once Plaintiffs discovered this promise was false, instead of addressing the fraud, Defendants made another false promise to Plaintiffs that they would received a Wells Fargo loan even though Defendants have never successfully obtained a Wells Fargo loan for any client.

Defendants also engaged in deception by misleading Plaintiffs and Wells Fargo as to their titles, accreditations, and relationship with EIN.

**b) The elements required to establish Plaintiffs' claims.**

Elements Required to Establish Civil RICO Liability under 18 U.S.C. § 1964(c).

To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See* Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007).

To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable acts listed in 18 U.S.C. § 1961. *See* Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007). Pursuant to 18 U.S.C. § 1961(6), "'unlawful debt' means a debt . . . (B) which was in incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." *Id*. Twice the enforceable rate under California law is 20%. *See* Ca. Stats. 1919, p. lxxxiii, and Stats. 1919 p. lxxxiii, § 3, and Article XV, § 1 of the California Constitution (the higher of 10%, or 5% plus the prevailing rate of the Federal Bank Reserve). Twice New York's criminal usury rate for commercial loans is 50%. *See* N.Y. Penal Law § 190.40. "RICO offenses may be predicated on a single instance of collection of unlawful debt[.]" *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020); *see also*, *Schreiber Distrib. Co. v. Serv-Well Furniture oc.*, 806 F.2d 1393, 1398 n. 4 (9th Cir. 1986) (similar).

California has a strong and well-defined public policy against usury. *See Mencor Enterprises, Inc. v. Hets Equities Corp.*, 190 Cal.App.3d 432, 440 (1987); *Gamer v. duPont Glore Forgan, Inc.*, 65 Cal.App.3d 280, 287 (1976). Indeed, the law of usury is based on the California Constitution, as well as a voter initiative measure adopted in 1918. *See OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 168 Cal.App.4th 185, 198 (2008). "The theory of [the usury] law is that society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them." *Stock v. Meek*, 35 Cal.2d 809, 817 (1950).

In enforcing the usury protections, California courts look to the substance of a transaction to determine its true nature, not its form. *See Ghirado v. Antonioli*, 8 Cal.4th 791, 802 (1994). "Sensitive to the ingenuity and creativity of those entrepreneurs willing to engage in legal brinkmanship to maximize profits, courts have carefully scrutinized the form of seemingly innocuous commercial transactions to determine whether the substance amounts to a usurious arrangement." *Boerner v. Colwell Co.*, 21 Cal.3d 37, 44 (1978) ("Although the constitutional and statutory provisions dealing with usury speak only in terms of a 'loan' or a 'forbearance' of money or other things of value, the courts, alert to the resourcefulness of some lenders in fashioning transactions designed to evade the usury law, have looked to the substance rather than the form of such transactions in assessing their effect and validity, and in many cases have struck down as usurious arrangements bearing little facial resemblance to what is normally thought of as a 'loan' or a 'forbearance' of money. In all such cases the issue is whether

or not the bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest.").  New York law follows the same approach. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 335 (N.Y. 2021) ("When determining whether a transaction is a loan, substance—not form—controls"); *Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("The root of all these factors is the transfer of risk.").

1) A pattern is defined as at least two acts of racketeering activity within ten years of each other. To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961.  Predicate acts must be proved by a preponderance of the evidence.  Under 18 U.S.C. § 1961(1), "wire fraud" constitutes "racketeering activity."  The three elements of wire fraud are: (1) a scheme to defraud, (2) use of wires in furtherance of the scheme, and (3) a specific intent to deceive or defraud.  *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013); *see also* 18 U.S.C. § 1343 (wire fraud statute).

**Authority**:  Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007); 18 U.S.C. § 1961(1); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (U.S. 2001); *Lateral Recovery LLC v. Funderz.Net,LLC*, 2024 U.S. Dist. LEXIS 10134, *39-40 (S.D.N.Y. Jan. 19, 2024); *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020); 18 U.S.C. § 1961(6); *Lateral Recovery LLC v. Queen Funding, LLC*, 21-cv-09607 (LGS), 2022 U.S. Dist. LEXIS 129032, at *4 (S.D.N.Y. July 20, 2022); *United States v.*

*Hussain*, 972 F.3d 1138, 1143 (9th Cir. 2020); *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023); *Haymount Urgent Care PC v. Go Fund Advance, LLC*, 609 F. Supp. 3d 237 (S.D.N.Y. 2022); *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022).

<u>Elements Required to Establish Civil RICO Liability under 18 U.S.C. § 1964(d).</u>

A RICO conspiracy under 18 U.S.C. § 1962(d) may be established by proof of an agreement to commit a substantive violation of RICO.  The conspirator need not have agreed to commit or facilitate each and every part of the substantive offense. However, the conspirator must have been "aware of the essential nature and scope of the enterprise and intended to participate in it."

**Authority:** Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007); *Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *81-82 (S.D.N.Y. Sept. 27, 2024) (granting summary judgment on RICO claim).

<u>Elements Required to Establish Promissory Estoppel</u>

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must both be reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."

**Authority:**  *Aceves v. U.S. Bank N.A.*, 192 Ca. App. 4th 218, 225 (Cal. App. Ct. 2011) (citing *Advanced Choices, Inc. v. State Dep't of Health Services*, 182 Cal. App. 4th 1661, 1672 (Cal. App. Ct. 2010)).

Elements Required to Establish Fraud

"The elements of fraud, which give rise to the tort action for deceit, are (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"

**Authority:** *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1239 (Cal. App. Ct. 2013) (citing *Laza v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. 1996)).

Elements Required to Establish Intentional Misrepresentation

"The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage."

**Authority:** *Port Medical Wellness v. Connecticut General Life Ins. Co.*, 24 Cal. App. 5th 153, 178 (Cal. App. Ct. 2018).

Elements Required to Establish Negligent Misrepresentation

In contrast to a fraud claim, "a claim for negligent misrepresentation does not require knowledge of falsity'; rather the plaintiff must show '(1) the misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'"

**Authority:**  *Thrifty Payless*, at 1239 (citing *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243 (Cal. App. Ct. 2007)).

<u>Elements Required to Establish Unfair Business Practices UCL § 172000.</u>

A "business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injuries to consumers which outweigh its benefits.  The determination of whether a business practice is unfair 'involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications  and motives of the alleged wrongdoer."

**Authority:**  *Notle v. Cedars-Sinai Medical Center*, 236 Cal. App. 4th 1401, 1407 (Cal. Dist. Ct. 2015) (citations omitted).

**c)  A brief description of the key evidence in support of each of the claims**

<u>Claim 1</u>:  Civil RICO liability under 18 U.S.C. § 1962(c).

**A.  RICO Liability for Collecting Unlawful Debt**

**First**, when Stein and Hartford solicited Plaintiffs into entering into the MCA Agreement, they expressly stated it would have a finite term of five months.  [P. Ex. 51].  Notably, this is the exact same term that is created by dividing the MCA Agreement's Repayment Amount ($360,000) by the fixed daily payment ($3,600), which equals 100 business days or approximately five months.  [P. Ex. 3] at 1.  Notably, EIN performed this exact same analysis to determine the term of the MCA Agreement during its deposition.  [P. Ex. 5 at 171:20-172:14].  Courts have found MCA agreements

to have a *de facto* finite term using this same math. *Queen*, at *16 ("a de facto term plausibly exists. The period of payment can be easily calculated by dividing the amount FTE owes by the among of daily payments"); *Haymount*, at 248 n. 5 (similar); *Cloudfund, LLC v. Mobile Rehad, Inc.*, 2024 N.Y. Misc. LEXIS 4817, *11-12 (N.Y. Sup. Ct. May 1, 2024) (same); *Akf, Inc. v. Haven Transp. Bus. Sols., Inc.*, 2024 U.S. Dist. LEXIS 103271, *17 (N.D.N.Y. June 11, 2024) (same).

**Second**, Stein and Hartford's solicitation and terms set forth for the MCA Agreement demonstrates that it was not negotiated based on IMS's receivables. Stein notes in the January 8, 2019 email that he had a telephone conversation with Vahe, and nothing more, and from that conversation Stein was able to provide all the economic figures for the MCA Agreement without any discussion of receivables. [P. Ex. 51]. EIN also testified that the repurchase amount and daily payment was not based on IMS' receivables, but rather the factor rate applied to the deal. [P. Ex. 5 at 174:1-12]. EIN further testified that they would enter into MCA agreements with merchants who had already sold their receivables to other MCA companies. [P. Ex. 5 at 185:21-186:25]. Woodley gave similar testimony that he would broker MCA deals with merchants who had already sold receivables to other MCA companies. [P. Ex. 58 at 11:12-12:19]. Finally, the parties did not specify any specific receivables of IMS being purchased. *Haymount*, at 249 ("Nor does any MCA agreement identify particular revenues or accounts that were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer'") (citing *Plymouth Venture Partners, II, L.P. v. GTR Source,*

*LLC*, 37 N.Y.3d 591, 609 n. 2 (2021) (Wilson, J. dissenting)); *Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *81-82 (S.D.N.Y. Sept. 27, 2024) ("*Funderz II*") (finding MCA agreements to be loans on summary judgment where they did not specify specific receivables purchased).

**Third**, despite EIN purportedly purchased IMS' receivables, EIN testified that IMS was responsible for maintaining these receivables in a bank account from which EIN would debit the daily amount via ACH.  [P. Ex. 5 at 190:8-191:19].  Thus, while EIN purportedly purchased IMS' receivables, IMS' remained at all times responsible for collecting the receivables EIN purportedly purchased.  *See also* [P. Ex. 4 at 45:15-21 (Slaving confirming the ACH payment system); *Funderz II*, at *82 ("Moreover, the agreement made clear that FTE 'is responsible for ensuring the specified percentage to be debited by BMF retains in the account and will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt.  Read in tandem, these two provisions suggest that the agreement was aimed at taking money from FTE's account generally, not specifically collecting on receivables.").

**Fourth**, EIN testified that it was up to the discretion of the collections department as to whether to grant reconciliation.  [P. Ex. 5 at 187:7-188:22].  Slavin (responsible for EIN's collections), conversely, contradicted EIN's testimony and said reconciliation would go through underwriting and he could not recall ever giving money back to a merchant who requested reconciliation.  [P. Ex. 4 at 30:25-31:15]. Woodley, for his part, had no knowledge of EIN MCA Agreements having a reconciliation provision. [P. Ex.

58 at 132:18-21]. When Plaintiffs expressed their inability to continue making the high interest payments on the MCA Agreement, Woodley said there was nothing that could be done to change the terms.  [P. Ex. 31].  This shows that Defendants and their agents treated the MCA as a loan by refusing to make any adjustments to the daily payments even after Plaintiffs expressed that they would have difficulty making the daily payments in light of the promised LOC never materializing. *Funderz II*, at *75 (finding MCA agreements to be loans on summary judgment where reconciliation was in the lender's "sole and absolute discretion"). Numerous courts applying New York law have ruled that discretionary reconciliation renders an MCA agreement a loan.  *Fleetwood Servs. LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *4 (2d Cir. June 8, 2023) (affirming finding MCA agreements to loans on summary judgment where "any adjustment to the daily amount was subject to Richmond's 'sole discretion.'"); *LG Funding, LLC v. United Senior Props. Of Olathe, LLC*, 181 A.D.3d 664, 666 (2nd Dep't 2020) (finding MCA agreement to be a loan where reconciliation was at lender's "sole discretion"); *New-Y-Capp v. Arch Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 180309, *11 (S.D.N.Y. Sept. 30, 2022) (same); *Funderz II*, at *75 (finding MCA agreements to be loans on summary judgment where reconciliation was in the lender's "sole and absolute discretion").

**Fifth**, Defendants conditioned the offer of the LOC being revoked if Plaintiffs missed a single payment in the first 30 days.  [P. Ex. 51]. Courts applying New York law have ruled *less onerous* default provisions have rendered MCAs to be loans.  *Davis*

*v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021) (finding MCAs like a loan where there were "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default"); *CMS*, at 455 (same); *Queen,* *18 (finding two missed payments an event of default made the MCA agreements like loans); *People v. Richmond*, 2023 NYLJ LEXIS 2487, at *8 (Sup. Ct. Sept. 15, 2023) (finding MCAs to be loans where default would be declared for three missed payments).

**Sixth**, as confirmed by EIN's testimony, EIN had full recourse should IMS declare bankruptcy.  [P. Ex. 5 at 188:24-190:3].

**Seventh**, Defendants language and conduct demonstrates they intended the MCA to serve as a loan.  For instance, Plaintiffs clearly understood the MCA to be a loan and conveyed this belief to Defendants in various communications, including a long email with Defendants with the subject of "EIN loan" in reference to the MCA.  [P. Ex. 64]. Slavin, Woodley and Naftali were all on this e-mail chain yet none of them responded to Vahe to dispel the notion that the MCA was a "loan."  [*Id*.]  Yet EIN also testified that it was its standard practice to correct a merchant who labeled an MCA a loan. [P. Ex. 5 at 158:14-159:8].  Slavin also testified that it was not his responsibility to correct a customer who referred to EIN MCA agreements as loans.  [P. Ex. 4 at 53:20-54:25]. Vahe also emailed Woodley (at his EIN email) on February 28, 2019, describing his inability to pay the high "interest" on the EIN contract, and Woodley did not correct him that the MCA Agreement had no interest, rather he said there was no way to change

the contract.  [P. Ex. 31].  Woodley also would refer to MCA Agreements as loans in his deposition:  "We broker MCA loans and other things."  [P. Ex. 58 at 6:6-7].  EIN also treats its MCA Agreements as absolutely repayable as evidenced by the fact they have filed over 700 lawsuits in New York alone, always against both the merchant and the owner as guarantor, from approximately 2016 through the present.  [P. Ex. 138].

### C.  The MCA Agreement Assess Usurious Interest At Twice The Rate Allowed Under California and New York Law

Viewing the MCA transaction as a loan, it was usurious as a matter of law because the transaction provided that IMS would receive $250,000 and repay $360,000 over 100 business days.  [P. Ex. 3] at 1, which yields an annual interest rate of 115%.  *See People v. Richmond* at *28 (the formula to calculate the applicable interest rate is (A/P)/(T/M) where A is interest amount, P is the principal amount, T is the number of days in the term, and M is the number of business days in a year).  The annual interest rate of 115% constitutes "unlawful debt" for RICO purposes under 18 U.S.C. § 1961(6)(B) because it is more than four times greater that the criminal usury limit of 10% under California law and 25% under New York law.

### D.  Plaintiffs Will Prove Multiple Predicate Acts Of Wire Fraud

Plaintiffs have proven two separate acts of wire fraud within a ten-year period.  First, there was the January 8, 2019 fraudulent statement made by Defendants' agents and co-conspirators Hartford and Stein that Plaintiffs were "pre-approved" for the $750,000 LOC using interstate emails. [P. Ex. 51]. Stein repeated this false promise on

several more occasions via interstate text messages with Plaintiffs through March 2019. [P. Ex. 78]. The purpose of these false promises made through interstate wires was to induce Plaintiffs into continuing to make payments to EIN on the MCA Agreement after the 30-day mark when Plaintiffs expected to receive the "pre-approved" $750,000 LOC. [P. Ex. 51]. Plaintiffs did continue making payments past the 30-day point in reliance on these continuous false promises made by Defendants' agents and co-conspirators Stein and Hartford. [P. Exs. 85-90, 104].

Second, Woodley made an additional, separate but related promise that he could secure Wells Fargo a loan. [P. Ex. 6 at 99:2-101:19; P. Ex. 58 at 80:25-83:3]. Woodley was told by Wells Fargo on March 7, 2019 that it would not likely be able to approve Plaintiffs for a loan. [P. Ex. 113] at 2. Woodley did not tell Plaintiffs of this decision by Wells Fargo when it occurred. [P. Ex. 58 at 158:3-11]. Instead, Woodley sent a false statement in a March 14, 2019 email to Plaintiffs informing them that there was still a possibility of securing them a Wells Fargo loan. [P. Ex. 145]. In addition to the March 7, 2019 email from Wells Fargo saying the loan was very unlikely, Woodley should have known his continuing promises of knowing false hope to Plaintiffs were false because Woodley testified he has never successfully obtained a Wells Fargo loan for any customer. [P. Ex. 58 at 80:25-83:3].

In addition to the above multiple acts of wire fraud directed at Plaintiffs specifically in this action, Plaintiffs will prove that Defendants routinely and continuously engage in similar fraud-based predicate acts. First, the record

demonstrates that Woodley, while acting as EIN's agent, sent interstate emails to Wells Fargo employees in which he knowingly misrepresented himself as being the "Senior Regional Manager" for EIN.  *See* [P. Exs. 113, 115, 119, 122, and 127].  Woodley testified that this title was made up and given to him by Komrash.  [P. Ex. 58] at 50:6-51:9. Thus, these five emails sent in 2019 constitute additional instances of Defendants making fraudulent representations through interstate wires, thereby constituting additional independent predicate acts of wire fraud.  18 U.S.C. § 1961(1).

These are not isolated incidents of fraud.  Before Plaintiffs took out the EIN MCA Agreement, on August 28, 2018, Woodley represented he was a "Senior Funding Specialist" at Fast Capital Partners.  [P. Ex. 23].  In later correspondence, Woodley represented to Plaintiffs that he was the "Senior Regional Manager" at Fast Capital Partners.  [P. Ex. 25].  Woodley testified that this title was made up.  [P. Ex. 58] at 50:6-10 (Q.  And do you see your signature line says that you're the senior regional manager?  A.  Right.  Q.  Were you? A. No, just a title.).

On January 15, 2019, shortly after Plaintiffs took out the MCA Agreement with EIN, Woodley emailed Plaintiffs and expressly told them to "[n]otice my signature below", which represented he was a "Senior Regional Manager" and EIN.  [P. Ex. 65]. Woodley also testified that this title was "not true."  [P. Ex. 58] at 59:16-21.

Woodley's misrepresentation of his title and affiliation with EIN was part of a pattern.  For instance, before even contacting Plaintiffs, in February 2018, Woodley sent several emails to a merchant named Russ Cook using an EIN email address and a

signature block title of EIN "ISO Relationship Manager." [P. Exs. 65-66]. Woodley testified he never worked for EIN. [P. Ex. 58 at 8:2-7]. Like the promised Line of Credit and the Wells Fargo loan, Woodley had made similar carrotting promises of term loans in exchange for merchants taking out MCA agreements. [P. Ex. 68].

The fraudulent schemes by Defendants also establishes a continuing threat of criminal activity. Since its inception, EIN has filed lawsuits against approximately 770 merchants and their owners as guarantors of EIN's MCA agreements. [P. Ex. 160]. Naftali has provided hundreds of affidavits in support of these confession of judgment actions in which he represents that EIN's MCA Agreements are sales of "future receivables." *See*, *e.g.*, [P. Exs. 175-177 ¶ 3]. These boilerplate affidavits also always recite the same purported basis for default, a "blocked payment." [*Id.* ¶ 6]. At times another individual, Gerony Medina, provided virtually identical affidavits as that of Naftali which also uniformly alleged that the agreements were sales of future receivables and that default was due to blocked payment. [P. Exs. 179, 181 ¶¶ 3, 6]. The EIN MCA agreements that underline these actions, *see, e.g.*, [P. Exs. 180 & 182], are substantively identical to the MCA Agreement as issue here. [P. Ex. 3].

Thus, all of the above arguments and proof that the MCA Agreement here is a usurious loan applies with equal force to the EIN MCA agreements that Naftali and EIN agents have falsely attested were legitimate purchase and sale of receivables. Defendants EIN, Naftali and their agents have made these representations just in New York courts alone over 700 times against Merchants and their owner/guarantors

between at least 2017 and 2023.  [P. Ex. 160].  Each of these representations is another instance of Plaintiffs making fraud-based predicate acts, including wire fraud, before the State of New York.   In addition, these 700+ actions always included suing the guarantor as a Defendant under the EIN MCA agreements' guaranties, which guaranty "the performance of all of the warranties and covenants or the accuracy of any representation in the Merchant Agreement."  *See, e.g.*, [P. Ex. 3, 178, 180].  Yet the only basis EIN, Naftali and their agents present as a basis for the EIN MCA agreement breach is blocked payments, as described above.  Blocked payments is not a representation, warranty or convent as those are defined in EIN's MCA agreements.   *See, e.g.*, [P. Ex. 3, 178, 180] § 2.  Thus, in each of these 700+ lawsuits against EIN MCA agreement guarantors, Plaintiffs are fraudulently asserting a basis to sue the guarantors for blocked payments even though the text of EIN's boiler-plate MCA does not include that as a basis to sue the guarantor.  This is another way Defendants commit fraud based predicate acts, including wire fraud, through their use of the New York Court system on hundreds of occasions continuously for at least half-a-dozen years.

### E.  Plaintiffs Have Proven All Elements To Establish A RICO Enterprise

Not only do the MCA Agreements constitute unlawful debt for RICO purposes and Plaintiffs establishment of multiple predicate acts within a 10-year period, Plaintiffs also have established all the elements of a RICO violation.  In the context of a RICO claim based upon collection of unlawful debt, to prove the claim, Plaintiffs must show that (1) there was a RICO enterprise, (2) its activities affected interstate commerce, (3)

the individual defendants were employed by or associated with the enterprise, (4) the individual defendants participated in the conduct of the affairs of the enterprise through collection of unlawful debt; (5) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (6) the debt was incurred in connection with the business of lending money at a usurious rate, (7) the usurious rate was at least twice the enforceable rate, and (8) Plaintiffs were injured in their business or property. *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985).

**First**, Plaintiffs have established a RICO Enterprise consisting of Defendants.  To establish a RICO enterprise, "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' who are 'employed by or associated with' the 'enterprise.'" *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161 (U.S. 2001). RICO defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Naftali is an individual who owns a 30% equity stake in EIN, [P. Ex. 5] at 8:7-9:13, and as such Naftali is a person under RICO.  *Kushner*, at 163 (the shareholder of a corporation is a "person" who can be held liable for conducting the affairs of the enterprise).  Slavin is an individual who owns his own company, GFJG Consulting, Inc. ("GFJG Consulting"), which entered into a consulting agreement with EIN to serve as EIN's in-house collection department, [P. Ex. 4] at 8:14-14:3, also making him a RICO "person" under *Kushne*r.

Woodley is an individual who works for Fast Capital Partners, a separate company retained by EIN to serve as their in-house broker department.  [P. Ex. 5] at 38:7-23, 68:5-10, and 104:12-13, as thus is also a "person" for RICO purposes. Plaintiffs have also proven a distinct Enterprise consisting of Fast Capital Partners, EIN, Woodley, Naftali, Slavin, and Doe investors (the "Enterprise"), which is not identical to the RICO persons, thereby satisfying the distinctiveness requirement.  *Funderz Recovery LLC v. Funderz.Net, LLC*, 2024 U.S. Dist. LEXIS 10134, at *40 (S.D.N.Y. Jan. 19, 2024) ("Even if the 'persons' alleged here, the Isaacov brothers, are principals of Funderz, a corporation that is part of the Enterprise, *Cedric Kushner* teaches that a distinct enterprise is still pleaded"); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016) (similar).  EIN testified that it authorizes its brokers, which would include Woodley, Fast Capital Partners, Hartford and Stein, to negotiate an offer EIN gives them with the merchant and that the broker has EIN's authorization to make the offer on EIN's behalf, with EIN paying the broker.  [P. Ex. 5 at 213:11-216:4].

**Second**, the RICO Enterprise affected interstate commerce.  As evidenced by the MCA Agreement itself, EIN had an office at 160 Pearl Street, New York, New York and IMS had an address in Glendale, California.  [P. Ex. 3] at 1.  Plaintiffs and the Enterprise discussed the transaction through e-mail communications sent between Plaintiffs in California and Defendants in New York.  *See, e.g.*, [P. Ex. 47].  The required interstate commerce nexus is "minimal." *Defalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001). It is sufficient to show the use of interstate commerce through the use of mail, interstate

wires, or other instrumentalities of interstate commerce. *See Haggiag v. Brown*, 728 F.Supp. 286, 295 (S.D.N.Y. 1990) (wire transfer of funds to foreign corporation sufficient); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 524 (S.D.N.Y. 2005) (use the wires and mail to advertise, sell, and/or deliver their wares to other states, thus their overall scheme has an effect on interstate commerce). EIN, in New York, debited IMS's bank accounts in California. [P. Ex. 85-90]. Thus, the unlawful debt transaction was an interstate transaction that affected interstate commerce, satisfying this element of a RICO violation.

**Third,** a person "conducts" the affairs of an enterprise when he "participates in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993). A person "participates in the operation or management of the enterprise" when he "directs" or has "some part in directing" the enterprise's affairs." *Id.* at 179. EIN testified that Naftali conducts the day-to-day decisions for EIN, [P. Ex. 5] at 9:15-25, and as such, Naftali directed the affairs of Enterprise as its ringleader in overseeing its collection of unlawful debt. Naftali also had a 30% equity stake in Fast Capital Partners, which served as EIN's in-house broker shop. [P. Ex. 5 at 38:1-19]. Slavin participated in the Enterprise's collection of unlawful debt by having the distinct role of serving as EIN's in-house debt collection department, and thus also constitutes a person that "participates" in the Enterprise's management. [P. Ex. 4] at 8:14-14:3. Woodley likewise "participated" in the Enterprise as EIN's in-house broker, Fast Capital Partners, which would solicit merchants to under into EIN's usurious loans disguised as

MCA agreements.  [P. Ex. 5] at 38:7-38:23, 68:5-10, and 104:12-13. Thus, Plaintiffs have proven the third and fourth elements under *Durante* because each individual was associated with the Enterprise and each individual had a distinct role in the Enterprise's goal of collecting unlawful debt. *Durante*, at 248 (2d Cir. 1985).

**Fourth**, per above, the transaction is really a loan with an interest rate of 115%, which renders it criminally usurious.  *See, e.g, Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021) ("Thus, loans proved to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument.").  An interest rate of 115% is far more than twice the limits under California and New York law and is therefore "unlawful debt" under RICO. 18 U.S.C. § 1961(6)(B). Thus, Plaintiffs have established the fifth and seventh RICO violation elements. *Durante*, at 248 (2d Cir. 1985).

**Fifth**, the Enterprise is engaged in the business of lending money as EIN testified it has issued "hundreds" of MCAs to merchants through years of operation. [P. Ex. 5] at 95:20-25. Correspondence sent by the Enterprise to Plaintiffs discussing the MCA described the product as an "EIN loan." [P. Ex. 64]. Plaintiffs have established the sixth element for proving a RICO violation. *Durante*, at 248 (2d Cir. 1985).

**Sixth**, a plaintiff suffers damages for the collection of unlawful debt when it pays more back on the usurious loan than it received as principle, with that difference being trebled under the RICO statute.  *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*,

2022 U.S. Dist. LEXIS 148032, *21 (S.D.N.Y. Aug. 17, 2022).  Plaintiffs received $228,536 under the MCA Agreement and repaid EIN $337,200.  [P. Exs. 85-90, 104].

**Claim 2:  Conspiracy To Violate RICO Through Collection Of Unlawful Debt And Predicate Acts Of Wire Fraud.**

Slavin explicitly created his own company, GFJG Consulting, to enter into an agreement with EIN so that he/GFJG could further the Enterprise by acting as collection agent on the unlawful debt while sharing the office with EIN.  [P. Ex. 4] at 8:14-14:3.  Woodley, for his part, worked at Fast Capital Partners, EIN's in-house broker department which entered into an ISO agreement with EIN to serve as EIN's broker agent for soliciting MCA deals while sharing an office with EIN.  [P. Ex. 5] at 37:21-39:11,  68:5-10, 104:12-13,  88:20-24, 104:12-13.    Thus, Woodley, through his employment with Fast Capital Partners, also entered into an agreement with the Enterprise to serve the function of soliciting merchants into entering unlawful debt with EIN disguised as EIN MCA.  EIN testified that it retained Hartford as a broker for EIN, which has brought in hundreds of MCA deals for EIN since the start of 2019.  [*Id*.] at 41:2-16, 45:21-46:19, and 180:6-12. Naftali founded EIN in January 2016 and made himself its Managing Member under EIN's operating agreement, thereby also establishing his agreement to participate in the conspiracy to collect debt.  [*Id*.] at 6:1-14:20. EIN testified that it authorizes its brokers, which would include Stein, Hartford, Woodley and Fast Capital Partners, to make offers on EIN's behalf to merchants, [P. Ex. 5 at 213:11-216:4], which would include the fraudulent statements made by Stein

and Hartford between January and March 2019, [P. Exs. 51 and 78], and fraudulent statements made by interstate wires by Woodley. [P. Exs. 113, 145].

**Claims 3-6: Promissory Estoppel, Fraud, Intentional Misrepresentation, and Negligent Misrepresentation**

First, Defendants' agents Hartford and Stein made a clear and unambiguous promise to Plaintiffs in an e-mail on January 8, 2019. *See* [P. Ex. 51]. This e-mail by Defendants' agents promised Plaintiffs a $750,000 LOC "priced on a term up to 60 months. We can submit in 30 days. The payment would depend on what you draw on. If you max out, the payment would be approximately $18,500 per month. This is priced on 8.89% . . . Deal stands contingent on you not taking other funding or missing payments." [P. Ex. 51]. Thus, all the terms for a "pre-approved" LOC were set forth in writing, and Stein and Hartford explained that the only conditions Plaintiffs had to meet to receive this "pre-approved" LOC was that it would make the first 30 payments on the MCA and not take any additional funding during that time.  [*Id.*]

Similarly, Woodley made a clear promise to Plaintiffs in February 2019 that he could and would help Plaintiffs secure a $1 million standard loan from Wells Fargo.  [P. Ex. 6] at 99:2-101:19; [P. Ex. 58] at 80:25-83:3. On March 1, 2019, Woodley texted Vahe to confirm he was meeting with Wells Fargo that day to discuss a loan for Plaintiffs. [P. Ex. 118]. On March 7, 2019, Wells Fargo responded that they were "not sure we could help." [P. Ex. 113] at 2. Woodley did not inform Plaintiffs that Wells Fargo stated it was "not sure we could help." [P. Ex. 58] at 158:3-11. Instead, on March

14, 2019, Plaintiffs asked Woodley for an update and stated "[t]hey are trying to work off your receivables. There is not enough equity for the[m] to utilize. We are waiting for their decision." [P. Ex. 145].

There can be no question that Stein and Hartford were acting as Defendants' agents in their solicitation of Plaintiffs to enter into the EIN MCA in consideration for the promise that a "pre-approved" LOC for $750,000 would be awarded to Plaintiffs after making 30 payments. Stein worked for Hartford while Hartford was operating under an Agent agreement it entered into with EIN whereby Hartford would serve as EIN's broker and solicit merchants, like Plaintiffs, into entering EIN's MCAs. [P. Ex. 5] at 41:2-16, 45:21-46:19, and 180:6-12. After proposing the terms of the MCA Agreement to Plaintiffs, Hartford and EIN had communications in which they listed the terms of the MCA Agreement and EIN expressly authorized Hartford that "[t]he buy rate starts at 1.32 and you can upsell to 1.44." [P. Ex. 186]. EIN testified that by allowing Hartford to charge a factor rate up to 1.44, it would "maximize" Hartford's commission. [P. Ex. 5 at 174:1-12]

Defendants belated production of the Hartford Agent Agreement with EIN expressly states that Hartford is EIN's "Agent," as an entire section titled "Agent Obligations" is dedicated to Hartford's obligations, which include marketing and promoting EIN's MCAs to merchants. [P. Ex. 171] § 1; *see also* [P. Ex. 172] (Defendants producing the Hartford ISO Agreement on May 9, 2025). Hartford was paid commission by EIN for bringing in MCA deals and the greater the difference

-29-

between the purchase price and the repayment amount on the MCA deals brokered by Hartford/Stein, the greater the commission they would earn for EIN.  [*Id*.] at 174:13-175:5.  Thus, Hartford and Stein were acting within the official scope of their business relationship with EIN when they solicited Plaintiffs into entering into the EIN MCA Agreement and acting in their own self-interest over that of Plaintiffs. EIN testified that it authorizes its brokers, which would include Woodley, Fast Capital Partners, Hartford and Stein, to negotiate an offer EIN gives them with the merchant and that the broker has EIN's authorization to make the offer on EIN's behalf, with EIN paying the broker. [P. Ex. 213:11-216:4].  This satisfies all the elements for Defendants' liability for torts committed by Stein and Hartford against Plaintiffs because the tort here, the fraudulent statement about Plaintiffs being "pre-approved" for a LOC as long as they made 30 payments on the MCA Agreement, was committed as part of their brokerage services for EIN.  *See Park v. Prop. Work, LLC*, 2024 Cal. Super. LEXIS 53814, *17 (Cal. Super. Ct. April 16, 2024) ("Common law *respondeat superior* doctrine holds an employer vicariously liable for the tortious acts of its employees when those acts are done 'within the scope of his or her employment . . . California law construes the 'scope of employment' broadly for purposes of *respondeat superior*.  'An essential element of respondeat superior is a casual nexus or reasonable relationship between the duties of employment and the conduct causing injury.'") (citations omitted).

Correspondingly, there can be no question that Woodley was acting as EIN's agent when he made representations to Plaintiffs about his ability and progress in

securing a loan for Plaintiffs from Wells Fargo. Woodley worked as a broker for Fast Capital Partners, which served as EIN's in-house brokerage department and had signed an Agent agreement with EIN. [P. Ex. 5 at 37:21-39:11, 68:5-10 88:20-24,104:12-13]. When Woodley contacted Wells Fargo to inquire about a loan for Plaintiffs, he did so using an EIN email address and presented himself as a "Senior Regional Manager" for EIN. [P. Ex. 113]. Woodley also represented to Plaintiffs that he was a "Senior Regional Manager" or EIN prominently on January 15, 2019. [P. Ex. 65]. As part of Fast Capital Partners and EIN's in-house brokerage, Woodley received compensation from EIN for the deals he brokered on its behalf, with Woodley receiving more commission the greater the difference between the purchase price and the repayment amount in the EIN MCA deals he brokered. [P. Ex. 5 at 174:13-175:5]. Woodley also testified that his commission for deals like that of the EIN MCA Agreement increase the more the merchant has to repay the MCA company. [Plaintiff Ex. 58 at 158:3-11].

Second, Plaintiffs reasonably and foreseeably relied on Stein's and Hartford's promise that if they entered into the MCA and made 30 payments thereon, they would receive the $750,000 LOC. The promised LOC was described as "pre-approved" in writing, [P. Ex. 51], thereby making it reasonable for Plaintiffs to surmise that it would be theirs immediately or shortly after they made 30 payments on the MCA. EIN confirmed that Hartford was employed by EIN to perform broker services like that offered by Hartford and Stein to Plaintiffs, [P. Ex. 5] at 41:2-16, 45:21-46:19, and 180:6-12, making Plaintiffs' reliance on Hartford's and Stein's promise all the more

reasonable. Moreover, Plaintiffs remained in regular contact with Stein/Hartford both while making the first 30 payments, and for weeks after asking for updates, with Stein consistently informing Plaintiffs the LOC would only require more time. *See* [P. Ex. 78]. Stein and Hartford knew Plaintiffs had relied on their promised LOC because Vahe explained to them on February 19, 2019 (after already making more than the requisite 30 payments on the MCA Agreement) that "I have a massive tour just launched and have a ton of costs coming up.  I had planned everything around the 30 day mark." [*Id.*] at 12. Vahe further explained to Stein/Hartford on February 25, 2019 that "I am out of time Bryan.  I need this [LOC] today.  Please keep me posted.  If this is not happening, I need to know ASAP . . . I had planned everything based on the timeline of 30 days and the delay is causing issues now.  Hope you understand my situation." [*Id.*] at 13.  Even after being informed that the delayed promised "pre-approved" LOC was causing issues to Plaintiffs' business, Stein did not respond to Plaintiffs to tell them that the LOC would not be coming through, instead Stein continued insinuating Plaintiffs just needed to be patient. [*Id.*] at 13-16. The evidence proves that Plaintiffs reasonably believed they had a firm offer for the LOC if they made 30 days payment, which they did, and continued to obtain reassurances from Defendants' agents that the LOC would be forthcoming, making their reliance foreseeable and reasonable.

Plaintiffs also reasonably relied on Woodley's promise that he would help secure them a Wells Fargo loan. Plaintiffs and Woodley had been having communications involving Woodley and Fast Capital Partners providing Plaintiffs with funding since

September 2018. [P. Ex. 20]. On March 1, 2018, Woodley assured Plaintiffs that the Wells Fargo loan could materialize soon. [P. Ex. 118]. Woodley was aware that Plaintiffs had expected to receive the $750,000 LOC from Stein and Hartford, and this is what prompted Woodley to raise the prospect of the Wells Fargo loan.  [P. Ex. 31]. On March 7, 2019, however, Woodley's contact at Wells Fargo told Woodley, who was using an EIN email address, that Wells Fargo could not provide a loan to Plaintiffs. [P. Ex. 113] at 2. Plaintiffs reasonably relied that a Wells Fargo loan could become on March 14, 2019, Woodley misrepresented to Plaintiffs that Wells Fargo was still considering Plaintiffs for a loan.  [P. Ex. 145].

Third, Plaintiffs were injured by relying on Defendants' agents' promises that they would receive the LOC upon making 30 payments on the MCA Agreement.  As shown above in the evidence for Plaintiffs' first claim, entering the MCA itself caused damages to Plaintiffs in the amount of $111,664, representing the usurious interest Defendants obtained on the MCA. Plaintiffs even explained to Defendants on February 28, 2019—after making well more than 30 payments—that without the LOC the MCA was a net negative to Plaintiffs because of its high interest. [P. Ex. 31]. Notably, this e-mail expressly informed Woodley that Plaintiffs were waiting on the LOC, which Woodley did not respond with any questions or surprise to, but rather said there was nothing EIN could do to alter the terms of the MCA Agreement. [*Id.*].  Plaintiffs testified how the loss of the LOC, even notwithstanding Plaintiffs' attempts at securing alternative financing, resulted in additional harm, such as losing thousands of ticket

sales which resulted in monetary and reputational damages.  [P. Ex. 6] at 42:8-43:17 and 127:8-17.

Plaintiffs were further harmed my Woodley's false promises that he could obtain them the Wells Fargo loan while the prospect of the LOC looked dim. Woodley continued giving Plaintiffs knowingly false hope through March 2019 when he misrepresented to Plaintiffs that they were still eligible for a loan from Wells Fargo even after Wells Fargo had declined.   *Compare* [P. Ex. 113 at 2] *with* [P. Ex. 145].  As a result, Plaintiffs were induced to delay securing actual alternative financing until later in the summer, at which point, Plaintiffs only options were other MCA lenders, which, in turn, resulted in hundreds of thousands in damages from judgments by these MCA lenders being issued against Plaintiffs.  [P. Exs. 77, 81, 83, 91].

Claim 7:   The evidence put forth above in support of Plaintiffs claims for collection of unlawful debt and fraud and misrepresentation claims also form the basis for Plaintiffs' unfair business practices claim. For one, usury violates California's strong public policy. This immoral and unethical practice was exacerbated by the false promise that Plaintiffs would receive the $750,000 LOC if they agreed to enter into the MCA, which never materialized. Defendants exhibits further unethical behavior by making the additional false representation that they could and would secure a Wells Fargo loan for Plaintiffs when Woodley acknowledged he had never obtained such a product for a client before, and even after Wells Fargo said it was not able to offer a loan, Woodley

continued to give Plaintiffs false hope while simultaneously pitching new MCA agreements to Plaintiffs.

   **d) Summary statement of Defendants' affirmative defenses, (e) elements to establish each affirmative defense, and (f) a brief description of the key evidence relied on in opposition to each affirmative defense**

As set forth in the accompanying Proposed Pretrial Conference Order, Defendants are only pursuing a fraction of their originally pled affirmative defenses, and what remains are (1) judicial estoppel (Thirteenth Affirmative Defense); (2) unclean hands (Eleventh Affirmative Defense); (3) Waiver (Twelfth Affirmative Defense); (4) statute of limitations (Eight Affirmative Defense); (5) an unpled fraudulent inducement; and (6) an unpled in pari delicto defense.  Below Plaintiffs address these six defenses that Defendants will raise at trial.

**First Affirmative Defense** (Failure to State a Claim):

Elements:  Not applicable.

Evidence in Opposition:  Plaintiffs RICO claim for collection of unlawful debt was pled in the Complaint.  A claim unlawful debt collection claim in violation of RICO is subject to the basic pleading standard of FRCP Rule 8. *Lateral Recovery LLC v. Funderz*, 2024 U.S. Dist. LEXIS 10134, *24 (S.D.N.Y. Jan. 19, 2024).  The Complaint alleges that the MCA Agreement was a "Bridge Loan" with an interest rate of 180%. [P. Ex. 1] ¶ 26.  An interest rate of 180% is more than twice the lawful maximum rate allowed by New York (25%), N.Y. Penal Law § 190.40, and the maximum rate allowed by California (20%). *See* Ca. Stats. 1919, p. lxxxiiii, and Stats. 1919 p. lxxxiii, § 3, and

Article XV, § 1 of the California Constitution (the higher of 10%, or 5% plus the prevailing rate of the Federal Bank Reserve). As such it constitutes unlawful debt under 18 U.S.C. § 1961(6)(B). Plaintiffs asserted that their RICO claims were premised on violations of 18 U.S.C. § 1962(c), [P. Ex. 1] ¶¶ 44-46, and § 1962(c) includes RICO violations for collection of unlawful debt.

Plaintiffs also alleged RICO violations premised on wire fraud in the form of at least two predicate acts: (1) the fraudulent promise that Plaintiffs would receive a $750,000 line of credit ("Term Loan") upon making 30 payments on the MCA Agreement; and (2) the fraudulent promise that Defendants could secure Plaintiffs a Wells Fargo loan. [P. Ex. 1] ¶¶ 26, 28, 36-38, 57, 64, 65, 67, 70, 73, 74, 83, 85, 92. Plaintiffs RICO complaint expressly asserted that these acts violated RICO statute 18 U.S.C. § 1961(1), which includes wire fraud. [*Id.*] ¶ 45-46.

Plaintiffs' third through sixth claims for (1) promissory estoppel; (2) fraud; (3) intentional misrepresentation; and (4) negligent misrepresentation incorporated by reference all prior paragraphs and explicitly re-asserted that they were premised on the false and misleading statements concerning the line of credit and Wells Fargo loan. [P. Ex. 1] ¶¶ 26, 28, 36-38, 42, 49, 56, 57, 63-65, 67, 70, 72-74, 80, 83, 85, 88, 92.

Plaintiffs' seventh and final cause of action for violations of UCL § 17200 incorporated by reference all the prior allegations concerning the collection of unlawful debt and fraud related to the promised line of credit and Wells Fargo loan. [*Id.*] ¶ 88.

The Complaint stated how this conduct constituted unfair and deceptive business practices in violation of UCL § 17200. [*Id.*] ¶¶ 89-92.

Per the above, Plaintiffs adequately alleged each of their causes of action in the Complaint. To the extent the Court finds any merit to Defendants' affirmative defense for failure to plead, this is readily curable under FRCP Rule 15(b)(1). *See also*, *Stiles v. Gove*, 345 F.2d 991 (9th Cir. 1965) (affirming trial court's decision to grant leave to amend to conform to evidence).

**Eighth Affirmative Defense** (Statute of Limitations) Summary:

Elements: "Civil RICO actions are governed by a four-year statute of limitations." *Parker v. Barlow*, 2024 U.S. App. LEXIS 16274, *3 (9th Cir. July 3, 2024).

"Contract claims and promissory estoppel [other than an oral promise] are subject to a four year statute of limitations." *Perez v. CitiMortgage, Inc.*, 2014 U.S. Dist. LEXIS 82356, *8 (C.D. Cal. June 10, 2014) (citing Cal. Civ. Proc. Code § 337(1)).

A cause of action based on fraud under California law is subject to a three-year statute of limitations, but the "cause of action in that case is not deemed to have been to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Code Civ. Proc. § 338(d). "When, as here, the underlying fraud is a continuing wrong, a convincing rational exists for delaying the running of the statute of limitations. Just as the statute of limitations does not run against an action based on fraud so long as the fraud remains concealed, so ought the statute to be tolled *even after fraud is discovered, for so long as the sheer economic duress or undue*

*influence embedded in the fraud continues to hold the victim in place*."  *Wyatt v. Union Mortgage Co.*, Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 788 (Cal. 1979)).

"A three-year statute of limitations applies to . . . negligent misrepresentation claims. California Code of Civil Procedure § 338(4) provides a statute of limitations of three years for causes of action sounding in fraud.  Here, the statute of limitations accrues at the time the allegedly aggrieved party discovers the facts giving rise to the fraud, or through the existence of diligence would have discovered such facts." *Brown v. Shimano Indus. Co.*, 1990 U.S. Dist. LEXIS 18797, *3-4 (C.D. Cal. Nov. 21, 1990) (citing *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 827-28 (Cal. App. Dist. Ct. 1983)).

<u>Evidence in Opposition</u>:  The alleged unlawful debt transaction was entered into on January 8, 2019, [P. Ex. 3], and the alleged fraudulent and misrepresented promised was made on January 8, 2019, as well. [P. Ex. 65]. Woodley falsely stated that Plaintiffs were still being considered for a Wells Fargo loan on March 14, 2019, [P. Ex. 145], after he received an e-mail from Wells Fargo on March 7, 2019 informing him the opposite.  [P. Ex. 1113] at 2.  Plaintiffs filed their first complaint against Defendants on October 28, 2019, [P. Ex. 74], which was approximately 9 months and 20 days after Stein's January 8, 2019 promise about the LOC and approximately 7 months and 14 days after Woodley's statement on March 14, 2019, that Plaintiffs were still being considered for the Wells Fargo loan.  This first complaint raised claims for promissory estoppel, fraud, intentional misrepresentation, and negligent misrepresentation relating to the promised LOC and promised Wells Fargo loan.  [P. Ex. 198] ¶¶ 23-28, 37-38.

On March 4, 2022, Plaintiffs filed the instant Complaint governing this action, which was removed to this Court on April 1, 2022. [P. Ex. 1]. The instant Complaint re-asserted the previously asserted claims of promissory estoppel, fraud, intentional misrepresentation, and negligent misrepresentation against Defendants premised on the false promises concerning the LOC and Wells Fargo loan. [*Id.*] ¶¶ 23-28, 37-38, 56-87. The instant Complaint also asserted that Defendants collected unlawful debt and brought claims for RICO violations and conspiracy to violate RICO. [*Id.*] ¶¶ 21, 24, 26, 30, 42-54. The instant complaint was filed three years, 1 month, and 24 days from the date the MCA Agreement was entered into on January 8, 2019. *Compare* [P. Ex. 1 *with* Ex. 3]. Plaintiffs discovered the LOC fraud no earlier than March 19, 2019, when Stein finally informed Plaintiffs that the LOC may not materialize even after Plaintiffs fulfilled the terms of the promise. *Compare* [P. Ex. 65] *with* [P. Ex. 128].

**Eleventh Affirmative Defense** (Unclean Hands):

Elements:  "The elements of unclean hands are: 1. Conduct by Plaintiff that was unconscionable, bad faith, or inequitable; 2. In connection with the matter in controversy; and 3. In would be inequitable to provide Plaintiff relief." *Heffernan v. Blizerian*, 2024 Cal. Super. LEXIS 60791, *6 (Cal. Super. Ct. Dec. 10, 2024).

Evidence in Opposition:  Defendants' unclean defense derives from purported representations made by Plaintiffs during a recorded funding call immediately prior to the MCA being executed (which Plaintiffs dispute). Notably, Defendants failed to preserve this recorded funding call, and failed to produce this recorded funding call

despite Woodley alerting Slavin, in response to an email from Vahe about the bait-and-switch LOC fraud, that "[j]ust so you know this guy may pursue legal action." [P. Ex. 27] at 6. EIN testified that it the records of its recorded funding calls would typically be held for one or two years in the normal course. [P. Ex. 5] at 55:22-56:17. EIN even testified that they re-listened to the recorded funding call after Vahe raised the issue of being bated-and-switched with the LOC, [*Id.*] at 54:8-56:17, yet it was still not preserved. This entitles Plaintiffs to an adverse inference that the recorded funding call does not support Defendants' statements about what was said therein and that, being the only basis for this affirmative defense, renders it not viable. *Apple Inc. v. Samsun Elecs. Co.*, 888 F. Supp. 2d 976, 985 (N.D. Cal. 2012) ("It is firmly established in the Ninth Circuit that '[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoilation of relevant evidence,' which includes the power 'to permit a jury to draw an adverse inference form the destruction or spoilation against the party or witness responsible for that behavior.'") (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).

But even in the absence of the recorded call, Defendants did in fact—belatedly—produce a copy of the contemporaneous notes relating to that call—and no such questions or representations were made. [P. Ex. 191]. Defendants withholding of relevant documents until after their depositions also permitted them to commit perjury, as described herein, during their depositions on crucial issues, including the false

statement that Hartford was Plaintiffs' agent and that EIN had nothing to do with Bryan Stein.  Defendants are the parties with unclean hands, not Plaintiffs.

**Fifteenth Affirmative Defense** (Failure to Mitigate):

Elements:   Failure to mitigate involves proof of the following elements: (1) a party has suffered damage resulting from a breach of contract or tort; (2) the party failed to take reasonable steps and exercise ordinary care to mitigate the damages; and (3) losses which could have been avoided for which there can be no recovery. *Valle De Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (Cal. App. Ct. 1994).

Evidence in Opposition:  As reflected in Plaintiffs amended responses to Naftali's interrogatories, once the promised Line of Credit and Wells Fargo loan never materialized, Plaintiffs mitigated their damages by entering into various other MCA agreements with other usurious MCA lenders.  [P. Ex. 102].  Specifically, starting in May 2019, Plaintiffs took out MCA agreements with five MCA companies to try to replace the fraudulently promised funding of the Line of Credit and Wells Fargo loan, but since Plaintiffs could not maintain the usurious interest on these loans, it only resulted in judgments being entered against Plaintiffs in the amount of $1,638,328.19.  [P. Exs. 76, 77, 81, 83, and 91].  Plaintiffs made additional efforts to secure financing from friends more legitimate lenders, [P. Ex. 102 at Ex. A], but by this point Plaintiffs were already experiencing significant six-figure losses each on various tour dates IMS had planned for 2019, leaving Plaintiffs unable to pay off these loans as well.  [*Id*.].

Plaintiffs made all these efforts to secure replacement financing in 2019, [*Id.*] and thus acted diligently to mitigate their damages.

**Twelfth Affirmative Defense** (Waiver):

Elements:  "The elements of waiver are: 1. Plaintiff knew Defendant was required to perform; and 2. Plaintiff freely and knowingly gave up their right to have Defendant perform this obligation."  *Heffernan*, at *6 (citing *Wind Dancer Production Group v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (Cal. App. Dist. Ct. 2017)).

Evidence in Opposition:  As set forth above in Plaintiffs' response to Defendants' statute of limitations affirmative defense, nothing in Plaintiffs' conduct could be construed as a waiver as they have diligently pursued their claims timely.  Moreover, Defendants have not presented any evidence in the form of a statement by Plaintiffs that they waived their claims.

**Eighteenth Affirmative Defense** (Release):

Elements:  A release is an affirmative defense that may foreclose a party from pursuing claims that they specifically released. *Baker v. Ferrel*, 78 Cal. App. 2d 578, 579 (1947).

Evidence in Opposition:   The settlement agreement with Hartford expressly provides:  **"It is expressly understood that nothing in this Settlement Agreement shall in anyway be interpreted to preclude any action against or act as a release of the EIN Defendants and its agents, officers, directors, shareholders, employees, successors, assignees, administrators, attorneys and other representatives."**.

**Thirteenth Affirmative Defense** (Estoppel):

Elements:  "A party asserting the defense of estoppel must establish the following elements: (1) the party estopped must know the facts; (2) the party estopped must engage in conduct intended to be acted upon by the party asserting estoppel; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) the injury must result from reliance on the other's conduct."  *Wells Fargo Bank v. Bank of America*, 32 Cal. App. 4th 424, 437-38 (Cal. App. Dist. Ct. 1995) (citations omitted).

Evidence in Opposition:  The Complaint pled and put Defendants on notice that Plaintiffs were asserting a claim of unlawful debt.  A claim unlawful debt collection claim in violation of RICO is subject to the basic pleading standard of FRCP Rule 8. *Lateral Recovery LLC v. Funderz*, 2024 U.S. Dist. LEXIS 10134, *24 (S.D.N.Y. Jan. 19, 2024). The Complaint alleges that the MCA is a loan, specifically defining it as the "Bridge Loan" and alleges that the "Bridge Loan" had an annual interest rate of 180%. [Doc. No. 1] ¶ 26. The Complaint further alleges that the Bridge Loan was "high interest" and part of the bait-and-switch global scheme to trick Plaintiffs into fully paying off the Bridge Loan when Plaintiffs were promised after 30 days it would convert to the low interest $750,00 LOC. [*Id.*] ¶¶ 36-38. The Complaint's RICO cause of action explicitly states it was premised on violation of 18 U.S.C. § 1962(c). [*Id.*] ¶¶ 44-46. 18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or

the activities of which affect, interstate or foreign commerce." The Complaint, therefore, adequately alleged collection of unlawful debt cause of action.

In addition to the Complaint, Plaintiffs repeatedly put Defendants on notice during discovery that they were pursuing a RICO unlawful debt claim. Plaintiffs described the MCA as a loan in their September 17, 2024 responses to EIN's interrogatories. [P. Ex. 100]. Plaintiffs further served amended answers to Naftali's interrogatories, on January 16, 2025, explicitly stating that Plaintiffs' damages from loans, previously disclosed in Plaintiffs' March 22, 2024 initial disclosures, [P. Ex. 84], "includes the unlawful debt collected on the January 8, 2019 EIN MCA, which is governed by New York law, is functionally and substantively a usurious loan . . . . Consequently, Plaintiffs damages just on the EIN MCA Agreement are $132,000 which is trebled to $396,000." [P. Ex. 102 at Response No. 13]. Moreover, on January 13, 2025, Plaintiffs provided Defendants a RICO statement letter setting forth how the Complaint asserted a RICO claim for collection of unlawful debt, which was never responded to by Defendants. [P. Ex. 174]. Plaintiffs made all these disclosures *before* any of the Defendants were deposed. To the extent Defendants maintain they were somehow prejudiced by this claim despite the repeated prior notice, it was self-inflicted, as EIN's corporate witness Naftali admitted he did nothing to prepare for EIN's deposition. [P. Ex. 5] at 70:19-21 (Q. What did you do to prepare for today's deposition? A. Nothing.).

Defendants' estoppel argument also misconstrues arguments made by Plaintiffs in opposing Defendants' motion to transfer venue. [ECF No. 68]. Plaintiffs' opposition to Defendants' motion to transfer venue asserted numerous grounds for denial, including (1) dismissal based on non conveniens grounds is no longer an option under Federal law; (2) the forum selection clause is not applicable because Plaintiffs have not alleged breach of the MCA Agreement; (3) the forum selection clause is not dispositive; (4) Defendants waived their right to bring the motion because they availed themselves of this Court's forum; and (5) Defendants failed to meet and confer with Plaintiffs on a motion to dismiss.  [ECF No. 78] at 1.

As Plaintiffs argued, "[w]here a cause of action is broader than the scope encompassed by the forum selection clause, the clause does not apply to the cause of action." [*Id.*] at 3. As described above, Plaintiffs asserted a RICO claim based on predicate acts of wire fraud and collection of unlawful debt, which necessarily makes this RICO claim broader than the scope of the MCA's forum selection clause.  Equally important, but omitted from Defendants papers, is that Defendants framed the invocation of the MCA's forum selection clause because, in their words, "[t]he Complaint filed in this action alleges, *inter alia*, fraudulent inducement of the Merchant Agreement." [ECF No. 69] at 4. It was this argument that Plaintiffs responded to, correctly, that a fraudulent inducement claim would not turn on an interpretation of the MCA Agreement. [ECF No. 78] at 4-5. Defendants' arguments concerning Plaintiffs' statements in opposition to their motion to transfer venue ignore the fact that Defendants

raised the forum selection clause argument in connection with the fraudulent inducement claim, not the RICO unlawful debt collection claim. As Plaintiffs noted in opposing the motion to transfer, the MCA Agreement was only one link in the chain, and that the "crux" of the claim was "the false promise by Defendants that they would provide a $750,000 line of credit ('Term Loan') to Plaintiffs if they took the $250,000 bridge loan contemplated in the Merchant Agreement. The $750,000 was not memorialized in the Merchant Agreement, and *the Merchant Agreement was just one part of this elaborate scheme*." [*Id.*] at 5 (emphasis added).

Thus, as Plaintiffs correctly noted, "[t]his dispute goes far beyond the ordinary terms of the Merchant Agreement into misrepresentations made outside the scope and terms of the Merchant Agreement . . . The Merchant Agreement was just one link in the chain of misconduct by Defendants." [*Id.*] at 5-6. Defendants cannot argue that these statements misled them as to Plaintiffs claim for collection of unlawful debt because their reply reiterated their understanding that Plaintiffs claims included damages in the interest payments on the MCA Agreement. [ECF No. 79] at 3. Defendants' own Reply Brief even acknowledged that Plaintiffs maintained that the MCA Agreement had a usurious interest rate of 15% per month, or 180% per annum. [*Id.*] at 2-3. Defendants always understood that a component of Plaintiffs claimed damages included the high interest collected on the MCA Agreement, i.e., the collection of unlawful debt.

Significantly, it is true that interpretation of the MCA Agreement is not necessary to show that it is a loan to constitute unlawful debt. Under both California and New York law, a transaction will be evaluated by the substance of its true nature and not its form.

Finally, estoppel is a form of equitable relief. *City of Galt v. Cohen*, 12 Cal. App. 5th 367, 384 (Cal. Dist. App. Ct. 2017). "The doctrine of unclean hands prevents a party form obtaining either legal or equitable relief when that party has acted inequitably or with bad faith relative to the matter for which relief is sought." *People v. Wickham*, 222 Cal. App. 4th 232, 238 (Cal. Dist. App. Ct. 2013). Defendants assert this estoppel defense with unclean hands. First, in addition to the Complaint, Plaintiffs further put Defendants on notice they were pursuing an unlawful debt claim through supplemental interrogatory responses and a RICO statement letter, yet EIN and Naftali still consciously chose not to prepare for their deposition. Second, Defendants intentionally withheld documents that support Plaintiffs' unlawful debt claim until after their depositions were completed and were only produced on May 15, 2025. [P. Ex. 185]. Among these withheld documents during discovery was a January 8-9, 2018 email chain between Hartford and EIN in which the parties described the MCA Agreement as having a fixed term while acknowledging that they were not actually purchasing IMS's receivables given their notes indicated that IMS had already sold its receivables in three prior MCA agreements. [P. Ex. 186]. These are just a small example of the wrongful conduct by Defendants in this case, which is fully briefed below in the section on

Plaintiffs' claim for punitive damages. At bottom, Defendants are precluded from asserting the equitable defense of estoppel given their demonstrative unclean hands.

**Ninth Affirmative Defense** (Offset):

Elements: Offset is an equitable process, to be applied in the discretion of the fact finder, such that consideration may be given, where equitable, to the value of any special benefit conferred by that act. The value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable. *Turpin v. Los Angeles Unified Sch. Dist. v. Torres Constr. Corp.,* 57 Cal. App. 5th 480, 500-01 (Cal. App. Ct. 2020).

Evidence in Opposition: Per above, offset is a discretionary equitable defense. As set forth in Plaintiffs' responses to Defendants' estoppel affirmative defense, Defendants are precluded from raising equitable defenses due to their own unclean hands. In addition, Plaintiffs expended far more than $110,000 in legal fees to prosecute their claims against Hartford and Stein such that there is no offset to be had once this settlement amount is applied to Plaintiffs' legal fees to date.

**Judicial Estoppel** (unpled):

Elements: Judicial estoppel occurs where a party's later position is "clearly inconsistent" with its earlier position, whether the party has succeeded in persuading a court to accept that party's earlier position, and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

<u>Evidence in Opposition</u>:  This unpled affirmative defense fails for the same reasons raised above in opposition to Defendants' estoppel argument.  Moreover, "Defendants cannot raise unpled affirmative defenses or counterclaims at trial."  *Peace United, Ltd. v. 1906 Collins, LLC*, 2022 U.S. Dist. LEXIS 127323, *4 (S.D. Fl. July 18, 2022).

**Equitable Estoppel** (unpled):

<u>Elements</u>:   The elements an equitable  estoppel defense  are:  (1)  an  admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act. The party asserting estoppel must prove each element by clear, cogent, and convincing evidence. An insurer can be estopped from enforcing its suit limitation provision where its conduct causes the insured to refrain from performing a necessary act that causes her prejudice.  *Hunting v. Am. Family Mut. Ins. Co*., No. 20-35916, 2021 U.S. App. LEXIS 37908, at *1 (9th Cir. Dec. 22, 2021).

<u>Evidence in Opposition</u>:  This defense fails for the same reasons raised above in opposition to Defendants' estoppel argument.

**Fraudulent Inducement** (unpled):

<u>Elements</u>:  The elements of fraudulent inducement are "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Hinesley v. Oakshade Town Center*, 135 Cal. App. 4th 289, 294 (Cal. Ct. App. 2005).

Evidence in Opposition:  *See supra* pgs. 45-46 (discussing funding call spoilation and belated evidence produced by Defendants refuting the basis of this defense).

Defendants, despite the facts of their fraud theory being known at the time of their Answer, did not assert fraudulent inducement as an affirmative defense.  *See generally* [ECF No. 2].  "Defendants cannot raise unpled affirmative defenses or counterclaims at trial."  *Peace United, Ltd. v. 1906 Collins, LLC*, 2022 U.S. Dist. LEXIS 127323, *4 (S.D. Fl. July 18, 2022).

**In pari delicto** (unpled):

Elements:  "In pari delcito means, 'in equal fault; equally culpable or criminal; in a case of equal fault or guilt.' (Blacks Law Dict. 6th ed. 1990) p. 791, col. 1.) . . . A court will neither aid in the commission of a fraud by enforcing a contract, nor relieve on of two parties to a fraud from its consequences, where both are *in pari delicto*.'"  *Jacobs v. Universal Dev. Corp.*, 53 Cal. App. 4th 692, 699 (Cal. Dist. App. Ct. 1997) (citations omitted).

Evidence in Opposition:  As set forth above, Plaintiffs did plead and put Defendants on notice of their unlawful debt claim, ergo the premise that Defendants have to make this unpled affirmative defense now to address an unpled claim is incorrect.  Defendants cannot raise unpled affirmative defenses or counterclaims at trial."  *Peace United, Ltd. v. 1906 Collins, LLC*, 2022 U.S. Dist. LEXIS 127323, *4 (S.D. Fl. July 18, 2022).

Moreover, even assuming the basis for the in pari delicto defense is true (which it is not), Vahe's purported failure to disclose the promise made by Defendants' agents Stein

and Hartford cannot be found to be "equal" to the conduct of Defendants in duping Vahe into entering into the MCA which constituted unlawful debt. First, Vahe fully paid off the MCA, leaving Defendants with no harm by which Vahe could be responsible for as a purported co-fraudulent actor. *See* [P. Ex. 46] (June 14, 2019 letter from EIN to IMS reflecting that the MCA had a zero balance). Second, California courts "regularly held that a borrower and a lender are not *in pari delicto* in a usurious transaction and the lender may not assert an estoppel against the borrower simply because the borrower took the initiative in seeking the loan, knew of the usurious nature of the transaction, and paid usurious interest without protest." *Buck v. Dahlgren*, 23 Ca. App. 3d 779, 787 (Cal. Dist. App. Ct. 1972) (collecting cases).  In pari delicto is not even an appropriate defense to the claim asserted by Plaintiffs for collection of unlawful debt.

Finally, since the basis of this unpled defense is supported or refuted by the recorded funding call that Defendants somehow lost or destroyed, it is subject to the same adverse inference as set forth with respect to the other affirmative defenses all of which hinge on this singular piece of evidence that was in Defendants' possession but destroyed while Defendants knew Plaintiffs may file a lawsuit.  And once again, the only existing evidence of this call is a belatedly produced written notes, which proves that no misrepresentations were made by Plaintiffs.

**Second through Fifth Affirmative Defenses** (Fault, Contributory Negligence, Comparative Fault, and Active and Primary Fault, respectively):  In the Proposed Pretrial Order, Defendants attempt to conflate their third through fourth affirmative

defenses as a singular affirmative defense which purportedly all have the same elements. As set forth in Defendants' Proposed Pretrial Order, all three of these affirmative defenses hinge on the alleged misrepresentation made by Plaintiffs during the lost recorded funding call that Plaintiffs purportedly represented they were not relying on any promise of additional funding in exchange for taking out the MCA Agreement.

Defendants' Position on the Elements: These four affirmative defenses overlap and generally rely on elements similar to that of contributory negligence which, like negligence, can be divided into its constituent elements including: (1) an act or omission; (2) a duty to so act or refrain; (3) a breach of said duty; (4) actual causation; that is, "cause in fact;" (5) legal causation; that is, "proximate cause;" and (6) injury or damage. *Curry v. United States*, 327 F. Supp. 155, 159 (N.D. Cal. 1971).

Similarly, comparative fault generally relies on the same elements as contributory negligence, but may be interpreted as applying only to non-parties. *See LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 823 (N.D. Cal. 2019) ("To avoid duplication of the defenses, the Court interprets Defendant's eight affirmative defense to apply only to non-parties—that is, that Defendant's liability should be reduced due to the fault of others (*i.e.*, non-parties).")

Plaintiffs Position on the Elements: Since Defendants now contend that these four affirmative defenses are based on the same law and facts, they are duplicative and should be stricken. *See People, Inc. v. Classic Woodworking, LLC*, 2005 U.S. Dist.

LEXIS 44641, *4 (N.D. Cal. Mar. 4, 2005) (holding that "duplicative" affirmative defenses "should be stricken from the answer"). Defendants do not identify what non-parties are involved in the purported comparative fault so that affirmative defense is also duplicative of the others.

As for the Fifth Affirmative Defense of "Active and Primary Fault", Plaintiffs are not aware of any California authority, state or Federal, that sets forth the elements for an affirmative defense of "Active and Primary Fault." In the few cases that mention such a defense, it appears California law treat the defenses the same or similarly as comparative fault. *See*, *e.g.*, *Buckner v. E.I. Dupont De Nemours & Co.*, 2006 U.S. Dist. LEXIS 108244, *9 (E.D. Cal. April 28, 2006).

<u>Evidence in Opposition</u>: All four of these Affirmative Defenses based on Plaintiffs' purported fault hinge on the alleged statements made by Plaintiffs during a recorded funding call that Defendants failed to preserve. Notably, Defendants failed to preserve this recorded funding call, and failed to produce this recorded funding call despite Woodley alerting Slavin, in response to an email from Vahe about the bait-and-switch LOC fraud, that "[j]ust so you know this guy may pursue legal action." [P. Ex. 27] at 6. Defendants were also clearly on notice of a potential lawsuit because on April 30, 2025, after Vahe raised Hartford's and Stein's criminal convictions with Defendants, Slavin emailed Naftali "Now we have a problem." [P. Ex. 184] at 1. Notably, while versions of this same email chain were produced during discovery, [P. Ex. 26], Defendants did not produce the version with this "problem" language until May 15, 2025. [P. Ex. 183].

EIN testified that it the records of its recorded funding calls would typically be held for one or two years in the normal course. [P. Ex. 5] at 55:22-56:17. EIN even testified that they re-listened to the recorded funding call after Vahe raised the issue of being bated-and-switched with the LOC, [*Id.*] at 54:8-56:17, yet it was still not preserved.  This entitles Plaintiffs to an adverse inference that no such representation was made on the call.  *Apple Inc. v. Samsun Elecs. Co.*, 888 F. Supp. 2d 976, 985 (N.D. Cal. 2012) ("It is firmly established in the Ninth Circuit that '[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoilation of relevant evidence,' which includes the power 'to permit a jury to draw an adverse inference form the destruction or spoilation against the party or witness responsible for that behavior.") (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).

Even more significant, on May 15, 2025, Defendants made a substantial and tardy production of responsive documents previously requested by Plaintiffs.  [P. Ex. 183]. Therein were Defendants hand-written notes from the recorded funding call produced for the first time.  [P. Ex. 191].  Nothing in these notes indicate any representation by Plaintiffs that they had not been promised any alternative financing in exchange for entering into the MCA Agreement.  [*Id.*]  And while these notes include various questions that were proposed to Plaintiffs, none involving asking if Plaintiffs had been promised additional funding in exchange for entering into the MCA Agreement.  [*Id.*]. Consequently, there is no evidence to support any of these affirmative defenses, and this

applies equally to the above affirmative defenses of waiver, release, unclean hands, fraudulent inducement, and in pari delicto.

**g) Similar statements for all third parties.**

Not applicable.

**h) Identification of any anticipated evidentiary issues, together with Plaintiffs' position on those issues.**

As set forth in the Proposed Pretrial Order, Defendants intend to file motions in limine for the following:  (1) to preclude Plaintiffs from introducing any evidence in support of their claims under RICO that Defendants sought to collect an unlawful debt; (2) to preclude any RICO claims or liability premised on any alleged predicate acts not alleged in the complaint; and (3) to preclude evidence and argument of any claims premised upon any alleged fraud committed directly by defendants Woodley, EIN, Naftali, or Slavin.

Plaintiffs will respond to these motions *in limine* upon their filing and in a timely fashion based on the amended scheduling order.  [ECF No. 113].  Briefly, Plaintiffs submit that several of these motions *in limine* appear to be impermissibly disguised motions for summary judgment, such as precluding Plaintiffs from introducing evidence in support of their unlawful debt collection claim.  Plaintiffs motions *in limine* also seek to preclude highly relevant evidence as to both the establishment of a RICO Enterprise and Defendants' understanding that they were operating the Enterprise alongside individuals Defendants knew had criminal convictions for financial crimes and fraud.

Defendants have also asserted over 70 objections to Plaintiffs' proposed exhibits, including objecting to Plaintiffs' exhibits over purportedly not being produced in discovery while Defendants admittedly failed to produce many documents themselves during discovery and are making missing productions while trial preparation is ongoing. [Plaintiffs Exs. 172-73].  Plaintiffs have also asserted dozens of objections on grounds of hearsay, including objecting to written statements made by Defendants, *see*, *e.g.*, Plaintiffs Exs. 8, 9, 10, 13, 17, 66-68, even though it is well settled that opposing party statements are not hearsay.  FRE 801(d)(2).  Plaintiffs have also objected to documents as not being authenticated, *see*, *e.g.*, Plaintiffs Exs. 97, 136, that are self-authenticating news reports. FRE 902(5). In addition, it is well settled that court filings are "self-authenticating." *Schweickert v. Nev. Sys. of Higher Educ.*, 2010 U.S. Dist. LEXIS 162392, *17 (D. Nev. Mar. 3, 2010). Yet Defendants have asserted objections based on FRE 901 to several court filings. *See*, *e.g.*, Plaintiffs Exs. 9, 10, 37, 76, 77, 81, 83, 91, 98, 117, 140, and 141. Plaintiffs will fully address their responses to these objections to Plaintiffs' proposed evidentiary exhibits when appropriate at trial.

i)    **Identification of any issues of law, such as the proper interpretation of a governing statute, which are germane to the case, together with Plaintiffs' position on those issues**

Choice of Law Issues

No conflict exists.  Plaintiffs agree California law applies. Defendants' argument that the MCA Agreement is exempt under Cal Corp. Code § 25118(b)—which applies to issuances of $300,000 or more—is a non-starter as the MCA on its face had a

principal of $250,000. [P. Ex. 3] at 1. Moreover, Cal Corp. Code § 25118(f) explicitly provides that "this section shall be only available in a transaction that meets either of the following criteria: (1) The lender and either the issuer of the indebtedness or the guarantor, as the case may be, or any of their respective officers, directors, or controlling persons, or, if any party is a limited liability company, the managers as appointed or elected by the members have a preexisting personal or business relationship. (2) The lender and the issuer, or the lender and the guarantor, by reason of their own business and financial experience or that of their professional advisers, could reasonably be assumed to have the capacity to protect their own interests in connection with the transaction." *Id*. Neither exception applies.

Punitive Damages Issues

Plaintiffs are also seeking punitive damages for Defendants' malicious, oppressive and reckless disregard for Plaintiffs' rights. If this Court finds for the Plaintiffs, it may, but is not required to, award punitive damages. The purpose of punitive damages are to punish a defendant and to deter similar acts in the future. Punitive damages may not be awarded to compensate a plaintiff. Ninth Circuit Manual of Model Civil Jury Instructions § 5.5 (2007). The Plaintiffs have the burden of proving by a preponderance of the evidence that punitive damages should be awarded and, if so, the amount of any such damages. *Id*. You may award punitive damages only if you find that the Defendants' conduct that harmed the Plaintiffs was malicious, oppressive or in reckless disregard of the Plaintiffs' rights. Conduct is malicious if it is

-57-

accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff.

Conduct is in reckless disregard of the Plaintiffs' rights if, under the circumstances, it

reflects complete indifference to the plaintiff's safety or rights, or if the Defendants act

in the face of a perceived risk that its actions will violate the Plaintiffs' rights under

federal law.  An act or omission is oppressive if the Defendants injure or damage or

otherwise violate the rights of the Plaintiffs with unnecessary harshness or severity, such

as by misusing or abusing authority or pawer or by taking advantage of some weakness

of disability or misfortune of the Plaintiffs.  *Id.*  If you find that punitive damage are

appropriate, you must use reason in setting the amount.  Punitive damages, if any,

should be in an amount sufficient to fulfill their purposes but should not reflect bias,

prejudice, or sympathy toward any party.  In considering the amount of any punitive

damages, consider the degree of reprehensibility.  *Id.*

Plaintiffs maintain that Defendants' conduct give rise to punitive damages.  There

is no dispute that Hartford and Stein promised Plaintiffs a $750,000 line of credit that

was "pre-approved" with the only condition that Plaintiffs make 30 payments on the

MCA Agreement.  [P. Ex. 51].  IMS' bank statements demonstrate Plaintiffs made the

requisite payments for 30 days (and for many more days as well).  [P. Exs. 86-90, 104].

There is no dispute that Stein and Hartford strung Plaintiffs along after the 30-day mark

with explanations for the delay.  [P. Ex 78]  Yet, when Plaintiffs raised issue of Hartford

and Stein's bait-and-switch, while noting that Hartford and Stein had significant past

criminal histories, Woodley responded "[i]t, however, is very unfair for you to lay the

blame at our feet when in fact it is clearly yours." [P. Ex. 184 at 2]. To further distance themselves from Hartford's and Stein's fraud, EIN falsely testified that Hartford is the merchant's agent. [P. Ex. 5 at 209:25-211:2]. This was proven false by Defendants refusing to produce the operative Hartford ISO Agreement with EIN until after all discovery was complete on May 9, 2025. [P. Ex. 172]. The Hartford ISO Agreement explicitly defined Hartford as EIN's "Agent." [P. Ex. 171]. Thus, by wrongly withholding highly pertinent documents, Defendants attempted to obstruct the truth as to the fact that Hartford and Stein are squarely agents of EIN, all while blaming Plaintiffs for the fraud EIN's agents perpetrated.

Defendants demonstrated even more offensive behavior by perpetrating a second bait-and-switch on Plaintiffs involving Woodley's promised Wells Fargo loan. Woodley made an additional, separate but related promise that he could secure Wells Fargo a loan for Plaintiffs after Plaintiffs raised the Hartford bait-and-switch. [P. Ex. 6 at 99:2-101:19; P. Ex. 58 at 80:25-83:3]. Woodley was told by Wells Fargo on March 7, 2019 that it would not likely be able to approve Plaintiffs for a loan. [P. Ex. 113] at 2. Woodley did not tell Plaintiffs of this decision by Wells Fargo when it occurred. [P. Ex. 58 at 158:3-11]. Instead, Woodley sent a false statement in a March 14, 2019 email to Plaintiffs informing them that there was still a possibility of securing them a Wells Fargo loan. [P. Ex. 145]. In addition to the March 7, 2019 email from Wells Fargo saying the loan was very unlikely, Woodley should have known his continuing promises of knowing false hop to Plaintiffs were false because Woodley testified he has never

successfully obtained a Wells Fargo loan for any customer. [P. Ex. 58 at 80:25-83:3]. While Plaintiffs were waiting on this Wells Fargo loan Woodley knew was certainly not obtainable, Woodley tried, just as Stein and Hartford did, to entice Plaintiffs into entering another usurious MCA agreement with EIN. [P. Ex. 146]. Notably, each time Woodley contacted Wells Fargo to attempt to acquire a loan, he further demonstrated malicious conduct by using a false title in his communications. *Compare* [P. Exs. 113, 115, 119, and 122 (Woodley communications with Wells Fargo using an EIN email address with the title of "Senior Regional Manager" at EIN) *with* P. Ex. 58 at 50:6-10 and 59:16-21 (Woodley testifying this was a made-up title).

Defendants employed all this deception on Plaintiffs knowing that Plaintiffs had planned concerts that needed funding as Hartford alerted Naftali of this fact in March 18, 2019. [P. Ex. 189]. Defendants could have avoided this lawsuit entirely and prevented Plaintiffs' damages had they simply offered Plaintiffs the promised $750,000 in funding, but they did not; instead, they required Plaintiffs to pay of the MCA Agreement even after knowing Plaintiffs only anticipated paying the first 30 payments. [P. Exs. 142-145]. Instead, Defendants continue to maintain that it was Plaintiffs who committed fraud by alleging that Plaintiffs gave a false statement during a recorded funding call for the MCA Agreement that in response to Defendants' purported question whether Plaintiffs had been promised any additional funding in exchange for taking the MCA Agreement. Notably, Defendants failed to preserve this recorded funding call, and failed to produce this recorded funding call despite Woodley alerting Slavin, in

response to an email from Vahe about the bait-and-switch LOC fraud, that "[j]ust so you know this guy may pursue legal action." [P. Ex. 27] at 6. Defendants were also clearly on notice of a potential lawsuit because on April 30, 2025, after Vahe raised Hartford's and Stein's criminal convictions with Defendants, Slavin emailed Naftali "Now we have a problem." [P. Ex. 184] at 1. Notably, while versions of this same email chain were produced during discovery, [P. Ex. 26], Defendants did not produce the version with this "problem" language until May 15, 2025. [P. Ex. 183]. EIN testified that it the records of its recorded funding calls would typically be held for one or two years in the normal course. [P. Ex. 5] at 55:22-56:17. EIN even testified that they re-listened to the recorded funding call after Vahe raised the issue of being bated-and-switched with the LOC, [*Id.*] at 54:8-56:17, yet it was still not preserved.

Not only was the call not preserved, Defendants withheld critical documents dispelling this theory of placing the blame on Plaintiffs until May 15, 2025, when Plaintiffs made a substantial production of documents at Bates range EIN 0187-1605 well after discovery closed. [P. Ex. 183]. Within this production was, produced for the first time, Defendants' hand-written notes from the funding call which notably are devoid of any mention that Plaintiffs stated they were not promised any other funding in exchange for taking out the MCA Agreement. [P. Ex. 191]. Thus, not only did Defendants destroy evidence after being put on notice to preserve in the event of a likely lawsuit, they tried to use this lost recorded funding call to accuse Plaintiffs of fraud when their own internal withheld documents further dispels this theory.

In addition to all of this malicious conduct directed at Plaintiffs during the underlying events and withholding of relevant documents until after discovery ended so as to prejudice Plaintiffs, Defendants entire business model runs on fraud. Since its inception, EIN has filed lawsuits, generally through confessions of judgment that were signed as part of EIN's MCA agreements, against approximately 770 merchants and their owners as guarantors of EIN's MCA agreements. [P. Ex. 160]. Naftali has provided hundreds of affidavits in support of these confession of judgment actions in which he represents that EIN's MCA Agreements are sales of "future receivables." *See*, *e.g.*, [Plaintiffs Exs. 175-177 ¶ 3]. These boilerplate affidavits also always recite the same purported basis for default, a "blocked payment." [*Id.* ¶ 6]. At times another individual, Gerony Medina, provided virtually identical affidavits as that of Naftali which also uniformly alleged that the agreements were sales of future receivables and that default was due to blocked payment. [P. Exs. 179, 181 ¶¶ 3, 6]. The EIN MCA agreements that underline these actions, *see, e.g.*, [P. Exs. 180 & 182], are substantively identical to the MCA Agreement as issue here. P. Ex. 3. Thus, all of the above arguments and proof that the MCA Agreement here is a usurious loan applies with equal force to the EIN MCA agreements that Naftali and EIN agents have falsely attested were legitimate purchase and sale of receivables. Defendants EIN, Naftali and their agents have made these representations just in New York courts alone over 700 times against Merchants and their owner/guarantors between at least 2017 and 2023. [P. Ex. 160]. Each of these representations is another instance of Plaintiffs making fraud-based

predicate acts, including wire fraud, before the State of New York.  In addition, these 700+ actions always included suing the guarantor as a Defendant under the EIN MCA agreements' guaranties, which guaranty "the performance of all of the warranties and covenants or the accuracy of any representation in the Merchant Agreement." *See, e.g.*, [P. Ex. 3, 178, 180].  Yet the only basis EIN, Naftali and their agents present as a basis for the EIN MCA agreement breach is blocked payments, as described above.  Blocked payments is not a representation, warranty or convent as those are defined in EIN's MCA agreements.   *See, e.g.*, [P. Ex. 3, 178, 180] § 2.  Thus, in each of these 700+ lawsuits against EIN MCA agreement guarantors, Plaintiffs are fraudulently asserting a basis to sue the guarantors for blocked payments even though the text of EIN's boiler-plate MCA does not include that as a basis to sue the guarantor.

In addition to this systematic fraud and abuse of the New York legal system, Defendants have engaged in PPP loan fraud EIN testified that it only employs W-9 individuals, i.e., independent contractors, and that as of the time of this lawsuit it has only two such W-9 contractors, Gene Slavin and a bookkeeper named Elvina.  [P. Ex. 5] at 7:10-8:3.  Yet EIN fraudulent represented it had 15 employees in successfully secured a PPP loan on or about May 6, 2020.  [P. Ex. 161].  Thus, EIN committed another instance of wire fraud, this time against the U.S. Government, in or about April and May 2020 when it applied for a PPP loan with the fraudulent representation it had 15 employees.

On March 5, 2025, EIN had a judgment entered against it for participating in a fraudulent Ponzi scheme, which is yet another predicate act of wire fraud. *See Melanie E. Damain et al v. EIN Cap, Inc. et al.*, 21-cv-01792 (E.D. Ill.).

Most importantly, Defendants knowingly hired criminals Craig (a/k/a "Stas") Leszczak and Boris Shteyngart (a/k/a Bryan Stein) ("Stein") to act as EIN's broker. As evidenced by the September 2017 Hartford ISO Agreement with EIN, "Stas Leszczak" (i.e., Craig Leszczak) signed the agreement on Hartford's behalf as its "Owner." [P. Ex. 171] at 7. Over a decade before agreeing to retain Craig Leszczak's business Hartford to serve as EIN's broker, on or about March 23, 2006, Craig Leszczak was charged by the Department of Justice, along with members of the Colombo and Luchese mafia, for racketeering and extortion in connection with a boiler room stock fraud scheme. [P. Ex. 192]. Craig Leszczak, described as a "Colombo family associate" in a April 17, 2007 DOJ press release, plead guilty to charges "including a racketeering conspiracy involving securities fraud, extortion, witness tampering, kidnapping and money laundering." [P. Ex. 193]. After hiring Hartford run by the known criminal Craig Leszczak, EIN used Hartford as a broker to solicit MCA agreements with hundreds merchants. [P. Ex. 5] at 41:2-16, 45:21-46:19, and 180:6-12.

Stein also has a criminal history pre-dating his employment with Hartford and serving as EIN's agent. On or about July 9, 2009, he was barred from the securities industry by FINRA for allegations that Stein violated the Securities Act of 1933 and Securities Exchange Act of 1934. [P. Ex. 130]. In 2010, the New York Attorney General

("NYAG") filed an indictment against Stein, alleging thirty-five (35) counts, including (1) grand larceny in the second degree (1 count); (2) scheme to defraud in the first degree (1 count); (3) grand larceny in the third degree (4 counts); (4) attempted grand larceny in the third degree (1 count); (5) criminal possession of a forged instrument in the second degree (2 counts); (6) forgery in the second degree (2 counts); (7) criminal impersonation in the second degree (4 counts); (8) fraudulent practices in respect to a stock, bond, and other securities (15 counts) ; and (9) attempted fraudulent practices in respect to a stock, bond and other securities (5 counts).  [P. Ex. 117].  EIN and Naftali testified that "EIN has nothing to do with Bryan Stein."  [P. Ex. 5 at 159:22-160:17].  However, documents produced by Defendants on May 15, 2025, [P. Ex. 183], included a direct email from Bryan Stein to Naftali on January 15, 2019 concerning the MCA Agreement.  [P. Ex. 188].

Defendants knew about both Craig Leszczak's and Stein's criminal history.  Vahe was able to confirm the above criminal history of these individuals and informed Defendants of this asking how they could allow such criminals to work for them in an April 30, 2019 correspondence.  [P. Ex. 184] at 3.  While versions of this chain were produced by Plaintiff during discovery, [P. Ex. 26], it was not until May 15, 2025, [P. Ex. 183], that Defendants finally produced a full version of this email chain which ended with Slavin telling Naftali, after Vahe exposed Leszczak's and Stein's criminal background:  "Now we have a problem."  [P. Ex. 183].  EIN's knowledge of Stein's criminal background can also be inferred by EIN's and Naftali's false testimony that

Stein had nothing to do with EIN when Defendants' May 15, 2025 production proved otherwise.  [P. Ex. 188].

Given the above, Plaintiffs maintain that Defendants' behavior is the very sort of conduct punitive damages were designed to address.

**L. R. 16-4.3  Bifurcation of Issues**

Not applicable.  Plaintiffs do not consent to a bifurcation of the trial.

**L.R. 16-4.4 Jury Trial**

In accordance with Local Rule 16-4.4, Plaintiffs report that no issues will be decided by a jury as the parties consented to a Court trial.  [ECF No. 110]. The issues that will be tried by the Court include:

1. Whether Plaintiffs have proven all elements of their RICO claim for collection of unlawful debt.  *See* Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007).

2. Whether Plaintiffs have proven all elements of their RICO conspiracy for collection of unlawful debt.  *See* Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007).

3. Whether Plaintiffs have proven a pattern of racketeering activity in violation of the RICO statute premised on instances of wire fraud committed by Defendants and Defendants' agents.  Ninth Circuit Manual of Model Civil Jury Instructions § 8 (2007).

4.  Whether Defendants are vicariously liable for the acts of Hartford and Stein.  *See See* Judicial Counsel of California Civil Jury Instruction §§ 3700 & 3701 (2025).

5.  Whether Plaintiffs have proven all elements of their promissory estoppel claim.  *See Wheel Grp. Holdings, LLC v. Club Elecparts, Inc.*, 2019 U.S. Dist. LEXIS 63967, *35 (C.D. Cal. Feb. 12, 2019) (noting that whether a claim for promissory estoppel is for the trier of fact to decide).

6.  Whether Plaintiffs have proven all elements of their fraud claim.  *See* Judicial Counsel of California Civil Jury Instruction § 1900 et seq. (2025).

7.  Whether Plaintiffs have proven all elements of their intentional misrepresentation claim.  *See* Judicial Counsel of California Civil Jury Instruction § 1900 et seq. (2025).

8.  Whether Plaintiffs have proven all elements of their negligent misrepresentation claim.  *See* Judicial Counsel of California Civil Jury Instruction § 1903 et seq. (2025).

9.  Whether Plaintiffs have proven their claim for unfair competition in violation of California Business & Professions Code § 17200.  *Notle v. Cedars-Sinai Medical Center*, 236 Cal. App. 4th 1401, 1407 (Cal. Dist. Ct. 2015) (citations omitted).

10. Whether any adverse inferences may be drawn against Defendants for destruction or spoliation of relevant evidence.  *Apple Inc. v. Samsun Elecs. Co.*, 888 F. Supp. 2d 976, 985 (N.D. Cal. 2012) ("It is firmly established in the Ninth Circuit that '[a] federal trial court has the inherent discretionary power to make appropriate

evidentiary rulings in response to the destruction or spoliation of relevant evidence,' which includes the power 'to permit a jury to draw an adverse inference form the destruction or spoliation against the party or witness responsible for that behavior.") (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).

11. Whether any adverse inferences may be drawn against Defendants as to their credibility if they are proven to have given false testimony. *AKH Co. v. Universal Underwriters Ins. Co.*, 429 F. Supp. 3d 546, 586 (D. Kan. 2019) ("The Court has imposed an adverse-inference instruction as a sanction for Hratch Andonian's false testimony"); *Kerley v. Diaz*, 2020 U.S. Dist. LEXIS 201113, *26 (E.D. Cal. Oct. 27, 2020) (affirming that jury instructions were "balanced" where the "jury was instructed that an adverse inference of consciousness of guilt was permissible only if it found 'someone other than [Kerley] tried to create false evidence [or] provide false testimony").

12. Whether Plaintiffs are entitled to punitive damages.

## L.R. 15-4.5 Attorneys' Fees

In accordance with Local Rule 16-4.5, Plaintiffs are seeking attorneys' fees for their two RICO claims as the recovery of "reasonable attorney fee[s]" are expressly provided to a party that proves a violation of RICO Section 1962. *See* 18 U.S.C. § 1964(c).

## L.R. 16-4.6  Abandonment of Issues

Not applicable for Plaintiffs; Defendants abandoned several affirmative defenses as mentioned above.

Dated: May 19, 2025                                **WHITE & WILLIAMS LLP**

                                        By:    */s/ Shane Heskin*

                                                SHANE HESKIN

                                                Attorney for Plaintiffs Its My Seat and Vahe Shahinian