# EXHIBIT A

Sareen Bezdikian (SBN 229165)
Email: sareen@bezdikkassab.com
Raffi Kassabian (SBN 260358)
Email: raffi@bezdikkassab.com
**BEZDIK KASSAB LAW GROUP**
790 E. Colorado Blvd., 9th Floor
Pasadena, CA 91101
Telephone: +1 626 499 6998
Facsimile:  +1 626 499 6993

Kris Demirjian (SBN 252767)
Email: kris@kdemlaw.com
**DEMIRJIAN LAW FIRM**
15915 Ventura Blvd., Suite 301
Encino, CA 91436
Telephone: (818) 275-0099
Facsimile:  (310) 946-0039

Shane R. Heskin (admitted *pro hac vice*)
heskins@whiteandwilliams.com
Alex D. Corey (admitted *pro hac vice*)
coreya@whiteandwilliams.com
**WHITE AND WILLIAMS LLP**
1650 Market Street, Suite 1800
Philadelphia, PA 19103
Telephone: (215) 864-700
Facsimile: (215)

Attorneys for Plaintiffs
IT'S MY SEAT, INC. and VAHE SHAHINIAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| IT'S MY SEAT, INC., a California Corporation; VAHE SHAHINIAN, an Individual,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD CAPITAL LLC, a Limited Liability Company; KEVIN WOODLEY, an Individual; EIN CAP, INC., a New York Corporation; RUSSELL NAFTALI, an Individual; GENE SLAVIN, an Individual; and DOES 1 through 100, Inclusive.<br><br>Defendants. | Case No.: 2:22-cv-02192-OWD-AJRx<br><br>Related Case:  2:20-cv-06378-ODW-AFM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1)  CIVIL-RICO;**<br>**(2)  CONIPIRACTY TO COMMITT RICO;**<br>**(3)  PROMISSORY ESTOPPEL;**<br>**(4)  FRAUD;**<br>**(5)  INTENTIONAL MISREPRESENTATION;**<br>**(6)  NEGLIGENT MISREPRESENTATION; AND**<br>**(7)  UNFAIR COMPETITION VIOLATION OF BUSINESS & PROFESSIONS CODE 17200** |

-1-

50252213v.1

Plaintiffs IT'S MY SEAT, INC. and VAHE SHAHINIAN, (collectively, "Plaintiffs") who complain and allege as follows:

## **PARTIES**

1.    Plaintiff VAHE SHAHINIAN ("SHAHINIAN"), as owner of IT'S MY SEAT, INC., is, and at all times relevant hereto was, an individual and resident of the County of Los Angeles, California.

2.    Plaintiff IT'S MY SEAT, INC. ("IT'S MY SEAT"), is a California corporation, that does business as a ticketing vendor for various organizers and events; is also a concert promoter for its internal concert productions, with its principal place of business in the County of Los Angeles, California.

3.    Plaintiffs are informed, believe, and thereupon allege that Defendant HARTFORD CAPITAL LLC ("HARTFORD") is, and at all relevant times was, a Limited Liability Company conducting business within this judicial district.

4.    Plaintiffs are informed, believe, and thereupon allege that Defendant KEVIN WOODLEY ("WOODLEY") is, and at all relevant times was, an individual, conducting business within this judicial district, and a resident of and conducting business in New York State.

5.    Defendant EIN CAP, INC. ("EIN") is, and at all relevant times was, a New York corporation conducting business within this judicial district.

6.    Plaintiffs are informed, believe, and thereupon allege that Defendant

RUSSELL NAFTALI ("NAFTALI") is, and at all relevant times was, an individual, conducting business within this judicial district, and a resident of and conducting business in New York State.

7.    Plaintiffs are informed, believe, and thereupon allege that Defendant GENE SLAVIN ("SLAVIN") is, and at all relevant times was, an individual, conducting business within this judicial district, and a resident of and conducting business in New York State.

8.    Plaintiffs are informed, believe and thereupon allege that the true names and capacities of defendants named herein as DOES 1 through 100 are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to insert the true names and capacities of such fictitiously-named defendants when they have been ascertained.  Plaintiffs are informed and believe, and on that basis allege that such defendants are liable for the injuries to Plaintiffs hereinafter alleged.

9.    Plaintiffs are informed and believe and upon that basis allege that the defendants named as DOES 1 through 100 are individuals and/or unknown entities that reside and/or conduct business within this judicial district.

10.  Plaintiffs are informed and believe and upon that basis allege that the defendants named as DOES 1 through 100 are responsible in some manner for the occurrences hereinafter alleged, and that Plaintiffs' damages were proximately

50252213v.1

caused by these defendants.

11.   At all relevant times to this action, the Defendants, and each of them, acted in concert with, and/or was the agent, partner, affiliate, joint venturer, co-conspirator, aider and abettor, servant, associate, representative, predecessor-in-interest and/or successor-in-interest of the other, and in engaging in the acts, omissions and occurrences hereinafter alleged, the defendants, and each of them, were acting in concert with and within the course and scope of their authority as agent, partner, affiliate, joint venturer, co-conspirator, aider and abettor, servant, associate, representative, predecessor-in-interest and/or successor-in-interest of the other.

## JURISDICTION AND VENUE

12.   This is an action for damages against Defendants HARTFORD, WOODLEY, EIN, NAFTALI and SLAVIN (collectively, "Defendants") for Racketeer Influenced and Corrupt Organizations Act ("RICO") authorized by 18 U.S.C. Sections 1964(a) and (c) ("Civil RICO"), Conspiracy to Commit RICO. Promissory Estoppel; Fraud; Intentional Misrepresentation; Negligent Misrepresentation; and Violation of California Unfair Competition Law (*Business & Professions Code* § 17200).

13.   This Court has subject-matter jurisdiction over the causes of action alleged in this Complaint because this Court is a court of general subject-matter jurisdiction and is not otherwise excluded from exercising subject-matter jurisdiction over said

50252213v.1

causes of action.

14.   This Court has personal jurisdiction over each and every one of the Defendants because each has had sufficient contacts with California and purposefully availed themselves to California's resources including California clients, such as Plaintiffs SHAHINIAN and IT'S MY SEAT, so as not to offend traditional notions of fair play and substantial justice.  A substantial portion of the acts, omissions, events, and transactions constituting the causes of action alleged herein occurred within the State of California.  CAL. CODE CIV. PROC. § 410.10.

15.   This Court is the appropriate venue for this action under California *Code of Civil Procedure* sections 395 and 395.5, because the acts that give rise to the causes of action alleged herein occurred in the County of Los Angeles, State of California.  Plaintiffs hereby designate the County of Los Angeles, State of California, as the place of proper venue.

## **THE RICO ENTERPRISE**

16.   Plaintiffs are informed and believe, and thereupon allege, that at all relevant times mentioned herein, Defendants, WOODLEY, NAFTALI, SLAVIN and Does 1 through 100 (also referred to as the "Non-Corporate Defendants") were the owners of all or a controlling proportion of the shares of stock of defendants HARTFORD and EIN and that there existed between Non-Corporate Defendants, including Defendants, WOODLEY, NAFTALI and SLAVIN a unity of interest and

- 5 -

ownership, such that any individuality and separateness between, WOODLEY, NAFTALI, SLAVIN, HARTFORD and EIN never existed or has ceased to exist, and that the Non-Corporate Defendants, including Defendants WOODLEY, NAFTALI and SLAVIN, are the alter ego of Defendants HARTFORD and EIN in that:

    a.    Defendants HARTFORD and EIN were conceived, intended, and used by the Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN as a device for the purpose of substituting a financially insolvent corporation in the place of the Non-Corporate Defendants, including Defendants WOODLEY, NAFTALI and SLAVIN, to avoid individual liability for the breach of contract and other acts alleged herein;

    b.    The Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN, used the assets of HARTFORD and EIN for their own purposes as though it were their own, and caused assets of HARTFORD and EIN to be transferred to them, or to entitles they controlled, or to their family members, without adequate consideration and to avoid clients with loans, including Plaintiffs;

    c.    The Non-Corporate Defendants, including Defendant, WOODLEY, NAFTALI and SLAVIN, dominated and controlled the finances of

HARTFORD and EIN, treated the corporate accounts as their personal bank accounts, and commingled corporate and personal funds for their personal use and to avoid clients with loans, including Plaintiffs;

d.    The Non-Corporate Defendants, including Defendant, WOODLEY, NAFTALI and SLAVIN, completely disregarded the corporate formalities and separateness of Defendants HARTFORD and EIN in that the operations of HARTFORD and EIN were carried out without the holding of shareholders' or directors' meetings, records or minutes of any corporate proceedings were not maintained, and transactions between and among the Defendants, including Defendant, WOODLEY, NAFTALI, SLAVIN, HARTFORD and EIN were neither approved by directors nor shareholders, nor properly documented;

17.    Plaintiffs are informed and believe, and thereupon allege that Defendants, WOODLEY, NAFTALI, SLAVIN, HARTFORD and EIN are one and the same in that defendants commingled funds.

18.    Plaintiffs are informed and believe, and thereupon allege that adherence to the fiction of the separate existence of HARTFORD and EIN as an entity distinct from the Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN, would permit an abuse of the corporate privilege and would sanction

COMPLAINT

50252213v.1

fraud and promote injustice in that, among other things, the Non-Corporate Defendants, including, WOODLEY, NAFTALI and SLAVIN, set up the business of HARTFORD and EIN to make an unfair profit from collecting daily payments on loans at high interest rates and failing to pay funds under a line of credit to clients with loans, including Plaintiffs.

19.    Defendant NAFTALI was the mastermind of the RICO enterprise and was responsible for the management and major decision making of the RICO enterprise consisting of NAFTALI, EIN, WOODLEY, SLAVIN, and WOODLEY'S direct employer Fast Capital Partners ("FAST CAPITAL") (the "ENTERPRISE").

20.    NAFTALI owns approximately a 30% equity stake in both EIN and FAST CAPITAL.

21.    NAFTALI, a "culpable person" for RICO purposes, oversaw and managed EIN's business, which was centered on lending money to merchants across the United States, using interstate wires such as e-mails and texts, through loans that the ENTERPRISE disguised as merchant cash advance agreements ("MCA Agreements"), which were governed by New York law, and include numerous hallmarks of substantive loans, including (a) leaving granting reconciliation requests in EIN's "sole discretion"; (b) making the merchant's filing of bankruptcy an event of default; and, *inter alia*, (c) granting EIN a security interest in all of the merchant's assets, present and future.

COMPLAINT

50252213v.1

22.     In addition to these substantive terms in the MCA Agreements themselves, Defendants substantively treated their MCA Agreements as loans, including, but not limited to, (a) negotiating and underwriting the MCA Agreements with finite repayment terms, and (b) entering into MCA Agreements with merchants, including IT'S MY SEAT, that Defendants knew had already sold their receipts to other MCA companies.

23.     By entering into MCA Agreements with merchants who already had MCA positions, like IT'S MY SEAT, Defendants further ensured their MCA Agreements were absolutely repayable loans because a provision in the MCA Agreements required the merchants and their owners, like IT'S MY SEAT and SHAHINIAN, to warrant that they had unencumbered receipts.  Defendants knew from the MCA Agreements inception that this warranty was not true, thereby allowing them, at their election, to hold merchants in default and file confessions of judgment against merchants for the full balance.

24.     Viewed appropriately as a loan, EIN's MCA Agreements assessed interest rates of greater than 100%, which is twice more than the maximum legal limit under several States' laws, including but not limited to, California (the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank), where Plaintiffs reside, and New York, where the Enterprise operated from and where Defendants' resided (25% for commercial loans of less $2.5 million).

COMPLAINT

50252213v.1

25.     Because the interest rates on EIN's MCA Agreements were more than twice the maximum legal limits for interest under the laws of approximately a dozen States, including New York and California, the MCA Agreements constitute unlawful debt under the RICO statute.  18 U.S.C. § 1961(6).

26.     Based on filings in New York state alone, the ENTERPRISE has been in the business of lending money to merchants across the United States since at least 2016 and through 2024, with over 700 confessions of judgment filed in New York State.

27.     With each of these confessions of judgment filed in New York State, the ENTERPRISE submits, often NAFTALI himself, an affidavit of merit to support filing the confession of judgment.

28.     In each of these affidavits of merit, the ENTERPRISE falsely affirms under oath that its MCA Agreements are legitimate purchases of receivables, rather than usurious loans.  Each affidavit of merit further falsely attests that EIN may also sue the merchant guarantor for breach under the MCA Agreement for blocked payments.  However, EIN's MCA Agreement's personal guaranties only extend to warranties and representations, which do not include a warranty that there will be no blocked payments.  By wrongly suing the merchant's guarantor with each filing of a confession of judgment, the ENTERPRISE further ensures their MCA Agreements are absolutely repayable.

29.     While NAFTALI runs the day-to-day operations for the ENTERPRISE, he

has organized the members of the ENTERPRISE, including Defendants, into specific roles for the common purposes of collecting unlawful debt and committing wire fraud.

30.     SLAVIN was hired by NAFTALI to join EIN as its collection manager in 2016, and to try to insulate himself from liability for the ENTERPRISE'S unlawful conduct, SLAVIN created his own company, GFJG Consulting, Inc. ("GFJG"), to be the formal entity that entered into a consulting agreement with EIN.  EIN was GFJG's only customer.  GFJG maintained its office within EIN's office in New York at 160 Pearl Street.

31.     SLAVIN reported to NAFTALI on his collection activities and for approval for collection actions.  While SLAVIN was purportedly responsible for granting the discretionary reconciliations provided in EIN's MCA Agreements, he could not recall ever doing so when examined under oath in this lawsuit.

32.     NAFTALI used FAST CAPITAL, which he had an equity ownership share in, to serve as EIN's in-house brokerage firm that was responsible for soliciting merchants into entering into MCA Agreements with EIN.  FAST CAPITAL also maintained its offices in the same building as EIN and GFJG at 160 Pearl Street in New York.

33.     WOODLEY was one of FAST CAPITAL's brokers who reached out to merchants to induce them into entering MCA Agreements with EIN.  In doing so,

50252213v.1

WOODLEY would at times promise the merchant could receive a standard, low-interest, loan upon making certain amounts of payments on EIN MCA Agreements, which never materialized as it was a fraud to include the merchant into entering into the usurious MCA Agreements.

34.    In communicating with merchants to solicit EIN MCA Agreements, WOODLEY frequently used misleading email addresses and titles.  At times, he would give false titles concerning his role at FAST CAPITAL to give the impression he was in a managerial position.  At other times, with the consent of the ENTERPRISE, he would use EIN email addresses and official EIN titles—even though WOODLEY testified he is not an EIN employee and confirmed these titles were made up.

35.    WOODLEY would also use these false EIN emails and titles in communications with banking institutions, such as Wells Fargo.

36.    At all relevant times, WOODLEY, FAST CAPITAL, SLAVIN, and GFJG were agents of EIN and the ENTERPRISE**.**

37.    In addition to retaining FAST CAPITAL as their in-house broker department, the ENTERPRISE would also retain other brokerage firms, including HARTFORD, to increase the scope of their solicitation activities.  Indeed, EIN confirmed that HARTFORD helped broker hundreds of EIN MCA Agreements.

38.    At all relevant times, as confirmed by Defendants' belated production of their "ISO Agent Agreement" with HARTFORD, HARTFORD and its employees were agents of the ENTERPRISE.

39.    The ENTERPRISE either knew or should have known that HARTFORD was owned by convicted criminal Craig (a/k/a "Stas") Leszczak ("LESZCZAK"), who, on March 23, 2006, was charged by the Department of Justice ("DOJ"), along with members of the Colombo and Luchese mafia, for racketeering and extortion in connection with a boiler stock room fraud scheme.  On April 17, 2007, as confirmed by publicly available documents from the DOJ, LESZCZAK pled guilty to the DOJ's charges "including a racketeering conspiracy involving securities fraud, extortion, witness tampering, kidnapping and money laundering."

40.    As Defendants knew, one of the brokers employed by HARTFORD  to solicit merchants into entering into MCA Agreements was Boris Shteyngart a/k/a Boris Stein ("STEIN"), who also had a criminal record.  Specifically, on or about July 9, 2009, he was barred from the securities industry by FINRA for allegations that Stein violated the Securities Act of 1933 and Securities Exchange Act of 1934. In 2010, the New York Attorney General ("NYAG") filed an indictment against Stein, alleging thirty-five (35) counts, including (1) grand larceny in the second degree (1 count); (2) scheme to defraud in the first degree (1 count); (3) grand larceny in the third degree (4 counts); (4) attempted grand larceny in the third

degree (1 count); (5) criminal possession of a forged instrument in the second

degree (2 counts); (6) forgery in the second degree (2 counts); (7) criminal

impersonation in the second degree (4 counts); (8) fraudulent practices in respect to

a stock, bond, and other securities (15 counts) ; and (9) attempted fraudulent

practices in respect to a stock, bond and other securities (5 counts).

41.    Plaintiffs had no idea of either LESZCZAK's or STEIN's criminal

background when HARTFORD and STEIN solicited them into entering into an

MCA Agreement with EIN.

## **GENERAL ALLEGATIONS AS TO PLAINTIFFS' CLAIMS**

42.    At all relevant times, IT'S MY SEAT does business as a ticket sales agency

and also a concert promoter for internal concert productions (which helps grow the

ticketing usage and reach).  As part of its business, IT'S MY SEAT provides A to Z

box office services for all kinds of event organizers (local school performing arts

centers, non-profit fundraising events, sports events, theaters, concerts, and any

other events that need ticket sales).  Additionally, IT'S MY SEAT produces high

caliber concerts and concert tours that exclusively make use of the ticketing

services in order to help expand the reach of such services to a wider audience.  The

goal of producing such concerts is to generate profits, help financially grow the

company and invest it all back into IT'S MY SEAT.  As a consequence of IT'S MY

SEAT's promotions and marketing, the company must pay for the services upfront.

- 14 -

SHAHINIAN is the owner and president of IT'S MY SEAT and manages the day to day operations of the company.

43.     In August of 2018, WOODLEY, an EIN internal lender/broker, contacted Plaintiffs in an attempt to sell a $250,000.00 EIN loan (Merchant Cash Advance loan).  Plaintiffs refused because the rate being offered was too high.

44.     In January of 2019, STEIN on behalf of HARTFORD and working as EIN's agent, approached SHAHINIAN, SHAHINIAN and IT'S MY SEAT were finishing up three (3) big loans from 2018 (from other lenders), and were in a prime condition to be eligible for regular low rate loans.  When STEIN suggested a $750,000.00 regular term loan at 8.89% annual rate, SHAHINIAN thought he could make use of this great rate term loan to plan seven (7) more shows for 2019. Plaintiffs already had six (6) shows planned in March 2019 so with such a new term loan, Plaintiffs saw the opportunity to grow the business by adding more dates in June and September.  Plaintiffs were excited to use the extra money to grow IT'S MY SEAT.  Plaintiffs planned to use most of the loan funds towards planning extra shows and the remainder would go into completing the programming upgrade project for IT'S MY SEAT.  The programming upgrade project was a new version of the company website (close to being launched) but needed more funding. Launching the new website would have greatly improved the look and feel of the site and helped IT'S MY SEAT grow, but this never happened due to the term loan

50252213v.1

never coming through from Defendants.

45.    On January 7, 2019, Plaintiffs received a phone call followed by an email communication from LESZCZAK, using the fake name Craig Walters, who identified himself as the managing partner of HARTFORD.  LESZCZAK sent Plaintiffs a Hartford Capital Application and requested bank statements and tax returns.  Plaintiffs explained to LESZCZAK that they need a low-term stable loan to help run, grow and expand the ticketing and concert promoting business.

46.    On January 8, 2019, STEIN contacted Plaintiffs, identified himself as another managing partner of HARTFORD and promised Plaintiffs a "pre-approved" $750,000.00 line of credit ("Term Loan") but only if Plaintiffs took a a "bridge loan" of $250,000.00 (to be funded by EIN) for 30 days ("Bridge Loan").  The Bridge Loan would be in the form of an MCA Agreement, through EIN at a usurious interest rate of 15% monthly and with a daily payment of $3,600.00 (the 15% monthly rate would always be calculated from the main principle amount of $250,000.00, regardless of how much of the principle was paid down by the daily payments.  This would be an equivalent of 180% annual interest rate).  STEIN represented that Defendants would transition this Bridge Loan to the "pre-approved" Term Loan after the first 30 days at an annual rate of 8.89%.  Terms of this agreement also required Plaintiffs make uninterrupted daily payments on the Bridge Loan and not take any other loans for 30 days (the "Agreement").  STEIN

- 16 -

stated that HARTFORD's money was invested in EIN, that it would be HARTFORD's money used to fund the Bridge Loan; they had to do this to show the bigger term-loan parent company that they risked their money with Plaintiffs for a good reason; and the result will be for the Bridge Loan to automatically roll over to the Term Loan. Once it transitioned to the Term Loan, interest would go down to 8.89% annual rate and Plaintiffs would not have to pay the EIN bridge loan to term with the usurious interest.  The transition would be the $250,000.00 loan minus the 30 daily payments, promising Plaintiffs that they would never pay any of the interest on the Bridge Loan.

47.     Immediately thereafter, STEIN sent Plaintiffs the Bridge Loan documents. Plaintiffs signed, notarized and sent the documents to EIN, care of NAFTALI as requested by STEIN.

48.     The Bridge Loan/MCA Agreement, facially governed by New York law, contained all the hallmarks of a substantive loan under New York and California law—both which elevate form over substance.  For instance, the Bridge Loan provided EIN recourse in the event of IT'S MY SEAT's bankruptcy, including filing a confession of judgment against both IT'S MY SEAT and SHAHINIAN. The Bridge Loan/MCA Agreement also gave EIN "sole discretion" to grant or deny a reconciliation.  The Bridge Loan/MCA Agreement also gave EIN a security interest in all of IT'S MY SEAT's current and future assets.

49.     Defendants' conduct, and that of its agent STEIN, also demonstrated that the MCA Agreement was substantively a loan.  When STEIN proposed the Agreement whereby the Bridge Loan/MCA Agreement would automatically convey to a Term Loan, he expressly stated the MCA Agreement had a fixed "five month" term. EIN's internal underwriting documents further confirmed that EIN scheduled the MCA Agreement/Bridge Loan to be paid off in 100 business days, i.e., five months as well.  Finally, EIN's underwriting documentation establishes that EIN and Defendants knew IT'S MY SEAT had already several other MCA agreements with other MCA lenders.  Therefore, Defendants knew they were not purchasing IT'S MY SEAT's receivables when entering into the Bridge Loan/MCA Agreement with Plaintiffs.  Moreover, neither STEIN nor anyone from Defendants had any conversations with Plaintiffs about their future receipts or revenue before offering and executing the Bridge Loan/MCA Agreement.

50.     On January 9, 2019, Plaintiffs asked STEIN what would happen if Plaintiffs kept their two conditions and after the 30th day the Bridge Loan does not roll over into the Term Loan.  STEIN reassured Plaintiffs that they should believe in the "sincerity in his voice" and there was nothing to worry about as long as Plaintiffs met the two conditions of making uninterrupted daily payments on the Bridge Loan and not take any other loans all for a period of 30 days.  When Plaintiffs asked STEIN why EIN would give up $130,000.00 in profits for Plaintiffs to roll over into

a Term Loan, STEIN replied because he would make the real money with Plaintiffs on the Term Loan commissions over the long term, since this was the best long term decision Plaintiffs would make; and it would be a long term solution where the Term Loan (Line of Credit) would be available for use at any time.  STEIN assured Plaintiffs that he and Defendants would handle the back-end transition of the roll over.  STEIN further stated that EIN will be fine with the transition because it was HARTFORD's money being used and that he handles the back-end transition through the senior EIN individuals and the parent term loan company.

51.    Prior to transferring the Bridge Loan funds to Plaintiffs, EIN contacted Plaintiffs for a recorded teleconference call known as the "Funding Call".  STEIN called Plaintiffs prior to this teleconference alerting Plaintiffs that a call would come from EIN and asked Plaintiffs not to mention the Agreement (transition of Bridge Loan to Term Loan) because the person calling is simply a paper shuffler at EIN and had no idea about the back-end plans of EIN and HARTFORD and the roll over plans; that to minimize any delay, Plaintiffs should focus on letting the EIN funding go through smoothly.  In reliance to STEIN's statements, Plaintiffs did not mention the Agreement during the EIN Funding Call, nor did Defendants inquire or ask Plaintiffs if they had been promised any financing or funding in exchange for taking out the Bridge Loan/MCA Agreement as confirmed by their hand written notes of the "Funding Call."  Despite Plaintiffs raising issue of fraud with

- 19 -

Defendants within a few months of this "Funding Call" and WOODLEY expressly acknowledging in writing to Defendants that Plaintiffs could pursue litigation, Defendants destroyed the recorded "Funding Call."

52.     On January 10, 2019, Plaintiffs received the Bridge Loan but in the amount of $228,000.00.  Although the initial Bridge Loan documents showed the amount of $250,000.00, $22,000.00 was taken out for funding fees.  STEIN falsely promised Plaintiffs he would return that $22,000.00 as credit when the roll over happened.

53.     Defendants encouraged Plaintiffs to use the money to grow Plaintiffs' business.  Defendants assured them that Plaintiffs made the best business decision and encouraged Plaintiffs to invest in future projects in confidence since the main Term Loan would be coming in 30 days.  Plaintiffs finalized six (6) June concerts and one (1) September concert in addition to the already planned six (6) shows in March, calculating how much daily payments could be made in preparation for these shows with enough to last until the 30 days were complete (on February 10, 2019).

54.     Plaintiffs strictly adhered to the Agreement terms and made daily payments to EIN for the first 30 days, totaling $108,000 in payment to EIN.

55.     On February 8, 2019, Plaintiffs contacted STEIN to follow up on anything that needed to be done prior to the 30th day that was soon approaching.  STEIN requested current bank statements, which Plaintiffs provided reflecting Plaintiffs'

daily payments and no other loans being taken out. Plaintiffs abided by the terms of the Agreement.

56.    The 30th day came around but there was no word from STEIN or any of the other Defendants. On February 12, 2019, Plaintiffs reached out to STEIN requesting the status of the Agreement (transition of the Bridge Loan to a Term Loan). STEIN replied that it was being worked on. For days and weeks, Defendants gave Plaintiffs knowingly false string-along statements to reassure Plaintiffs that the Term Loan would come through. Such fraudulent statements included STEIN responding to SHAHINIAN on February 13, 2019 "[a]ll submitted I expect an update soon as I didn't receive one yesterday evening." Other string-along fraudulent statements included but are not limited to the following:

On February 22, 2019:

STEIN: "Got delayed did not forget will call ASAP."

SHAHINIAN: "Ok. Bryan can we finalize this today? I have major milestones coming up early next week. Let me know when it will be done please." "Hi Bryan, day is about to end in NYC. You think we'll have an update before closing office hours?"

STEIN: "Only update I got was 'wait for the link' which is positive."

SHAHINIAN: "Ok, great. I'll keep an eye out for it. Have a good weekend Bryan. Hope we can finalize this on Monday. If there [is] an issue, I need to know

- 21 -

ASAP please."

STEIN: "No issue."

On March 4, 2019, Plaintiffs asked for status of the Term Loan transition and link to a login which was suppose to be provided to Plaintiffs.

STEIN: "As I expressed to you, we use a different platform for the consolidation. They are delayed. The file is not declined. This being said, I will be in touch with an update as soon as I have one."

On March 5, 2019:

STEIN: "I understand the urgency based on the numerous emails and calls. This is submitted and we are waiting for sign off approval. The platform is not yet assigned thus there is no login. We use different platforms depending on the investors in these files. I am doing everything I can to get this pushed through."

57.     STEIN made the above false statements using interstate wires, specifically text messages from his location in New York to SHAHINIAN in California while continuing to work as EIN's agent.

58.     Plaintiffs consistently inquired on status of the Agreement but Defendants kept providing excuses to stall and continued to assure Plaintiffs that the Agreement would be completed very soon. In the meantime, Plaintiffs continued to make the daily EIN payments of $3,600.00 in the hopes that the transition would occur soon and smoothly. Plaintiffs patiently waited for over seventy (70) days but the Bridge

Loan was never transitioned into a Term Loan. In other words, Plaintiffs never received the line of credit under a Term Loan from any of the Defendants and were forced to pay over one (1) month of extra payments to EIN at high interest that Plaintiffs had not accounted for because the Agreement was for a 30 day period. By the end of March 2019, Plaintiffs had paid EIN $190,800 on the MCA Agreement.

59.    Plaintiffs were induced into the Agreement where Defendants had no intention of following through on their end of the terms. Defendants conspired to force Plaintiffs into a corner at every opportunity. Both HARTFORD and its representatives along with EIN and its representatives pushed a non-existent product to unknowing businesses and individuals.

60.    In March 2019, WOODLEY, a representative of EIN (later confirmed to be fabricated titles at EIN) and FAST CAPITAL, offered Plaintiffs another promise of a term loan. WOODLEY explained that Plaintiffs could obtain a Wells Fargo loan of $1 million at low interest, but that it would take a long time to get this loan and Plaintiffs would have to take another Merchant Cash Advance. WOODLEY sent Plaintiff application form with Wells Fargo logo on it, giving the impression that a legitimate loan process was taking place. WOODLEY connected Plaintiffs to a supposed Wells Fargo loan agent to discuss terms but when Plaintiffs asked the agent for his Wells Fargo email, he responded he could not share his email address

COMPLAINT

because of his level of work at Wells Fargo.

61.    On March 1, 2019, WOODLEY and SHAHINIAN had an text message conversation in which WOODLEY falsely assured Plaintiffs that the Wells Fargo loan was going to be approved.  Specifically, WOODLEY texted SHAHINIAN that he had a "morning meeting with the Senior Partners.  I'll call you in about an hour. Everything is going forward."  SHAHINIAN responded, writing: "I need funding today Kevin. You think it's possible?" and WOODLEY responded "Yes."

62.    WOODLEY knew the statements he made via interstate text messages from New York, where he resided, to Plaintiffs, in California on March 1, 2019, were false.  First, WOODLEY confirmed that he has never successfully obtained any loan for any client ever from Wells Fargo.  Ergo, it was a knowingly false statement for WOODLEY to tell SHAHINIAN the Wells Fargo loan was "going forward" when he had no basis for that assertion.  Second, WOODLEY also confirmed that there was no March 1, 2019 meeting with Wells Fargo, which is supported by the emails between WOODLEY and Wells Fargo employees that make no mention of a March 1, 2019 meeting.

63.    While giving Plaintiffs false hope of this Wells Fargo loan, on March 3, 2019, WOODLEY engaged in another attempted bait-and-switch on EIN's behalf as its agent.  Specifically, WOODLEY offered Vahe another MCA Agreement "as high as $260,000 should you need it.  Better still at a lower factor.  1.14."  This

factor rate meant that Plaintiffs would have to repay $100,00 more than the

purchase price.  WOODLEY unquestionably knew Plaintiffs were in dire financial

straights when making this bait-and-switch offer as SHAHINIAN explained to

WOODLEY on March 1, 2019 Plaintiffs' desperate need for funding that day,

which WOODLEY fraudulently promised was possible.

64.    On March 7, 2019, the representative at Wells Fargo that WOODLEY

contacted about securing a loan for Plaintiffs confirmed that Wells Fargo would not

fund.  Specifically, the Wells Fargo representative stated "No equity to speak of in

the real estate so not sure we could help . . . what does he want the money for?  If

its computers / equipment we could potentially 100% financing but would need to

know more."

65.    WOODLEY's communications with Wells Fargo were not produced within

the cut-off of discovery, rather, they were produced during his belated deposition

on April 15, 2025.  WOODLEY did not provide any correspondence with Wells

Fargo after receiving this March 7, 2019 response declining to fund a loan to

Plaintiffs, demonstrating that WOODLEY knew the prospect of the Wells Fargo

loan was dead.  WOODLEY did testify, however, that he did not inform Plaintiffs

of Wells Fargo's decline on the loan on March 7, 2019, or anytime thereafter.  In

these communications with Wells Fargo, WOODLEY fraudulently and knowingly

misrepresented himself as EIN's "Senior Regional Manager"—a title he would also

misrepresent to Plaintiffs.

66.     Instead, on March 14, 2019, when Plaintiffs emailed WOODLEY asking "any update on the Wells Fargo?  They were supposed to check my history to see if I have any bankruptcy or not.  That should have taken 5 minutes.  Now they have had 2 weeks."  Rather than telling Plaintiffs the truth that Wells Fargo had declined any term loan and that WOODLEY had ceased communicating with Wells Fargo for Plaintiffs, WOODLEY knowingly and falsely stated that "they are trying to work off your receivables.  There is not enough for the[m] to utilize.  We are waiting for their decision."

67.     Throughout WOODLEY's false statements to Plaintiffs concerning the Wells Fargo loan in March 2019 described above, they were made using interstate wires through emails and text messages from WOODLEY in New York to Plaintiffs in California.  On top of these false statements, when communicating with Plaintiffs about the Wells Fargo loan, WOODLEY would falsely represent himself as EIN's "Senior Regional Manager" which he later confirmed in deposition testimony was a made up title and that he has never been employed by EIN.  Rather, EIN at all times worked as EIN's agent through FAST CAPITAL.  WOODLEY's agency relationship with EIN cannot be disputed as his testimony confirms that the greater the factor rate he sells to merchants like Plaintiffs on EIN's MCA Agreement (i.e., the greater the difference between the purchase price and the amount the merchant

- 26 -

has to pay and the more profit for EIN), the higher his commission from EIN is.

68.     Plaintiffs were in serious financial jeopardy as a result of relying on Defendants' fraudulent promises of the Term Loan and Wells Fargo loan. Defendants and their agents made these misrepresentations knowingly and were designed to keep Plaintiffs making payments on the usurious Bridge Loan/MCA Agreement.  Despite time being of the essence and Plaintiffs waiting over two times the agreed upon period, Plaintiffs had no other option but to obtain two (2) emergency loans from third-parties.  When STEIN learned of the new loans on March 19, 2019—over a month *after* the "pre-approved" Term Loan should have begun—he automatically claimed that Plaintiffs were in direct violation of the Agreement and used the third-party loans as an excuse, refused to provide the line of credit (no transition of the Bridge Loan to a Term Loan).

69.     NAFTALI, SLAVIN and WOODLEY called and emailed Plaintiffs on numerous occasions in the guise of being a 'friend' to Plaintiffs.  By Spring of 2019 when it became clear to Plaintiffs that they were duped by all Defendants, NAFTALI, SLAVIN and WOODLEY on behalf of EIN insisted they did nothing wrong and denied any involvement in the conspiracy.  Their general statement was that EIN would no longer work with Defendants anymore but refused to discuss anything that STEIN and Defendants did in detail.

70.     Specifically, on April 29, 2019, SHAHINIAN emailed SLAVIN,

- 27 -

WOODLEY, and NAFTALI, with the subject line "Colombo organized crime family member – founder of 'Hartford Capital LLC" and therein set forth LESZCZAK's criminal history which SHAHINIAN had found using public information and, still believing Defendants to be not part of HARTFORD's fraud, explained: "[t]hrough several hours of research, we have discovered the 'Hartford Capital LLC' operation is founded by nonother than **Colombo organized crime family _convicted_ member 'CRAIG LESZCZAK**[.]"  What he is doing with MCA/Loan products now, **_is the exact same thing_** he was pulling back in early 2000 in penny-stock marketing (getting slick smooth talker brokers like 'Bryn Stein' [sic] to sell junk to honest hardworking people and rip them out of their hard earned money and destroy businesses) **for which he got busted for and plead guilty**." (emphasis in original)

71.    On April 30, 2019, Woodely responded to Vahe, writing: "in all due respect. You were actually speaking with me and you my friend chose to not work with me directly.  I have always kept things straight with you.  Ein made an advance to you asked you if you were taking this **loan** because of any other promises of funding, to which YOU replied no.  We are an mca advance company.  That's all we do and we do it in good faith 100% of the time.  It, however, is very unfair for you to lay the blame at our feet when in fact it is clearly yours."  [Plaintiffs Ex. 184] at 2 (emphasis added).

72.    On April 30, 2019, Vahe responded to Woodley's above email, copying Slavin, writing in pertinent part, "[g]ood point you bring up, which makes my argument even stronger.  You see, I Chose not wo work with you because ***your rates were high and I could not afford it***.  So think about it for a second – why on earth would I get a loan from your company ***with even a much higher rate***???  ***Why???.***  The Answer is very simple, The only way that could happen is for a slick smooth talker to ***LIE*** to me and to pull a fraud on me to go in this – thaty's why.  You get it now?  Did you read about the supposed roll-over plan?  It took a well-orchestrated, and a very experienced liar such as 'Bryan Stein', backed by a convicted stock fraud master to convince me to do this.  And that is the definition of fraud."  [Plaintiffs Ex. 184] at 1.

73.    On April 30, 2019, Slavin forwarded Vahe's above response to Naftali, writing "Now we have a problem.  Let's call him together."  This email was not produced until months after discovery closed and Defendants retained new counsel.

74.    Despite acknowledging that "Now we have a problem", and a separate email on March 26, 2019 from WOODLEY to SLAVIN stating, in response to an earlier email from SHAHINIAN raising the Term Loan bait-and-switch, that "this guy may pursue legal action", Defendants forced Plaintiffs to continue making payments on the EIN Bridge Loan/MCA Agreement.  Plaintiffs had been making daily payments through April 30, 2019, and Defendants continued to debit Plaintiffs' bank account

COMPLAINT

50252213v.1

each business day through June 11, 2019.  Defendants also forced Plaintiffs to use $29,720 of an SBA loan Plaintiffs obtained as emergency replacement funding for the fake promises of the Term Loan and Wells Fargo loan.  In total, Plaintiffs paid EIN $336,920 on the MCA Agreement ($6,920 *more* than the Bridge Loan/MCA Agreement's Purchase Price).

75.     Further, EIN used corporate logos on their website to obtain authenticity and look like a legitimate business. Based upon inquiries, Plaintiffs have now discovered that EIN was not authorized to use any of the logos, including but not limited to claiming to be a 5000, Inc. company, ETA member, Business Consumer Alliance, and Better Business Bureau.









COMPLAINT

50252213v.1

76.    As of Plaintiffs having to continue making payments on the usurious Bridge Loan/MCA Agreement (including over $6,000 that was over-collected), and both the Term Loan and Wells Fargo loans not coming through, Plaintiffs had to face financial issues on a daily basis since then, finding other financial sources to keep the business afloat, taking unnecessary attention away from the concert promoting projects and even having to cancel several of those projects.  Plaintiffs took massive financial losses.

77.    Specifically, Plaintiffs' damages, which are ongoing, consist of, but are not limited to, the following: (1) $141,384 paid above the principal on the Bridge Loan/MCA Agreement; (2) $1,973,646 in losses to Plaintiffs' 2019 concert series (lost ticket sales, non-refundable vendor payments for cancelled shows, etc…) as a result of Plaintiffs not obtaining the timely promised funding under either the Term Loan or Wells Fargo loan; and (3) $1,638,823.19 as judgments entered against Plaintiffs when they had to turn to other usurious MCA lenders in May and June 2019 to use as emergency replacement funding for the fraudulently promised Term Loan and Wells Fargo loan that Defendants never intended on providing to Plaintiffs.

**FIRST CAUSE OF ACTION**

**(Civil RICO against all Defendants)**

78.    Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1

- 31 -

through 77 of this Complaint.

79.    At various times and places, all Defendants did associate with a RICO enterprise of individuals who were associated in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

80.    Likewise, all RICO DEFENDANTS did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(1), (4), (5), (6) (9), and 1962(c)

81.    Specifically, in violation of 18 U.S.C. § 1961(1), Defendants and their agents acting on their authority, committed wire fraud by sending numerous fraudulent statements concerning the "pre-approved" Term Loan and Wells Fargo loan, as described above, between January and April 2019.  Each of these communications were made through electronic interstate communications by e-mail, text messages, and/or telephone calls between Defendants in New York and Plaintiffs in California. Defendants made fraudulent representations using these interstate wires to induce Plaintiffs into entering into the usurious Bridge Loan/MCA Agreement and to continue making payments on the Bridge Loan/MCA Agreement through and after the 30 day mark where Plaintiffs were promised they would receive the "pre-approved" term loan and continuing to make payments in March through June 2019 through the false promise that the Wells Fargo loan would be forthcoming.

Defendants and their agents both knew neither loan would ever materialize but either fraudulently told Plaintiffs otherwise or omitted telling Plaintiffs the loans were no longer available.

82.     Plaintiffs relied on these fraudulent promises in these interstate wires to their detriment as they refrained from securing replacement financing immediately as Defendants and their agents continued to falsely assure Plaintiffs that they would obtain either the Term Loan and/or Wells Fargo loan after the 30-day period of payments under the Agreement had been completed.  As a result, Plaintiffs paid over $200,000 more on the Bridge Loan/MCA Agreement than they were originally promised they would have to make, Plaintiffs' 2019 tours and concert series were cancelled or undersold because Plaintiffs never received either the Term Loan or Wells Fargo loan, and Plaintiffs had to take toxic and usurious loans from other MCA lenders like EIN which only further put Plaintiffs in a toxic debt spiral.

83.     During the four (4) calendar years prior to this Complaint, as described above, all RICO DEFENDANTS did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that is itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c).

84.     PLAINTIFF further alleges that all the RICO DEFENDANTS did commit two (2) or more of the offenses itemized above in a manner which they calculated and

premeditated intentionally to damage the PLAINTIFF and their conduct continues to threaten PLAINTIFF, the title and lending industry i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c).

85.    These false representations included, but are not limited to, (1) the January 8, 2019 email from STEIN, acting on Defendants' behalf, to Plaintiffs setting for the Agreement and promise that Plaintiffs would receive the Term Loan after making 30 days payments on the Bridge Loan/MCA Agreement; (2) dozens of subsequent communications via interstate texts between SHAHINIAN and STEIN, both before and after Plaintiffs made the 30 payments to receive the Term Loan, that the Term Loan would still materialize; (3) WOODLEY's March 1, 2019 text messages to Plaintiffs fraudulently stating that the Wells Fargo loan was in the process of being approved; (4) WOODLEY's March 14, 2019 email to Plaintiffs telling them Wells Fargo was still considering Plaintiffs for a loan after Wells Fargo told WOODLEY it was declining on Plaintiffs' application on March 7, 2019; (5) numerous e-mails by Defendants between March 27, 2019, and April 30, 2019 in which Defendants fraudulently stated they had no affiliation or relationship with STEIN or HARTFORD in response to Plaintiffs' raising the Term Loan fraud.

86.    In addition to this wire fraud, Defendants violated 18 U.S.C. § 1961(6) and § 1962(c) by collecting unlawful debt as memorialized by the Bridge Loan/MCA

Agreement's terms that made it a usurious loan and Defendants conduct treating it as a substantive loan, including having a finite repayment date and knowing that Plaintiffs could not sell their receivables under the Bridge Loan/MCA Agreement because they had already sold their receivables under multiple other MCA agreements.

87.    As a direct and proximate result of the RICO DEFENDANTS' racketeering activities and violations of 18 U.S.C. §§ 1962(a) & (c), PLAINTIFF has been damaged in an amount to be proven at trial.

88.    As a direct and proximate result of the RICO DEFENDANTS' racketeering activities and violations of *18 U.S.C.* sections 1961 and 1962, PLAINTIFF has been damaged in an amount to be proven at trial, not less than $4,000,000.

88.    Plaintiffs' damages are subject to trebling under 18 U.S.C. § 1964(c), plus recovery of its reasonable attorney's fees and costs.  Plaintiffs are also seeking punitive damages against Defendants given the depravity of their financial crimes.

## SECOND CAUSE OF ACTION

### (Conspiracy to Engage in a Pattern of Racketeering Activity against all Defendants)

89.    Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 88 of this Complaint.

90.    At various times and places partially enumerated in Plaintiff's documentary

50252213v.1

material, Defendants conspired to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961(1) and (6) and 1962(b), (c) and (d), specifically wire fraud and collection of unlawful debt as described above.

91.     At various times and places, Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d), all for the common purpose of goal of collecting unlawful debt and to keep Plaintiffs paying the unlawful debt by wire fraud.

92.     During the four (4) calendar years preceding the filing of this Complaint, the defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1) (A) and (B), in violation of 18 U.S.C. 1962(d).

93.     Plaintiff further alleges that all defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d).

94.     As a proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. sections 1961 and 1962, Plaintiff has been injured in its business and financially damaged in an amount of not less than $4,000,000.00.

COMPLAINT

95.    Plaintiffs' damages are subject to trebling under 18 U.S.C. § 1964(c), plus recovery of its reasonable attorney's fees and costs.  Plaintiffs are also seeking punitive damages against Defendants given the depravity of their financial crimes.

### THIRD CAUSE OF ACTION

**(Promissory Estoppel Against All Defendants)**

96.    Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 95 of this Complaint.

97.    As alleged above, Defendants, through STEIN and individuals, promised to provide a Line of Credit of $750,000.00 (the Term Loan) if Plaintiffs took a Bridge Loan of $250,000.00 (to be funded by EIN) for 30 days.  The Bridge Loan would be in the form of a Merchant Cash Advance, through EIN at a usurious monthly interest rate of 15%.  Defendants would transition this Bridge Loan to a Term Loan after the first 30 days at an annual rate of 8.89%.  Plaintiffs relied upon the statements made by Defendants, made their daily payments for over 70 days pursuant to their belief and understanding of the original Agreement terms, and forwent alternative loans and scheduled future concert promotions, in reliance upon the promises made by Defendants.

99.    Defendants breached the terms of its promise by failing to transition the Bridge Loan to a Term Loan.

100.  Similarly, beginning in February 2019 and March 2019, WOODLEY, acting

on behalf of EIN and NAFTALI, promised as early as March 1, 2019, that Plaintiffs were going to be approved for a Wells Fargo loan after Plaintiffs complained to Defendants that the Term Loan never materialized.

101.  Plaintiffs actually relied upon the promises of Defendants by foregoing alternative financing for the concert promoting business.  Plaintiffs scheduled upcoming shows and worked on marketing such concerts.

102.  Plaintiffs' reliance upon Defendants' promises were reasonable and foreseeable, as Defendants were lenders in the industry and provided the underlying paperwork for the Bridge Loan, which appeared legitimate.  Defendants had also transferred some monies to Plaintiffs under the Bridge Loan.  Daily payments at a high $3,600.00 were being paid by Plaintiffs to Defendants.   WOODLEY also sent false and misleading messages that the Wells Fargo loan was close to being approved and that he had a meeting with Wells Fargo on March 1, 2019, and that funding could be secured from Wells Fargo as soon as that day.   Plaintiffs remained in regular contact with Defendants and their agents about both the promised Term Loan and Wells Fargo loan and were always assured that they would be forthcoming.

103.  Plaintiffs have been injured to their detriment, by relying on the promises made by Defendants.  Plaintiffs now face the loss of a failing business and monies required to keep it afloat.

COMPLAINT

50252213v.1

104.   As Plaintiffs face cancellation of future projects, monetary loss as a result and loss of reputation as a qualified concert promoter, an injustice can only be avoided by making Plaintiffs whole from the damages they sustained due to their detrimental reliance on the falsely promised Term Loan and Wells Fargo loan, in an amount to be determined at trial, but not less than $4,000,000.

### FOURTH CAUSE OF ACTION

### (Fraud Against All Defendants)

105.   Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 104 of this Complaint.

106.   Defendants, either personally or through their agents and employees, knowingly and willfully made false representations to Plaintiffs, as described above. STEIN represented to Plaintiffs that Defendants would give Plaintiffs a $750,000.00 Line of Credit (the Term Loan) if Plaintiffs took a Bridge Loan of $250,000.00 (to be funded by EIN) for 30days.  The Bridge Loan would be in the form of a Merchant Cash Advance, through EIN at a monthly high interest rate of 15% but Defendants would transition this Bridge Loan to a Term Loan after the first 30 days at an annual rate of 8.89%.  Defendants further represented that as long as Plaintiffs made their daily payments and did not take any third-party loan for the first 30 days, the Line of Credit would be approved.  STEIN stated that HARTFORD's money was invested in EIN, that it would be HARTFORD's money

used to fund the Bridge Loan; they had to do this to show the bigger term-loan parent company that they risked their money with Plaintiffs for a good reason; and the result will be for the Bridge Loan to roll over to the Term Loan. Once it transitioned to the Term Loan, interest would go down to 8.89% annual rate and Plaintiffs would not have to pay the EIN bridge loan to term with the high interest. The transition would be the $250,000.00 loan minus the 30 day payments, promising Plaintiffs that they would never pay any of the interest on the Bridge Loan.  STEIN reassured Plaintiffs that they should believe in the "sincerity in his voice" and there was nothing to worry about.  STEIN insisted that the real money would be made by Defendants on the Term Loan commissions because it would be a long term solution for Plaintiffs as a Line of Credit.  Prior to the EIN Funding Call, STEIN contacted Plaintiffs and advised Plaintiffs not to mention the Agreement (transition of Bridge Loan to Term Loan) because the person calling is simply a paper shuffler at EIN and had no idea about the back end plans of EIN and HARTFORD and the roll over plans; that to minimize any delay, Plaintiffs should focus on letting the EIN funding go through smoothly.  In reliance to STEIN's statements, Plaintiffs did not mention the Agreement during the EIN Funding Call. Each time Plaintiffs inquired as to the status of the transition to Term Loan, Defendants all used the same string-along statements such as 'it is delayed but submitted', 'in the works', 'file is not declined', 'waiting for approval' and will get

an 'update' soon.

107.    Similarly, beginning in February 2019 and March 2019, WOODLEY, acting on behalf of EIN and NAFTALI, promised as early as March 1, 2019, that Plaintiffs were going to be approved for a Wells Fargo loan after Plaintiffs complained to Defendants that the Term Loan never materialized.  In fact, even after Wells Fargo confirmed to WOODLEY on March 7, 2019 that it would not offer Plaintiffs a loan, WOODLEY confirmed he did not inform Plaintiffs of this material development.  Rather, on March 14, 2019, in response to an inquest by Plaintiffs as to the status of the Wells Fargo loan, WOODLEY fraudulent told Plaintiffs Wells Fargo was still considering them for a loan.

108.    The representations set forth above were false, and at the time the above representations were made, Plaintiffs were informed and believe, and on that basis allege, that Defendants and/or their agents and employees knew they were false.  Defendants had knowledge of the falsity because Defendants were in sole control of whether to transition the Bridge Loan to a Term Loan.  Rather than provide the transition (and thus the Line of Credit) to Plaintiffs at the end of the first 30 days, they continued to provide false representations that the approval for the transition was 'in the works' even after the 30 days had passed, kept Plaintiffs in the dark and resulted in Plaintiffs having to take third-party loans to save the business.  Defendants then used Plaintiffs' last resort action of taking third-party loans (after

50252213v.1

70 days from the start of the Bridge Loan) as the reason to deny the Line of Credit.

109.   Defendants also knew the representations about the Wells Fargo loan were false.  First, WOODLEY never had a meeting with Wells Fargo on March 1, 2019. Second, WOODLEY knew any Wells Fargo loan was unlikely as he testified he has never successfully obtained a loan from Wells Fargo for any customer ever.  Third, Wells Fargo affirmatively told WOODLEY on March 7, 2019, that Wells Fargo was declining to fund Plaintiffs, yet WOODLEY never informed Plaintiffs of this material development.  Fourth, WOODLEY affirmatively and falsely told Plaintiffs on March 14, 2019, that Wells Fargo was still considering them for a loan.

110.   At the time of the representations, Plaintiffs were ignorant of the falsity of such representations, and believed them to be true.  Had Plaintiffs known of the falsity of the representations, Plaintiffs would have never entered into any agreement with Defendants and would have stopped making usurious interest payments on the Bridge Loan/MCA Agreement after the 30 day mark passed. When Defendants, through WOODLEY, reached out to Plaintiffs in August 2018 and offered a Merchant Credit Advance loan, Plaintiffs knew it was high interest and therefore refused the offer.  Because Plaintiffs refused the loan due to the high interest, Defendants realized through this joint fishing that they were dealing with a more advanced company and owner.  In round two of the conspiracy, in January 2019, Defendants contacted Plaintiffs through HARTFORD representatives to see

- 42 -

what it would take to hook Plaintiffs and their monies into Defendants' scam.

111.  Plaintiffs actually and reasonably relied on the representations made by Defendants and/or their agents and employees, in particular, STEIN and WOODLEY.  Not only did Defendants string Plaintiffs along past the first 30 days, they did so for an additional 40 days under the guise that they would make sure the Term Loan would happen and Plaintiffs would get their Line of Credit to help support and grow their business.  Plaintiffs were forced to make daily payments to EIN at high interest and way beyond the agreed-upon 30 days.  With such an additional financial responsibility, Plaintiffs' business sales, marketing development and reputation in the industry were damaged because Plaintiffs were no longer able to fund any project upfront as a concert promoter.  Plaintiffs were put in a corner by Defendants and had no other option but to find other funding from third-parties.  Statements made by HARTFORD and EIN representatives were all made fraudulently with intent to make Plaintiffs think it was a legitimate business transaction of transitioning a Bridge Loan to a Term Loan within 30 days to obtain a Line of Credit.  Defendants' statements encouraged them to use monies towards business development when in actuality all Defendants did was defraud Plaintiffs of their hard-earned monies.  As described above, to the best of their knowledge, Plaintiffs had an Agreement with Defendants; and Plaintiffs submitted all of their daily payments to Defendants and did not take any third-party loans for

- 43 -

the first 30 days in accordance with the Agreement.  In bad faith, Defendants refused to honor the Agreement by refusing to abide by the terms and denied Plaintiffs their Line of Credit. Furthermore, in bad faith, Defendants conspired to pin Plaintiffs into a corner by making them pay the daily $3,600.00 to Defendants for 70 days at high interest.  During this time, Defendants strung Plaintiffs along for days and weeks with assurances that the Line of Credit would happen and near the tail end of those 70 days when monies were depleted, even attempted to get Plaintiffs to take out another Merchant Cash Advance from Defendants (round three of the conspiracy when WOODLEY communicated with Plaintiffs).  Plaintiffs were ping-ponged between Defendants.  EIN and representatives said since Plaintiffs failed to tell them during the Funding Call that they were taking the advance for any other reason, Plaintiffs are to blame and Defendants are off the hook.  HARTFORD and representatives called Plaintiffs before the Funding Call advising Plaintiffs not to mention the transition Agreement in order for the  transition to go smoothly. When Plaintiffs were strung along for 70 days and had no other option but to get third-party funding, HARTFORD and Defendants jumped on that excuse to claim they were off the hook from providing the Line of Credit.

112.   As a direct result of the above-mentioned misrepresentations, Plaintiffs have been and continue to be damaged in an amount to be proven at trial, but in no event less than $4,000,000.

113.   Further, Defendants, in engaging in the acts, omissions and/or occurrences alleged herein, acted with malice and oppression towards Plaintiffs, and in conscious disregard for their rights.  As such, Plaintiffs hereby request that they be awarded punitive and exemplary damages pursuant to California *Code of Civil Procedure* section 3294, in an amount sufficient to punish and make an example of Defendants.

114.   HARTFORD, EIN and their respective representatives represented to Plaintiffs that Defendants intended to provide Plaintiffs with a Line of Credit of $750,000.00 at an annual rate of 8.89%.  HARTFORD and its representatives along with EIN and its representatives knew that Defendants never had any intention of actually providing Plaintiffs with the $750,000.00 Line of Credit because HARTFORD and its representatives along with EIN and its representatives knew that Defendants targeted vulnerable borrowers and misrepresented the terms of loan agreements for the purpose of collecting monies from such borrowers at high interest rates and never transitioning the Bridge Loans to Term Loans. Furthermore, STEIN and WALTERS both represented themselves as managing partners of HARTFORD, knew the senior EIN individuals who could approve the Line of Credit, had knowledge of underhanded dealings at HARTFORD and EIN where they targeted vulnerable borrowers.  WOODLEY on behalf of EIN came back for round three of the conspiracy by offering (and actually fabricating a Wells Fargo

application and interview) Plaintiffs a Wells Fargo loan that would take time to come through so that in the meantime Plaintiffs would need another Merchant Cash Advance from Defendants.

115.   Had Plaintiffs known of the falsity of STEIN, WOODLEY and Defendants' representations, Plaintiffs would not have entered into an agreement with Defendants.

## **FIFTH CAUSE OF ACTION**

### **(Intentional Misrepresentation Claims Against All Defendants)**

116.   Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 115 of this Complaint.

117.   Between 2018 and the present, Defendants made intentional misrepresentations of material fact to Plaintiffs by representing that they would transition the Bridge Loan to a Term Loan after the first 30days (give Plaintiffs a $750,000.00 Line of Credit).  Defendants further made intentional misrepresentations during the 70 days that Plaintiffs paid the daily $3,600.00 to Defendants by assuring Plaintiffs that even though things were delayed, the transition to a Term Loan would happen.  Defendants intentionally encouraged Plaintiffs to use monies towards supporting and growing the concert promoting business because the Line of Credit was coming.  Defendants kept repeating that the request was submitted and in the works.  Plaintiffs were forced to make daily

payments to EIN at high interest and way beyond the agreed-upon 30days.  With such an additional financial responsibility, Plaintiffs' business sales, marketing development and reputation in the industry were damaged because Plaintiffs were no longer able to fund any project upfront as a concert promoter.  Plaintiffs were put in a corner by Defendants and had no other option but to find other funding from third-parties.  Statements made by HARTFORD and EIN representatives were all made fraudulently with intent to make Plaintiffs think it was a legitimate business transaction of transitioning a Bridge Loan to a Term Loan within 30days to obtain a Line of Credit.  Defendants' misrepresentation resulted in robbing Plaintiffs of their hard-earned monies.  As described above, Plaintiffs submitted all of their daily payments to Defendants and did not take any third-party loans for the first 30days.  Plaintiffs patiently waited for the Line of Credit that never came through.  Furthermore, Defendants intentionally misrepresented and conspired to pin Plaintiffs into a corner by making them pay the daily $3,600.00 to Defendants for 70 days at high interest.  During this time, Defendants strung Plaintiffs along for days and weeks with assurances that the Line of Credit would happen and near the tail end of those 70 days when monies were depleted, even attempted to get Plaintiffs to take out another Merchant Cash Advance from Defendants.

118.   Similarly, beginning in February 2019 and March 2019, WOODLEY, acting on behalf of EIN and NAFTALI, promised as early as March 1, 2019, that Plaintiffs

were going to be approved for a Wells Fargo loan after Plaintiffs complained to Defendants that the Term Loan never materialized.  In fact, even after Wells Fargo confirmed to WOODLEY on March 7, 2019 that it would not offer Plaintiffs a loan, WOODLEY confirmed he did not inform Plaintiffs of this material development.  Rather, on March 14, 2019, in response to an inquest by Plaintiffs as to the status of the Wells Fargo loan, WOODLEY fraudulent told Plaintiffs Wells Fargo was still considering them for a loan.

119.   These representations were in fact false.  When Defendants made these representations, they knew them to be false and intentionally made these representations to deceive and defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.  Defendants knew the above representations were false because they had no intention of giving Plaintiff a Line of Credit; they only intended to keep collecting from Plaintiffs for over the 30day period at high interest and conspired to find other ways to extract more monies from Plaintiffs.

120.   Defendants also knew the representations about the Wells Fargo loan were false.  First, WOODLEY never had a meeting with Wells Fargo on March 1, 2019. Second, WOODLEY knew any Wells Fargo loan was unlikely as he testified he has never successfully obtained a loan from Wells Fargo for any customer ever.  Third, Wells Fargo affirmatively told WOODLEY on March 7, 2019, that Wells Fargo

- 48 -

was declining to fund Plaintiffs, yet WOODLEY never informed Plaintiffs of this material development.  Fourth, WOODLEY affirmatively and falsely told Plaintiffs on March 14, 2019, that Wells Fargo was still considering them for a loan.

121.   At the time Plaintiffs acted, Plaintiffs did not know Defendants' representations were false and believed them to be true.  Plaintiffs acted in justifiable reliance upon the truth of the material representations.

122.   Because of Plaintiff's reliance upon Defendants' misrepresentations and conduct, Plaintiffs sustained damages as set forth herein and according to proof.

123.   The aforementioned conduct of Defendants was not only fraudulent, but also malicious and oppressive within the meaning of Cal. Civ Code Section 3294 in that the conduct was egregious, reckless and carried out with a willful and conscious disregard of plaintiff's rights and made with the intent to injure Plaintiffs by depriving Plaintiffs of property and other legal rights.

124.   Defendants intended to cause injury to Plaintiffs because Defendants intentionally instituted its intellectually dishonest, deceptive and misleading lending policy to disguise its real intention of scamming honest businesses and individuals of their hard-earned monies.

125.   Defendants' acts and omissions were in conscious disregard of Plaintiff's rights so as to justify an award of exemplary and punitive damages, in an amount to be determined at trial, but no less than $4,000,000.

- 49 -

50252213v.1

# SIXTH CAUSE OF ACTION

## (Negligent Misrepresentation Claims Against All Defendants)

126.   Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1 through 125 of this Complaint.

127.   Plaintiffs are informed and believe and upon that basis allege that Defendants, through their agents and employees, made representations to Plaintiffs that they knew or should have known were false, or had no reasonable grounds to believe were true, as described above.  The representations were, in fact, false.

128.   Such false representations were made in an effort to induce Plaintiffs into forgoing alternative loans and making daily payments to Defendants at high interest rates.

129.   At the time of the representations, Plaintiffs were ignorant of the falsity of such representations, and believed them to be true.  Had Plaintiffs known of the falsity of the representations, Plaintiffs would not have foregone alternative loans from other entities and relied upon the representations of Defendants that they would provide a Line of Credit (Term Loan).

130.   Similarly, beginning in February 2019 and March 2019, WOODLEY, acting on behalf of EIN and NAFTALI, promised as early as March 1, 2019, that Plaintiffs were going to be approved for a Wells Fargo loan after Plaintiffs complained to Defendants that the Term Loan never materialized.  In fact, even after Wells Fargo

- 50 -

confirmed to WOODLEY on March 7, 2019 that it would not offer Plaintiffs a loan, WOODLEY confirmed he did not inform Plaintiffs of this material development. Rather, on March 14, 2019, in response to an inquest by Plaintiffs as to the status of the Wells Fargo loan, WOODLEY fraudulent told Plaintiffs Wells Fargo was still considering them for a loan.

131.   Plaintiffs actually and reasonably relied on the representations made by Defendants and/or their agents and employees.

132.   HARTFORD and its representatives, EIN and its representatives negligently represented to Plaintiffs that Defendants would provide Plaintiffs with a Line of Credit of $750,000.00 on or around January 08, 2019.  Defendants and their representatives should have known that HARTFORD and EIN would not actually provide Plaintiffs with a $750,000.00 Line of Credit because Defendants, knew that Defendants targeted vulnerable borrowers and misrepresented the terms of loan agreements for the purpose of collecting monies from such borrowers at high interest rates and never transitioning the Bridge Loans to Term Loans. Furthermore, STEIN and WALTERS both represented themselves as managing partners of HARTFORD, knew the senior EIN individuals who could approve the transition into the Line of Credit, had knowledge of underhanded dealings at HARTFORD and EIN where they targeted vulnerable borrowers. Defendants made such negligent representations to induce Plaintiffs to act in reliance on these

representations in the manner herein alleged or with the expectation that Plaintiff would so act.

133.   Similarly, it was negligent for WOODLEY to represent to Plaintiffs that he could secure a Wells Fargo loan when he knew he had never successfully obtained a Wells Fargo loan for any customer ever.  Woodley also negligently failed to inform Plaintiffs that Wells Fargo officially declined the loan on March 7, 2019, and negligently represented to Plaintiffs on March 14, 2019, that Wells Fargo was still considering Plaintiffs for the loan.

134.   At the time Plaintiffs acted, Plaintiffs did not know Defendants' representations were false and believed them to be true. Defendants also did not provide their real names, such as Boris Shteyngart, which would have resulted in immediate google search red-flag evidence of prior financial criminal activity, and evidence of barred brokerage status.  Plaintiffs acted in justifiable reliance upon the truth of the material representations.

135.   As a direct result of the above-mentioned misrepresentations, Plaintiffs have been and continue to be damaged in an amount to be proven at trial, but in no event less than $4,000,000.

## **SEVENTH CAUSE OF ACTION**

### **(Violation of Business and Professions Code §17200 Against All Defendants)**

136.   Plaintiffs incorporate by reference, as though fully set forth, paragraphs 1

- 52 -

50252213v.1

through 135 of this Complaint.

137.   *Business and Professions Code* section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

138.   Beginning in 2018, Defendants violated and continue to violate by engaging in the practices described above that are prohibited under the UCL.

139.   By engaging in the false, deceptive, and misleading conduct alleged above, Defendants have engaged in unlawful business acts and practices in violation of the UCL by violating state and federal laws including but not limited to Business and Professions code§ 17500 et seq., which makes false and deceptive advertising unlawful.

140.   Section 17200 also prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business & Professions Code §17200.  Defendants deceived Plaintiffs and the public by providing false representations to the public that the approval for a transition was 'in the works' even after the 30 days had passed, and keeping Plaintiffs and members of the public in the dark, which resulted in Plaintiffs having to take third-party loans to save their business.  Defendants would then use Plaintiffs' last resort

50252213v.1

action of taking third-party loans (after 70 days from the start of the Bridge Loan) as the reason to deny the Line of Credit. On information and belief, this unfair business practice has deceived the public.

141. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs. Plaintiffs have suffered injury in fact and lost money as a result of Defendants' unfair conduct.

142. Additionally, pursuant to California Business & Professions Code §17203, Plaintiffs seek an order requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring Defendants to return the full amount of money improperly collected to all those who have paid them.

## **PRAYER**

WHEREFORE, Plaintiff prays for relief as follows:

1. General and consequential damages in an amount to be proven at trial but no less than $4,000,000, which are subject to trebling pursuant to 18 U.S.C. § 1964(c);

2. Special damages in an amount to be proven at trial;

3. For disgorgement of profits;

4. For pre and post judgment interest;

5. For attorney's fees pursuant to 18 U.S.C. § 1964(c);

COMPLAINT

50252213v.1

6.      For punitive damages;

7.      For costs of suit pursuant to 18 U.S.C. § 1964(c); and,

8.      For such other and further relief as the Court may deem just and proper.


Dated:  June XX, 2022

                                                    **BEZDIK KASSAB LAW GROUP**

                                                    By: _____
                                                         Sareen Bezdikian
                                                         Raffi Kassabian
                                                         Attorneys for Plaintiffs

                                                    **WHITE AND WILLIAMS LLP**


                                                    By: _/s/ *Shane R. Heskin*_____
                                                         Shane R. Heskin
                                                         Alex D. Corey

COMPLAINT

50252213v.1